Thomas F. DellaFera, Jr. (CA Bar No. 325005)
Miller DellaFera PLC
3420 Pump Road | PMB 404
Henrico, VA 23233
Telephone: (800) 401-6670
tdellafera@millerdellafera.com

John Arthur Eaves, Jr. (MS Bar No. 8843) (*pro hac vice application forthcoming*)
Christopher Brady Eaves (MS Bar No. 106474) (*pro hac vice application forthcoming*)
Sterling Overton Eaves (MS Bar No. 106642) (*pro hac vice application forthcoming*)
Eaves Law Firm, LLC
101 North State Street
Jackson, MS 39201
Telephone: (601) 355-7961
Facsimile: (601) 355-0530
johnjr@eaveslawmail.com
brady@eaveslawmail.com
sterling@eaveslawmail.com

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| KYLIN JATAVIAN HILL; JORDAN LEWIS TUCKER; MICHAEL ANTHONY HARLEY, JR.; CHARLESTON CHA'CAINE RAMBO; ANTHONY GOULD; HUNTER ECHOLS; STEPHEN CARR; BRYCE RAYMOND JON NZE; BREVIN JORDAN; HASAHN FRENCH; TATHAN FRANCIS MARTELL; TREVON BRADFORD; PALAIE GAOTEOTE; TIMMY HERNANDEZ; TYJON ALVIN LINDSEY; KELLEN GRADY; JOSHUA NOAH GRAY; VANCE JACKSON; CHAD PATRICK KELLY; JOSHUA NOAH PIERRE-LOUIS; DAMUZHEA BOLDEN; KEVIN MARFO; N'KOSI TRAVAUGHN PERRY; AL-MALIK HAUSMAN; CARSON BROWN STRONG; ZION BETHEA; MAURICE "MOE" ODOM; NATHANIEL PIERRE-LOUIS; JIMMY BELL, JR.; DEMETRIS HARRIS, II; ALEXANDER SHAW; MEKHI ELIJAH | No. _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

LAPOINTE; TRU CYMON THOMPSON;        |
ELIJAH DIJAIE BLADES; DIXIE WOOTEN, III;  |
WESTIN BRANNING GRAVES; IKEM OKEKE;  |
KAHLIL JOHNSON; ALEX PERRY; CAMERON   |
ECHOLS-LUPER; MONTELL COZART;         |
JUSTIN RAGIN; RASHARD MARKESE DAVIS;  |
RASHAD WILLIAMS; JAYDEN CURRY;        |
STANLEY O'NEAL DYE, JR.; AMERI JAMON  |
CATCHINGS; RON TIAVAASUE; GREGORY     |
MICHAEL FRANCIS; HUNTER EVERETT;      |
DONELL CHRISTOPHER PASTER, SR.;       |
TEVIN BROYLES; VINCENT PAUL SAMPSON;  |
JAWON JOHNSON; MARCUS LYNARD          |
WALLACE; MICAH JETT PARTEN;           |
AMARVEER SINGH; ISHMAEL HYMAN;        |
HANNAH CROFUT; CARTER CUNNINGHAM;     |
JACOB COX; EDGAR BURROLA; TREVON      |
THOMAS SIDNEY; JAYLON ROBINSON;       |
LAMONT JAMES EVANS, IV; MALIQUE       |
KENNETH JACOBS; and ERICK NEAL        |
                                      |
                 Plaintiffs,          |
                                      |
v.                                    |
                                      |
NATIONAL COLLEGIATE ATHLETIC          |
ASSOCIATION; PAC-12 CONFERENCE;       |
THE BIG TEN CONFERENCE, INC.;         |
THE BIG 12 CONFERENCE, INC.;          |
SOUTHEASTERN CONFERENCE; and          |
ATLANTIC COAST CONFERENCE,            |
                                      |
                 Defendants.          |

COMPLAINT

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  JURISDICTION AND VENUE ............................................................................5

III.  PARTIES .................................................................................................................6

    A.  Plaintiffs ......................................................................................................6

        1.  Kylin Jatavian Hill ...........................................................................6

        2.  Jordan Lewis Tucker .........................................................................9

        3.  Michael Anthony Harley, Jr. .............................................................9

        4.  Charleston Cha'caine Rambo ..........................................................10

        5.  Anthony Gould ................................................................................10

        6.  Hunter Echols ..................................................................................11

        7.  Stephen Carr ...................................................................................11

        8.  Bryce Raymond Jon Nze .................................................................12

        9.  Brevin Jordan ..................................................................................12

        10.  Hasahn French .................................................................................13

        11.  Tathan Francis Martell .....................................................................13

        12.  Trevon Bradford ..............................................................................14

        13.  Palaie Gaoteote ...............................................................................15

        14.  Timmy Hernandez ...........................................................................15

        15.  Tyjon Alvin Lindsey ........................................................................16

        16.  Kellen Grady ...................................................................................16

        17.  Joshua Noah Gray ...........................................................................17

COMPLAINT

i

18.    Vance Jackson ................................................................................................17

19.    Chad Patrick Kelly .........................................................................................18

20.    Joshua Noah Pierre-Louis .............................................................................18

21.    Damuzhea Bolden ..........................................................................................19

22.    Kevin Marfo ...................................................................................................20

23.    N'kosi Travaughn Perry .................................................................................20

24.    Al-Malik Hausman .........................................................................................21

25.    Carson Brown Strong .....................................................................................21

26.    Zion Bethea ....................................................................................................22

27.    Maurice "Moe" Odom .....................................................................................22

28.    Nathaniel Pierre-Louis ...................................................................................23

29.    Jimmy Bell, Jr. ...............................................................................................23

30.    Demetris Harris, II .........................................................................................24

31.    Alexander Shaw ..............................................................................................25

32.    Mekhi Elijah LaPointe ...................................................................................25

33.    Tru Cymon Thompson ....................................................................................26

34.    Elijah Dijaie Blades .......................................................................................26

35.    Dixie Wooten, III ...........................................................................................27

36.    Westin Branning Graves .................................................................................27

37.    Ikem Okeke .....................................................................................................28

38.    Kahlil Johnson ................................................................................................28

39.    Alex Perry .......................................................................................................29

40.    Cameron Echols-Luper ...................................................................................30

COMPLAINT

41.   Montell Cozart ........................................................................................30

42.   Justin Ragin............................................................................................31

43.   Rashard Markese Davis ..........................................................................31

44.   Rashad Williams .....................................................................................32

45.   Jayden Curry ...........................................................................................32

46.   Stanley O'Neal Dye, Jr. ..........................................................................33

47.   Ameri Jamon Catchings...........................................................................33

48.   Ron Tiavaasue .........................................................................................34

49.   Gregory Michael Francis .........................................................................35

50.   Hunter Everett .........................................................................................35

51.   Donell Christopher Paster, Sr. .................................................................36

52.   Tevin Broyles ..........................................................................................36

53.   Vincent Paul Sampson .............................................................................37

54.   Jawon Johnson ........................................................................................37

55.   Marcus Lynard Wallace ...........................................................................38

56.   Micah Jett Parten.....................................................................................38

57.   Amarveer Singh .......................................................................................39

58.   Ishmael Hyman ........................................................................................39

59.   Hannah Crofut ..........................................................................................40

60.   Carter Cunningham...................................................................................41

61.   Jacob Cox.................................................................................................41

62.   Edgar Burrola ..........................................................................................42

63.   Trevon Thomas Sidney ............................................................................42

64.  Jaylon Robinson ................................................................................43

65.  Lamont James Evans, IV .....................................................................43

66.  Malique Kenneth Jacobs .....................................................................44

67.  Erick Neal .........................................................................................44

B.  Defendants ....................................................................................................45

C.  Co-Conspirators .............................................................................................50

IV.  THE ILLEGAL AGREEMENTS TO RESTRAIN COMPETITION ..............................51

A.  NCAA NIL-Specific Compensation Rules ........................................................52

B.  NCAA Compensation Rules ............................................................................55

C.  NCAA Scholarship Limits ...............................................................................57

D.  Conference Rules ...........................................................................................57

V.  RELEVANT MARKETS ........................................................................................59

VI.  FACTUAL ALLEGATIONS ...................................................................................63

A.  An Overview of the NCAA .............................................................................63

1.  History and Purpose ..........................................................................63

2.  Governance Structure.........................................................................65

3.  Bylaws and Enforcement ....................................................................67

B.  The Commercial Nature of Division I Sports ....................................................70

C.  The NCAA's History of Antitrust Violations ....................................................84

D.  The Supreme Court's *Alston* Decision, This Court's Motion to Dismiss
and Class Certification Orders in *In re Collegiate Athletics NIL
Litigation*, 4:20-cv-03919-CW, and State Laws Result in the NCAA and
Conference Defendants' Interim Suspension of Many of the NIL Restraints ........ 88

E.  The Challenged Restraints are not Necessary to Serve any Purported
Procompetitive Purpose ..................................................................................90

COMPLAINT

1.      Any Procompetitive Justification Based on Consumer Demand for College Sports is Legally Irrelevant Because It Concerns an Entirely Different Market ..................................................................90

2.      Even if Effects on Consumer Demand in Output Markets Were Relevant, the Restraints at Issue are not Necessary to Preserve Consumer Demand for College Sports ......................................................92

3.      Education and Compensation are not Mutually Exclusive .......................98

4.      NCAA Compensation Restrictions do not Prevent Exploitation – They are Exploitative ................................................................. 101

5.      Female Athletes Have Been Especially Adversely Impacted by NIL Restrictions and Will Profit in the New NIL Era .....................................102

6.      The Challenged Restraints Cannot be Justified by the Purported Need to Cross-Subsidize Non-Revenue Sports........................................103

F.      There is a Significant Support for Allowing Athletes to Receive NIL Compensation and Plaintiffs Have Been Damaged by Defendants' Anticompetitive Restraints........................................................................104

1.      The NCAA and Its Members Have Made Numerous Statements Supporting NIL Compensation, in a Stark Departure From Previous Positions Taken Before Federal Courts.....................................105

2.      Statements From the Knight Commission on Intercollegiate Athletics ..................................................................................................115

3.      The NCAA Has Made Exceptions for Several Years That Have Allowed Some Athletes to Profit From the Value of Their NILs.............117

4.      NCAA Division I Athletes Have Sought the Ability to Compete Without Anticompetitive Restraint in the Labor Markets, and Would Receive Such Compensation Absent Defendants' Unlawful Restraints ................................................................................118

5.      Corporate Sponsors Value Student-Athlete NILs and Would Compete for the Rights to Use Plaintiffs' NILs Absent Defendants' Anticompetitive Restraints......................................................................124

6.      When The NAIA Withdrew NIL Strictions, Athletes Prospered Financially and Academically................................................................126

VII.    ANTITRUST ALLEGATIONS .........................................................................127

COMPLAINT

VIII.    CAUSES OF ACTION ..................................................................................................128

IX.    REQUEST FOR RELIEF ............................................................................................132

X.    JURY DEMAND .........................................................................................................133

Plaintiffs, here are current and former athletes who formerly played collegiate sports in the National Collegiate Athletics Association, and exercised their right to "opt-out" of the class of individuals represented in the related case *In re Collegiate Athlete NIL Litigation, et al.*, 4:20-cv-03919-CW pending before this court.  For their Complaint against Defendants National Collegiate Athletic Association ("NCAA"), Pac-12 Conference, Big Ten Conference ("Big Ten"), Big Twelve Conference ("Big 12"), Southeastern Conference ("SEC"), and Atlantic Coast Conference ("ACC"), Plaintiffs individually allege as follows:

## I.      INTRODUCTION

1.      The hard work of college athletes has translated into billion-dollar television deals, multi-million-dollar coaching salaries, extravagant facilities, and lucrative commercial licensing and sponsorship agreements that greatly benefit the NCAA and its member conferences and schools as well as NCAA executives, conference administrators, and college coaches. For those in positions of power at the NCAA or a Division I conference or school, the college sports industry has become immensely profitable. Indeed, each of the Power Five (or "P5") Conference commissioners are making more than $2.5 million annually, with the highest paid—former Big Ten commissioner, Jim Delany—reportedly earning $10.3 million in his final year at the conference.[1] The salaries for the top head coaches in FBS football and Division I men's basketball exceed $11 million per year,[2] and compensation packages for the top head coaches in Division I women's basketball exceed $3 million per year.[3] This compensation continues to rise, with salaries for coaches in the Power Five Conferences increasing in 2023 by a "whopping

---

[1] Zach Barnett, *Here's how much each Power 5 conference raked in last year*, Footballscoop (July 10, 2020), https://footballscoop.com/news/heres-how-much-each-power-5-conference-raked-in-last-year.
[2] Amanda Christovich and Doug Greenberg, *Who Is Highest-Paid Coach in College Football?*, Front Office Sports (October 4, 2023), https://frontofficesports.com/who-are-highest-paid-college-football-coaches/.
[3] Greg Lee and Amanda Christovich, *Who Is The Highest-Paid Women's College Basketball Coach?*, (November 6, 2023), https://frontofficesports.com/who-is-the-highest-paid-womens- college-basketball-coach/.

14.3% . . . from 2022."[4] The head football or basketball coach is the highest-paid public employee in states throughout the country, dwarfing the salaries of college presidents and all other state employees.[5] The profligate spending on coaches is exemplified by the fact that Texas A&M University went so far as to—when firing its head football coach, Jimbo Fisher, in November 2023—agree to pay Fisher more than *$76 million* to buy out the remainder of his contract.[6] In other words, they are paying him $76 million to *not* coach.

2.      This spending on coaches and athletic directors and conference commissioners has no end. A September 2023 report from the Knight Commission on Intercollegiate Athletics contains a financial analysis from CliftonLarsonAllen (CLA), which has projected that within ten years, P5 public institutions' spending on football coaches ($1.363 billion) would virtually equal the spending on athletic scholarships and medical expenses for *all athletes* across *all sports* at those same schools ($1.372 billion).[7]

3.      Although student-athletes provide their labor to fuel the industry, and they are the individuals whose athleticism, hard work, and character make college sports so popular, these same young men and women have received only a tiny fraction of the revenues they generate, while facing severe penalties for failing to abide by a labyrinth of rules that restrict meaningful financial participation in the Division I football/basketball financial juggernaut and restrict for all athletes, in whole or now in part, the compensation they may receive from their schools,

---

[4] Tom Schad and Steve Berkowitz, *Why College Football is King in Coaching Pay–Even at Blue Blood Basketball Schools*, USA Today (October 3, 2023), https://www.usatoday.com/story/sports/ncaaf/2023/ 10/03/college-football-coach-pay-is-soaring-even-at-basketball-schools/70924373007/.
[5] Charlotte Gibson, *Who's Highest-Paid in Your State?*, ESPN (last accessed on November 30, 2023), https://www.espn.com/espn/feature/story/_/id/28261213/dabo-swinney-ed-orgeron-highest-paid-state-employee.
[6] Pete Thamel, *Jimbo Fisher Fired by Texas A&M, to Receive Record Buyout*, ESPN (Nov. 12, 2023), https://www.espn.com/college-football/story/_/id/38880082/jimbo-fisher-expected-fired-texas-sources-confirm.
[7] Financial Projections Through 2032 For Division I FBS Programs, https://www.knightcommission.org/wp-content/uploads/2023/09/cla_financial_projections_report_2023.pdf, at p. 2.

conferences, or third parties for their athletic services and the use of their "NIL."[8]

4.      Through its Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including the conduct of schools, conferences, third-party business partners, and student-athletes. Among the many areas that the NCAA regulates are the compensation and benefits that athletes may receive while participating in college sports. At various points in time, the NCAA has claimed that these rules are necessary to promote the NCAA's principle of "amateurism" and to preserve "a clear line of demarcation between intercollegiate athletics and professional sports"—a demarcation that applies only to athletes and not to coaches or administrators or schools or even to non-athlete college students.

5.      In addition, in the name of "cost containment," the NCAA also regulates the number of players in a sport who may receive athletic scholarships (in so-called "counter sports"), or the overall scholarship amount available in a sport (in so-called "equivalency sports"). Therefore, the NCAA rules deny scholarships to Division I athletes who would otherwise be offered scholarships but for the restraints of trade imposed by the scholarship restrictions. Had the NCAA and Division I members not agreed to impose the scholarship restraints, free and open competition to provide additional scholarships would have occurred.

6.      The NCAA proclaims that its overarching purpose is "to create a safe, and equitable environment that allows student-athletes to reach their full potential in academics, athletics and life," and that it is "united around one goal: creating opportunities for college athletes." The NCAA further purports to protect college athletes from commercial exploitation, yet it has conspired to create an anticompetitive market where student-athletes have been unable to benefit from the same opportunities that are available to their fellow classmates and powerless

---

[8] "NIL" refers to name, image and likeness.

to realize the commercial value available for their athletic services and NILs. These young men and women—often from socio-economically disadvantaged backgrounds—are deprived of the economic and other benefits that the market would pay.

7.     The NCAA and its members have committed violations of the federal antitrust laws and common law by engaging in an overarching conspiracy to: (a) fix the amount that student-athletes may be paid for the licensing, use, and sale of their names, images, and likenesses at zero; (b) foreclose student-athletes from the market for licensing, use, and sale of their names, images, and likenesses entirely; (c) fix the amount that student-athletes may be paid for their athletic services at no more than the value of a scholarship; and (d) limit the quantity of athletic scholarships available in the market for student-athletes' labor services. In addition to violating the antitrust laws, Defendants have also unjustly enriched themselves and their for-profit business partners while causing extensive damage to the student-athletes.

8.     Accordingly, Plaintiffs request an injunction permanently restraining Defendants from enforcing all of their unlawful and anticompetitive rules that restrict the compensation available to Plaintiffs from conferences and schools, and that limit the number of athletic scholarships available to Plaintiffs.

9.     Plaintiffs seek the compensation that Plaintiffs would have received from their schools or conferences absent Defendants' unlawful restraints on pay-for-play compensation, a share of game telecast revenue and compensation that these Plaintiffs would have received from their schools or conferences for their Broadcast NILs ("BNIL"), and the compensation that these Plaintiffs would have received for their NILs from third parties for use in video games and in individual NIL agreements, including marketing, sponsorship, social media, branding, promotional and other NIL deals.

## II.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. 28 U.S.C. §§ 15(a) and 26.

13.     Venue is proper because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. §§ 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.

14.     This Court has personal jurisdiction over Defendants because, *inter alia*, they: (a) transacted business throughout the United States, including in this District; (b) participated in organizing intercollegiate athletic contests, and/or licensing or selling merchandise throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Numerous NCAA Division I universities or colleges also are found within this District, e.g., the University of California–Berkeley ("Cal"), Stanford University, Santa Clara University, the University of San Francisco ("USF"), and St. Mary's College.

15.     **Divisional Assignment.** This action arises in Alameda County or San Francisco County because that is where a substantial part of the events that give rise to the claim occurred. Within Alameda County is found the University of California Berkeley ("Cal") campus. Cal, for example, fields 31 Division I intercollegiate sports teams, 24 of which compete in the Pac-12. Current and former Cal athletes have been subjected to the violations described herein. Pursuant to Civil Local Rule 3-2(d), this action should be assigned to the San Francisco Division or to the

Oakland Division.

### III.    PARTIES

**A.    Plaintiffs**

    **1.    Kylin Jatavian Hill**



16.    Kylin Jatavian Hill, an individual, is a resident of 144 Roanoke Circle, Columbus, MS 39705. From the years of 2017 to 2020 he was a Division I athlete who played Football at Mississippi State University. However, until July 1, 2021, Kylin Hill failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

17.    Mr. Hill has been a valuable asset to the NCAA and the Southeastern Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Kylin Hill would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

18.    Mr. Hill was a four-star running back recruit ranked sixth by 247 sports at his position in the 2017 recruiting class. His numerous accolades include preseason candidate for the Doak Walker Award, given to the nation's top running back, named to the Maxwell Award

preseason watch list, which is presented annually to the most outstanding player in college football, tabbed preseason first-team All-SEC  by the conference, 2019 Conerly Trophy (best football student-athlete in Mississippi), 2019 First-Team All-SEC (Associated Press), 2019 Second-Team All-SEC (Coaches), 2019 PFF National Team of the Week (Southern Miss), 2019 PFF National Team of the Week (at Arkansas), 2019 SEC Offensive Player of the Week (at Arkansas), 2019 SEC Fall Academic Honor Roll, 2018 PFF National Team of the Week (at Kansas State), and 2018 SEC Offensive Player of the Week (at Kansas State). A dynamic and elusive running back known for his ability to evade defenders and accelerate into open space he earned the starting role during fall camp in 2018 and started 25 of his final 27 games. Hill ranked among the top running backs in the SEC in yards after contact. He demonstrated exceptional ball security, recording just one fumble in 481 career touches (Texas A&M, 10/28/17), and maintained an active streak of 448 consecutive touches without a turnover. His last lost fumble occurred during his sophomore year of high school, highlighting his consistency and reliability.

19.     As the highest-rated running back signee for Mississippi State since Jerious Norwood (2002), he solidified himself as one of the program's all-time greats. He is ranked number eight on the school's career rushing yards list (2,535), trailing LaDarius Perkins (2,554; 2010-13) for seventh place. He also sits just outside the top 10 in career rushing attempts and career rushing touchdowns and logged 11 career 100-yard rushing games, ranking sixth in Mississippi State history.

20.     Throughout his career at Mississippi State University (MSU), he became a leader on and off the field, particularly known for his stance on social justice issues. Hill's advocacy in 2020 extended his influence beyond athletics, which should have resulted in endorsement deals and partnerships. Hill's impact transcended sports when he used his platform to advocate for social change, specifically in the removal of the Confederate emblem from the Mississippi state

flag. His national TV appearances and *Sports Illustrated* cover would have made him a top marketable athlete. Had Hill played in an NIL era, his presence on the Sports Illustrated cover, combined with his leadership in the social justice movement, could have led to similar financial opportunities, allowing him to partner with brands that champion activism and social change. Olivia Dunne, a gymnast at LSU, exists in a market where she has been able to fully capitalize on her name, image, and likeness (NIL) under new NCAA policies, securing endorsement deals with brands like Reebok and American Eagle. Dunne, who appeared in the 2023 and 2024 Sports Illustrated Swimsuit Issues, leveraged her visibility into an estimated net worth of $9.5 million.

21.    Mr. Hill's bold stance gained national media attention and played a pivotal role in Mississippi's decision to change the state flag—a moment of historical significance. Had he been allowed to monetize his name, image, and likeness, Hill would have had opportunities like Colin Kaepernick and others who leveraged their platform for social justice. Major brands that support activism, such as Nike and Adidas, have demonstrated a willingness to partner with athletes who stand for change, and Hill's leadership in this movement would have positioned him as a prime candidate for lucrative endorsement deals.  However, due to NCAA restrictions, he was prevented from capitalizing on this opportunity.

22.    These restrictions not only denied Hill fair compensation for his athletic achievements but also prevented him from capitalizing on his cultural and social influence. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation—and the Conferences' associated rules, see ¶ *infra*—Kylin Hill would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 2.    Jordan Lewis Tucker

23.    Jordan Lewis Tucker, an individual, is a resident of 517 Taylor Ave., Bronx, NY 10403. From the years of 2017 to 2020 he was a Division I athlete and played Basketball at Duke University and Butler University. However, until July 1, 2021, Jordan Lewis Tucker failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

24.    Jordan Lewis Tucker has been a valuable asset to the NCAA and the Atlantic Coast Conference (Duke) and Big East Conference (Butler). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Jordan Lewis Tucker would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 3.    Michael Anthony Harley, Jr.

25.    Michael Anthony Harley, Jr. is a resident of 10191 NW First Manor, Coral Springs, FL 33071. From the years of 2016 to 2021 he was a Division I athlete and played Football at the University of Miami. However, until July 1, 2021, Michael Anthony Harley, Jr. failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

26.    Michael Anthony Harley, Jr. has been a valuable asset to the NCAA and the Atlantic Coast Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Michael Anthony Harley, Jr. would

have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 4.    Charleston Cha'Caine Rambo

27.    Charleston Cha'Caine Rambo is a resident of 4430 Kelton Dr., Dallas, TX 75209. From the years of 2018 to 2021 he was a Division I athlete and played Football at the University of Oklahoma and the University of Miami. However, until July 1, 2021, Charleston Cha'Caine Rambo failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

28.    Charleston Cha'Caine Rambo has been a valuable asset to the NCAA and the Big 12 Conference (Oklahoma) and the Atlantic Coast Conference (Miami). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Charleston Cha'Caine Rambo would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 5.    Anthony Gould

29.    Anthony Gould is a resident of 1104 NW 94th Terrace, Kansas City, MO 64155. From the years of 2019 to 2023 he was a Division I athlete and played Football at Oregon State University. However, until July 1, 2021, Anthony Gould failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

30.    Anthony Gould has been a valuable asset to the NCAA and the Pac-12 Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation

or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Anthony Gould would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 6. Hunter Echols

31.     Hunter Echols is a resident of 11921 Menlo Ave, Los Angeles, CA 90044. From the years of 2017 to 2022 he was a Division I athlete and played Football at USC and Arizona. However, until July 1, 2021, Hunter Echols failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

32.     Hunter Echols has been a valuable asset to the NCAA and the Pac-12 Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Hunter Echols would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 7. Stephen Carr

33.     Stephen Carr is a resident of 17131 Crabapple Lane, Fontana, CA 92337. From the years of 2017-2021 he was a Division I athlete and played Football at USC and Indiana. However, until July 1, 2021, Stephen Carr failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

34.    Stephen Carr has been a valuable asset to the NCAA and the Pac-12 Conference (USC) and Big Ten Conference (Indiana). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Stephen Carr would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 8.    Bryce Raymond Jon Nze

35.    Bryce Raymond Jon Nze is a resident of 4236 N 104th St. Apt #1, Milwaukee, WI 53322. From the years of 2016 to 2022 he was a Division I athlete and played Basketball at Butler University and Milwaukee. However, until July 1, 2021, Bryce Raymond Jon Nze failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

36.    Bryce Raymond Jon Nze has been a valuable asset to the NCAA and the Big East Conference (Butler) and Horizon League (Milwaukee). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Bryce Raymond Jon Nze would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 9.    Brevin Jordan

37.    Brevin Jordan is a resident of 10978 Shallow Water Ct., Henderson, NV 89052. From the years of 2018 to 2020 he was a Division I athlete and played Football at the University of Miami. However, until July 1, 2021, Brevin Jordan failed to derive any personal profit from

his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

38. Brevin Jordan has been a valuable asset to the NCAA and the Atlantic Coast Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Brevin Jordan would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 10. Hasahn French

39. Hasahn French is a resident of 258 South Harrison Street Apt 407, East Orange, NJ 07018. From the years of 2017 to 2021 he was a Division I athlete and played Basketball at Saint Louis University. However, until July 1, 2021, Hasahn French failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

40. Hasahn French has been a valuable asset to the NCAA and the Atlantic 10 Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Hasahn French would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 11. Tathan Francis Martell

41. Tathan Francis Martell is a resident of 188 Petaluma Valley Drive, Las Vegas,

NV 89138. From the years of 2017 to 2021 he was a Division I athlete and played Football at

Ohio State, University of Miami, and UNLV. However, until July 1, 2021, Tathan Francis

Martell failed to derive any personal profit from his social media activity or any other use of his

name, image, or likeness because NCAA rules prohibited him from doing so.

42.     Tathan Francis Martell has been a valuable asset to the NCAA and the Big Ten

Conference (Ohio State), Atlantic Coast Conference (Miami), and Mountain West Conference

(UNLV). But the NCAA's pay-for-play rules prohibited him from earning any compensation or

benefits for his athletic services, aside from the limited (and fixed) categories of compensation

that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive

rules prohibiting pay-for-play compensation, Tathan Francis Martell would have received

substantial additional compensation in the relevant labor market for his services. He was harmed

by these anticompetitive rules.

### 12.     Trevon Bradford

43.     Trevon Bradford is a resident of 3083 Main St. Apt. 315, Philomath, OR 97370.

From the years of 2016 to 2021 he was a Division I athlete and played Football at Oregon State

University. However, until July 1, 2021, Trevon Bradford failed to derive any personal profit

from his social media activity or any other use of his name, image, or likeness because NCAA

rules prohibited him from doing so.

44.     Trevon Bradford has been a valuable asset to the NCAA and the Pac-12

Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation

or benefits for his athletic services, aside from the limited (and fixed) categories of compensation

that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive

rules prohibiting pay-for-play compensation, Trevon Bradford would have received substantial

additional compensation in the relevant labor market for his services. He was harmed by these

anticompetitive rules.

### 13.    Palaie Gaoteote

45.    Palaie Gaoteote is a resident of 3317 Bristle Cone Ave, Las Vegas, NV 89146. From the years of 2018 to 2022 he was a Division I athlete an played Football at USC and Ohio State. However, until July 1, 2021, Palaie Gaoteote failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

46.    Palaie Gaoteote has been a valuable asset to the NCAA and the Pac-12 Conference (USC) and Big Ten Conference (Ohio State). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Palaie Gaoteote would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 14.    Timmy Hernandez

47.    Timmy Hernandez is a resident of 1721 West Nighthawk Way, Phoenix, AZ 85045. From the years of 2016-2018 he was a Division I athlete and played Football at Oregon State University. However, until July 1, 2021, Timmy Hernandez failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

48.    Timmy Hernandez has been a valuable asset to the NCAA and the Pac-12 Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive

rules prohibiting pay-for-play compensation, Timmy Hernandez would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 15.    Tyjon Alvin Lindsey

49.    Tyjon Alvin Lindsey is a resident of 1746 Littlecrow Ave., Las Vegas, NV 89123. From the years of 2017 to 2018 he was a Division I athlete and played Football at the University of Nebraska and Oregon State University. However, until July 1, 2021, Tyjon Alvin Lindsey failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

50.    Tyjon Alvin Lindsey has been a valuable asset to the NCAA and the Big Ten Conference (Nebraska) and Pac-12 Conference (Oregon State). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Tyjon Alvin Lindsey would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 16.    Kellen Grady

51.    Kellen Grady is a resident of 129 Beech Street, Boston, MA 02131. From the years of 2017 to 2022 he was a Division I athlete and played Basketball at Davidson and the University of Kentucky. However, until July 1, 2021, Kellen Grady failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

52.    Kellen Grady has been a valuable asset to the NCAA and the Atlantic 10 Conference (Davidson) and Southeastern Conference (Kentucky). But the NCAA's pay-for-play

rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Kellen Grady would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 17.    Joshua Noah Gray

53.    Joshua Noah Gray is a resident of 520 Crown St. Apt A6, Brooklyn, NY 11213. From the years of 2020 to 2024 he was a Division I athlete and played Basketball at LSU, South Carolina, and Missouri. However, until July 1, 2021, Joshua Noah Gray failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

54.    Joshua Noah Gray has been a valuable asset to the NCAA and the Southeastern Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Joshua Noah Gray would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 18.    Vance Jackson

55.    Vance Jackson is a resident of 1935 N Marengo Ave., Pasadena, CA 91103. From the years of 2016 to 2022 he was a Division I athlete and played Basketball at UCONN, New Mexico, Arkansas, and East Carolina. However, until July 1, 2021, Vance Jackson failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

56.    Vance Jackson has been a valuable asset to the NCAA and the American Athletic Conference (UCONN, East Carolina), Mountain West Conference (New Mexico), and Southeastern Conference (Arkansas). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Vance Jackson would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 19.    Chad Patrick Kelly

57.    Chad Patrick Kelly is a resident of 3110-33 Shore Breeze Drive, Etobicoke, Ontario, Canada M8V 0G1. From the years 2015-2016 he was a Division I athlete and played Football at Ole Miss. However, until July 1, 2021, Chad Patrick Kelly failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

58.    Chad Patrick Kelly has been a valuable asset to the NCAA and the Southeastern Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Chad Patrick Kelly would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 20.    Joshua Noah Pierre-Louis

59.    Joshua Noah Pierre-Louis is a resident of 7 Dickinson Ln., Livingston, NJ 07039. From the years of 2019 to 2024 he played Football at Temple and UC Santa Barbara and was a

Division I athlete. However, until July 1, 2021, Joshua Noah Pierre-Louis failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

60.    Joshua Noah Pierre-Louis has been a valuable asset to the NCAA and the American Athletic Conference (Temple) and Big West Conference (UC Santa Barbara). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Joshua Noah Pierre-Louis would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 21.    Damuzhea Bolden

61.    Damuzhea Bolden is a resident of 537 Front Range Lane, North Las Vegas, NV 89084. From the years of 2017 to 2021 he was a Division I athlete and played Football at USC and the University of Miami. However, until July 1, 2021, Damuzhea Bolden failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

62.    Damuzhea Bolden has been a valuable asset to the NCAA and the Pac-12 Conference (USC) and Atlantic Coast Conference (Miami). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Damuzhea Bolden would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 22.    Kevin Marfo

63.    Kevin Marfo is a resident of 75B Carr Ave., Keansburg, NJ 07734. From the years of 2016 to 2022 he was a Division I athlete and played Basketball at George Washington University, Quinnipiac, and Texas A&M. However, until July 1, 2021, Kevin Marfo failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

64.    Kevin Marfo has been a valuable asset to the NCAA and the Atlantic 10 Conference (George Washington), Metro Atlantic Athletic Conference (Quinnipiac), and Southeastern Conference (Texas A&M). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Kevin Marfo would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 23.    N'Kosi Travaughn Perry

65.    N'Kosi Travaughn Perry is a resident of 1432 Northwest 16th Ct., Ocala, FL 34475. From the years of 2017 to 2022 he played Football at the University of Miami and FAU and was a Division I athlete. However, until July 1, 2021, N'Kosi Travaughn Perry failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

66.    N'Kosi Travaughn Perry has been a valuable asset to the NCAA and the Atlantic Coast Conference (Miami) and Conference USA (FAU). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic

scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, N'Kosi Travaughn Perry would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 24.    Al-Malik Hausman

67.    Al-Malik Hausman is a resident of 2978 Jacaranda Dr., Las Vegas, NV 89117. From the years of 2017 to 2022 he was a Division I athlete and played Football at Arizona and Hawaii. However, until July 1, 2021, Al-Malik Hausman failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

68.    Al-Malik Hausman has been a valuable asset to the NCAA and the Pac-12 Conference (Arizona) and Mountain West Conference (Hawaii). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Al-Malik Hausman would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 25.    Carson Brown Strong

69.    Carson Brown Strong is a resident of 2025 Long Meadow Drive, Reno, NV 89521. From the years of 2018-2021 he was a Division I athlete and played Football at Nevada. However, until July 1, 2021, Carson Brown Strong failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

70.    Carson Brown Strong has been a valuable asset to the NCAA and the Mountain West Conference. But the NCAA's pay-for-play rules prohibited him from earning any

compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Carson Brown Strong would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 26. Zion Bethea

71.    Zion Bethea is a resident of 7 Dickinson Ln., Livingston, NJ 07039. From the years of 2020 to 2024 he played Basketball at Hofstra, St. Francis Brooklyn, and Delaware and was a Division I athlete. However, until July 1, 2021, Zion Bethea failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

72.    Zion Bethea has been a valuable asset to the NCAA and the Colonial Athletic Association (Hofstra), Northeast Conference (St. Francis Brooklyn), and Coastal Athletic Association (Delaware). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Zion Bethea would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 27. Maurice "Moe" Odom

73.    Maurice "Moe" Odom is a resident of 7 Dickinson Ln., Livingston, NJ 07039. From the years of 2022 to 2024 he played Basketball at Pacific and Pepperdine and was a Division I athlete. However, until July 1, 2021, Maurice "Moe" Odom failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness

because NCAA rules prohibited him from doing so.

74.    Maurice "Moe" Odom has been a valuable asset to the NCAA and the West Coast Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Maurice "Moe" Odom would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 28.    Nathaniel Pierre-Louis

75.    Nathaniel Pierre-Louis is a resident of 7 Dickinson Ln., Livingston, NJ 07039. From the years of 2017 to 2020 he was a Division I athlete and played Football at Temple. However, until July 1, 2021, Nathaniel Pierre-Louis failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

76.    Nathaniel Pierre-Louis has been a valuable asset to the NCAA and the American Athletic Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Nathaniel Pierre-Louis would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 29.    Jimmy Bell, Jr.

77.    Jimmy Bell, Jr. is a resident of 45 Spectra Dr., Starkville, MS 39759. From the years of 2020 to 2023 he played Basketball at Saint Louis University, West Virginia University,

and Mississippi State University and was a Division I athlete. However, until July 1, 2021, Jimmy Bell, Jr. failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

78.    Jimmy Bell, Jr. has been a valuable asset to the NCAA and the Atlantic 10 Conference (Saint Louis), Big 12 Conference (West Virginia), and Southeastern Conference (Mississippi State). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Jimmy Bell, Jr. would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 30.    Demetris Harris, II

79.    Demetris Harris, II is a resident of 5504 Lofty Pines Circle South, Jacksonville, FL 32210. From the years of 2017 to 2021 he was a Division I athlete and played Football at the University of South Florida. However, until July 1, 2021, Demetris Harris, II failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

80.    Demetris Harris, II has been a valuable asset to the NCAA and the American Athletic Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Demetris Harris, II would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 31.    Alexander Shaw

81.    Alexander Shaw is a resident of 6464 San Felipe Street #4117, Houston, TX 77057. From the years of 2017 to 2023 he played Football at Jackson State University and Mississippi State University and was a Division I athlete. However, until July 1, 2021, Alexander Shaw failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

82.    Alexander Shaw has been a valuable asset to the NCAA and the Southwestern Athletic Conference (Jackson State) and Southeastern Conference (Mississippi State). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Alexander Shaw would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 32.    Mekhi Elijah LaPointe

83.    Mekhi Elijah LaPointe is a resident of 2223 Tapestry Park Dr., Land O Lakes, FL 34639. From the years of 2018 to 2022 he played Football at the University of South Florida and was a Division I athlete. However, until July 1, 2021, Mekhi Elijah LaPointe failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

84.    Mekhi Elijah LaPointe has been a valuable asset to the NCAA and the American Athletic Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's

anticompetitive rules prohibiting pay-for-play compensation, Mekhi Elijah LaPointe would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 33.   Tru Cymon Thompson

85.   Tru Cymon Thompson is a resident of 4031 Lake Carlton Rd S., Loganville, GA 30052. From the years of 2019 to 2022 he played Football at Florida State University and Jackson State University and was a Division I athlete. However, until July 1, 2021, Tru Cymon Thompson failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

86.   Tru Cymon Thompson has been a valuable asset to the NCAA and the Atlantic Coast Conference (Florida State) and Southwestern Athletic Conference (Jackson State). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Tru Cymon Thompson would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 34.   Elijah Dijaie Blades

87.   Elijah Dijaie Blades is a resident of 485 Toolen Place, Pasadena, CA 91103. From the years of 2019 to 2022 he was a Division I athlete and played Football at Texas A&M, Florida, and Buffalo. However, until July 1, 2021, Elijah Dijaie Blades failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

88.   Elijah Dijaie Blades has been a valuable asset to the NCAA and the Southeastern

Conference (Texas A&M, Florida) and Mid-American Conference (Buffalo). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Elijah Dijaie Blades would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 35.    Dixie Wooten, III

89.    Dixie Wooten, III is a resident of 12055 Sabo Rd., Houston, TX 77089. From the years of 2016 to 2019 he was a Division I athlete and played Football at the University of Houston. However, until July 1, 2021, Dixie Wooten, III failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

90.    Dixie Wooten, III has been a valuable asset to the NCAA and the American Athletic Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Dixie Wooten, III would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 36.    Westin Branning Graves

91.    Westin Branning Graves is a resident of 4428 Audubon Park Drive, Jackson, MS 39211. From the years of 2016 to 2017 he was a Division I athlete and played Football at Mississippi State University. However, until July 1, 2021, Westin Branning Graves failed to

derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

92.    Westin Branning Graves has been a valuable asset to the NCAA and the Southeastern Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Westin Branning Graves would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 37.    Ikem Okeke

93.    Ikem Okeke is a resident of 12015 Vento Forte Ave., Las Vegas, NV 89138. From the years of 2016 to 2019 he was a Division I athlete and played Football at Arizona and Hawaii. However, until July 1, 2021, Ikem Okeke failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

94.    Ikem Okeke has been a valuable asset to the NCAA and the Pac-12 Conference (Arizona) and Mountain West Conference (Hawaii). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Ikem Okeke would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 38.    Kahlil Johnson

95.    Kahlil Johnson is a resident of 1 Canary Place, Jackson, MS 39204. From the

years of 2019 to 2022 he was a Division I athlete and played Football at Jackson State University. However, until July 1, 2021, Kahlil Johnson failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

96.    Kahlil Johnson has been a valuable asset to the NCAA and the Southwestern Athletic Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Kahlil Johnson would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 39.    Alex Perry

97.    Alex Perry is a resident of 9712 Highridge Drive, Las Vegas, Nevada, 89134. From the years of 2017 to 2019 he was a Division I athlete and played Football at Arizona State University and UNLV. However, until July 1, 2021, Alex Perry failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

98.    Alex Perry has been a valuable asset to the NCAA and the Pac-12 Conference (Arizona State) and Mountain West Conference (UNLV). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Alex Perry would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 40.     Cameron Echols-Luper

99.     Cameron Echols-Luper is a resident of 311 James Ave., Auburndale, FL 33823. From the years of 2015 to 2017 he was a Division I athlete and played Football at TCU, Arkansas State, and Western Kentucky. However, until July 1, 2021, Cameron Echols-Luper failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

100.     Cameron Echols-Luper has been a valuable asset to the NCAA and the Big 12 Conference (TCU), Sun Belt Conference (Arkansas State), and Conference USA (Western Kentucky). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Cameron Echols-Luper would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 41.     Montell Cozart

101.     Montell Cozart is a resident of 8961 Metcalf Ave. Apt 352, Overland Park, KS 66212. From the years of 2016 to 2017 he was a Division I athlete and played Football at Kansas and Boise State. However, until July 1, 2021, Montell Cozart failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

102.     Montell Cozart has been a valuable asset to the NCAA and the Big 12 Conference (Kansas) and Mountain West Conference (Boise State). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic

scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Montell Cozart would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 42.    Justin Ragin

103.    Justin Ragin is a resident of 5380 Flowers Hill Rd, Vicksburg, MS 39183. From the years of 2017 to 2022 he was a Division I athlete and played Football at Jackson State University. However, until July 1, 2021, Justin Ragin failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

104.    Justin Ragin has been a valuable asset to the NCAA and the Southwestern Athletic Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Justin Ragin would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 43.    Rashard Markese Davis

105.    Rashard Markese Davis is a resident of 11882 Brighton Knoll Loop, Riverview, FL 33579. From the years of 2015 to 2016 he was a Division I athlete and played Football at James Madison University. However, until July 1, 2021, Rashard Markese Davis failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

106.    Rashard Markese Davis has been a valuable asset to the NCAA and the Colonial Athletic Association. But the NCAA's pay-for-play rules prohibited him from earning any

compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Rashard Markese Davis would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 44.    Rashad Williams

107.    Rashad Williams is a resident of 37570 Dale Dr. #303, Westland, MI 48185. From the years of 2018 to 2023 he was a Division I athlete and played Basketball at Oakland University. However, until July 1, 2021, Rashad Williams failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

108.    Rashad Williams has been a valuable asset to the NCAA and the Horizon League. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Rashad Williams would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 45.    Jayden Curry

109.    Jayden Curry is a resident of 4111 East Ham Rd., Virginia Beach, VA 23453. From the years of 2020 to 2024 he was a Division I athlete and played Football at the University of South Florida and Maine. However, until July 1, 2021, Jayden Curry failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

110.    Jayden Curry has been a valuable asset to the NCAA and the American Athletic Conference (USF) and Colonial Athletic Association (Maine). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Jayden Curry would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 46.    Stanley O'Neal Dye, Jr.

111.    Stanley O'Neal Dye, Jr. is a resident of 4887 Creek Bluff Lane, Middleburg, FL 32068. From the years of 2016 to 2017 he was a Division I athlete and played Football at the University of Texas at San Antonio. However, until July 1, 2021, Stanley O'Neal Dye, Jr. failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

112.    Stanley O'Neal Dye, Jr. has been a valuable asset to the NCAA and Conference USA. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Stanley O'Neal Dye, Jr. would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 47.    Amari Jamon Catchings

113.    Amari Jamon Catchings is a resident of 6300 Old Canton Rd. Apt 5-102, Jackson, MS 39211. From the years of 2017 to 2021 he was a Division I athlete and played Football at Jackson State University. However, until July 1, 2021, Amari Jamon Catchings failed to derive

any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

114.    Amari Jamon Catchings has been a valuable asset to the NCAA and the Southwestern Athletic Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Amari Jamon Catchings would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 48.    Ron Tiavaasue

115.    Ron Tiavaasue is a resident of 334 East Southfield Rd Spanish Fork, UT 84660. From the years of 2021 to 2023 he was a Division I athlete and played Football at Missouri State, Utah State, and New Mexico State. However, until July 1, 2021, Ron Tiavaasue failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

116.    Ron Tiavaasue has been a valuable asset to the NCAA and the Missouri Valley Football Conference (Missouri State), Mountain West Conference (Utah State), and Conference USA (New Mexico State). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Ron Tiavaasue would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 49.    Gregory Michael Francis

117.    Gregory Michael Francis is a resident of 53 Gulf Pines Ave, Las Vegas, NV 89148. From the years of 2017 to 2021 he was a Division I athlete and played Football at UNLV and North Texas. However, until July 1, 2021, Gregory Michael Francis failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

118.    Gregory Michael Francis has been a valuable asset to the NCAA and the Mountain West Conference (UNLV) and Conference USA (North Texas). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Gregory Michael Francis would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 50.    Hunter Everett

119.    Hunter Everett is a resident of 2464 Talbot Ave. Apt. 817, Thibodaux, LA 70301. From the years of 2023 to 2024 he was a Division I athlete and played Football at New Mexico. However, until July 1, 2021, Hunter Everett failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

120.    Hunter Everett has been a valuable asset to the NCAA and the Mountain West Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive

rules prohibiting pay-for-play compensation, Hunter Everett would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 51.    Donell Christopher Paster, Sr.

121.    Donell Christopher Paster, Sr. is a resident of 400 Belmont Pace SE Apt. 2320, Smyrna, GA 30080. From the years of 2016 to 2018 he was a Division I athlete and played Football at Jackson State University. However, until July 1, 2021, Donell Christopher Paster, Sr. failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

122.    Donell Christopher Paster, Sr. has been a valuable asset to the NCAA and the Southwestern Athletic Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Donell Christopher Paster, Sr. would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 52.    Tevin Broyles

123.    Tevin Broyles is a resident of 4832 Scarborough Circle, Mobile, AL 36618. From the years of 2016 to 2017 he was a Division I athlete and played Basketball at the University of New Orleans. However, until July 1, 2021, Tevin Broyles failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

124.    Tevin Broyles has been a valuable asset to the NCAA and the Southland Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation

or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Tevin Broyles would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 53.    Vincent Paul Sampson

125.    Vincent Paul Sampson is a resident of 146 Belle Valley Dr, Nashville, TN. From the years of 2016 to 2021 he was a Division I athlete and played Football at Jackson State University. However, until July 1, 2021, Vincent Paul Sampson failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

126.    Vincent Paul Sampson has been a valuable asset to the NCAA and the Southwestern Athletic Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Vincent Paul Sampson would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 54.    Jawon Johnson

127.    Jawon Johnson is a resident of 1006 Crigler Road, Crawford, MS 39759. From the years of 2016 to 2017 he was a Division I athlete and played Football at Mississippi State University. However, until July 1, 2021, Jawon Johnson failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

128.    Jawon Johnson has been a valuable asset to the NCAA and the Southeastern Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Jawon Johnson would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 55.    Marcus Lynard Wallace

129.    Marcus Lynard Wallace is a resident of 317 E Capitol St. Suite 1004, Jackson, MS 39201. From the year of 2016 to 2020 he was a Division I athlete and played Basketball at the University of Arkansas at Pine Bluff. However, until July 1, 2021, Marcus Lynard Wallace failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

130.    Marcus Lynard Wallace has been a valuable asset to the NCAA and the Southwestern Athletic Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Marcus Lynard Wallace would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 56.    Micah Jett Parten

131.    Micah Jett Parten is a resident of 240 Double Oak Rd., North Prince Frederick, MD 20678. From the years of 2015 to 2016 he was a Division I athlete and played Football at the University of Central Arkansas. However, until July 1, 2021, Micah Jett Parten failed to derive

any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

132.    Micah Jett Parten has been a valuable asset to the NCAA and the ASUN Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Micah Jett Parten would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 57.    Amarveer Singh

133.    Amarveer Singh is a resident of 520 Crown St. Apt. A6, Brooklyn, NY 11213. From the years of 2015 to 2017 he was a Division I athlete and played Basketball at Seton Hall. However, until July 1, 2021, Amarveer Singh failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

134.    Amarveer Singh has been a valuable asset to the NCAA. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Amarveer Singh would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 58.    Ishmael Hyman

135.    Ishmael Hyman is a resident of 1 Genesis St., Manalapan, NJ 07726. From the years of 2016 to 2017 he was a Division I athlete and played Football at James Madison

University. However, until July 1, 2021, Ishmael Hyman failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

136.    Ishmael Hyman has been a valuable asset to the NCAA and the Colonial Athletic Association. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Ishmael Hyman would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 59.    Hannah Crofut

137.    Hannah Crofut is a resident of 1952 Centro West, Tiburon, CA 94920. From the years of 2016 to 2017 she was a Division I athlete and played Soccer and Softball at Bryant University. However, until July 1, 2021, Hannah Crofut failed to derive any personal profit from her social media activity or any other use of her name, image, or likeness because NCAA rules prohibited her from doing so.

138.    Hannah Crofut has been a valuable asset to the NCAA and the America East Conference. But the NCAA's pay-for-play rules prohibited her from earning any compensation or benefits for her athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Hannah Crofut would have received substantial additional compensation in the relevant labor market for her services. She was harmed by these anticompetitive rules.

### 60.    Carter Cunningham

139.    Carter Cunningham is a resident of 520 Carter Cunningham Rd., Louisville, MS 39339. From the years of 2020 to 2021 he was a Division I athlete and played Football at Jackson State University. However, until July 1, 2021, Carter Cunningham failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

140.    Carter Cunningham has been a valuable asset to the NCAA and the Southwestern Athletic Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Carter Cunningham would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 61.    Jacob Cox

141.    Jacob Cox is a resident of 60516 Mount Zion Road, Amory, Mississippi. From the years of 2022 to 2024 he was a Division I athlete and played Football at the University of Central Arkansas. However, until July 1, 2021, Jacob Cox failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

142.    Jacob Cox has been a valuable asset to the NCAA and the ASUN Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Jacob Cox would have received substantial additional compensation

in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 62.    Edgar Burrola

143.    Edgar Burrola is a resident of 7900 Leavorite Dr., Las Vegas, NV 89128. From the years of 2017 to 2020 he was Division I athlete and played Football at Arizona. However, until July 1, 2021, Edgar Burrola failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

144.    Edgar Burrola has been a valuable asset to the NCAA and the Pac-12 Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Edgar Burrola would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 63.    Trevon Thomas Sidney

145.    Trevon Thomas Sidney is a resident of 1034 N La Breda St. Covina, CA 91722. From the years of 2016 to 2021 he was a Division I athlete and played Football at University of Southern California, University of Illinois and San Jose State University. However, until July 1, 2021, Cameron Echols-Luper failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

146.    Trevon Thomas Sidney has been a valuable asset to the NCAA and the PAC-12 (USC), Big Ten (Illinois), and Mountain West (San Jose State). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside

from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Trevon Thomas Sidney would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 64.     Jaylon Robinson

147.     Jaylon Robinson is a resident of 2847 Grandview Dr. Grand Prairie, TX 75052. From the years of 2018 to 2023 he was Division I athlete and played Football at UCF, Ole Miss, and TCU. However, until July 1, 2021, Jalen Robinson failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

148.     Jaylon Robinson has been a valuable asset to the NCAA and the American Athletic Conference (UCF), Southeastern Conference (Ole Miss), and Big 12 Conference (TCU). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Jaylon Robinson would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 65.     Lamont James Evans, IV

149.     Lamont James Evans, IV is a resident of 1305 S. 24th Ave, Hollywood Florida 33020. From the years of 2021 to 2024 he was a Division I athlete and played Basketball at the University of South Florida and Saint Louis University. However, until July 1, 2021, Lamont Evans, IV failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

150.    Lamont James Evans, IV has been a valuable asset to the NCAA and the American Athletic Conference (USF) and Atlantic 10 Conference (Saint Louis). But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Lamont Evans, IV would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 66.    Malique Kenneth Jacobs

151.    Malique Kenneth Jacobs is a resident of 105 Colfax Dr. Boiling Springs, SC. From the years of 2020 to 2023 he was a Division I athlete and played Basketball at the Kent State University. However, until July 1, 2021, Malique Jacobs failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

152.    Malique Kenneth Jacobs has been a valuable asset to the NCAA and the Mid-American Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Malique Jacobs would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 67.    Erick Neal

153.    Erick Neal is a resident of 3530 El Benito Dr. Dallas, TX 75212. From the years of 2016 to 2018 he was a Division I athlete and played Basketball at the University of Texas at

Arlington. However, until July 1, 2021, Lamont Evans IV failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

154.    Erick Neal has been a valuable asset to the NCAA and the Sun Belt Conference. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation, Erick Neal would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

**B.     Defendants**

155.    National Collegiate Athletic Association ("NCAA") describes itself as an "unincorporated not-for-profit educational organization founded in 1906," and maintains its principal place of business at 700 W. Washington Street, Indianapolis, Indiana 46204. The NCAA further states that it "is the organization through which the colleges and universities of the nation speak and act on athletic matters at the national level." It is composed of more than 1,200 colleges, universities, and athletic conferences located throughout the United States.

156.    Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports. The Constitution and Bylaws were adopted by votes of the member institutions and may be amended by votes of the member institutions. The NCAA has also established an enforcement program to ensure that institutions and athletes comply with NCAA rules. Through its enforcement program, the NCAA has the authority to impose severe penalties on member schools and athletes for non-compliance.

157.    The NCAA includes 1,099 active member schools, and these schools are

organized into three Divisions. Division I includes 352 schools, including 267 with major football programs. Divisions II and III include schools with much less extensive or no football programs. As a practical matter, any academic institution that wishes to participate in any meaningful way in the highest and most popular levels of college sports must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members.

158.    In its Consolidated Financial Statements for the fiscal year ending August 31, 2019, the NCAA reported total revenues of $1,118,495,545.[9]

159.    Pac-12 Conference ("Pac-12") is an unincorporated association, with its principal place of business located in this District at 360 3rd Street, Third floor, San Francisco, California 94107. The Pac-12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990 the Pac-12 identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for the fiscal year ending June 30, 2018, it obtained gross revenues of $496,930,601. The Pac-12's "2018-19 Handbook" states that the conference was organized for purposes including: "[t]o provide its members with a jointly governed body for sponsoring, supervising and regulating intercollegiate athletics as a conference member of the National Collegiate Athletics Association ('NCAA') in accordance with the principles, policies, constitution and bylaws of the NCAA" and "[t]o assist its members in funding and promoting their intercollegiate athletics programs."

160.    The Pac-12's current members are the following institutions: Oregon State University and Washington State University.

161.    Defendant Pac-12 participated in the collusive restraint of trade and other

---

[9] NCAA Consolidated Financial Statements August 31, 2019 and 2018.

violations of law alleged in this Complaint, has thereby damaged Plaintiffs, and will continue to damage them.

162.    **The Big Ten Conference, Inc. ("Big Ten")** is a nonprofit corporation, organized under the laws of Delaware, with its principal place of business located at 5440 Park Place, Rosemont, Illinois 60018. The Big Ten is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990 the Big Ten identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for the fiscal year ending June 30, 2018, it obtained gross revenues of $758,899,883.

163.    The Big Ten's members are the following institutions: University of California, Los Angeles, University of Illinois at Urbana-Champaign, Indiana University, University of Iowa, University of Maryland, University of Michigan, Michigan State University, University of Minnesota, University of Nebraska–Lincoln, Northwestern University, Ohio State University, University of Oregon, Pennsylvania State University, Purdue University, Rutgers University, University of Southern California, University of Washington, and University of Wisconsin–Madison. All of the Big Ten's football members are also members of the NCAA's Division I, Football Bowl Subdivision.

164.    Defendant Big Ten participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiffs, and will continue to damage them.

165.    **The Big 12 Conference, Inc. ("Big 12")** is a nonprofit corporation organized under the laws of Delaware, with its principal place of business located at 400 East John Carpenter Freeway, Irving, Texas 75062. The Big 12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS

COMPLAINT

Form 990 the Big 12 stated that it is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and that, for the fiscal year ending June 30, 2018, it obtained gross revenues of $373,924,498.  The Big 12 further stated in its IRS filing that its mission is to "organize, promote and administer intercollegiate athletics among its member institutions" and to "optimize revenues and provide supporting service sompatible [sic] with both academic and competitive excellence."

166.    The Big 12's current members are the following institutions: Arizona State University, University of Arizona, Baylor University, Brigham Young University, University of Central Florida, University of Cincinnati, University of Colorado, University of Houston, Iowa State University, University of Kansas, Kansas State University, Oklahoma State University, Texas Christian University, Texas Tech University, University of Utah, and West Virginia University. All of the Big 12's football members are also members of the NCAA's Division I, Football Bowl Subdivision.

167.    Defendant Big 12 participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiffs, and will continue to damage them.

168.    **Southeastern Conference ("SEC")** is an unincorporated association, with its principal place of business located at 2201 Richard Arrington Boulevard North, Birmingham, Alabama 35203-1103. The SEC is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990 the SEC identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for the fiscal year ending August 31, 2018, it obtained revenues of $659,938,592. It further identified its mission is to "promote and administer intercollegiate athletic competition among its member institutions located in the Southeastern United States."

169.    The SEC's current members are the following institutions: University of Florida, University of Georgia, University of Kentucky, University of Missouri, University of Oklahoma, University of South Carolina, University of Tennessee, University of Texas-Austin, Vanderbilt University, University of Alabama, University of Arkansas, Auburn University, Louisiana State University, University of Mississippi, Mississippi State University, and Texas A&M University. All of the SEC's football members are also members of the NCAA's Division I, Football Bowl Subdivision.

170.    Defendant SEC participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiffs, and will continue to damage them.

171.    **Atlantic Coast Conference ("ACC")** is an unincorporated association with its principal place of business located at 620 South Tryon Street, Suite 1200, Charlotte, North Carolina 28202. The ACC is a multi-sport collegiate athletic conference and a formal "conference member" of Defendant NCAA's Division I. In its 2017 U.S. Internal Revenue Service ("IRS") Form 990 the ACC stated that it is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and that, for the fiscal year ending June 30, 2018, it obtained gross revenues of $464,677,828. The ACC further stated in its IRS filing that it "exists to promote and regulate inter-collegiate athletic programs for and among twelve member institutions, all of which are non-profit educational institutions."

172.    The ACC's current members are the following institutions: Boston College, University of California, Berkeley, Clemson University, Duke University, Florida State University, Georgia Institute of Technology ("Georgia Tech"), University of Miami, University of North Carolina–Chapel Hill, North Carolina State University, University of Pittsburgh, Southern Methodist University, Stanford University, Syracuse University, University of Virginia,

Virginia Polytechnic Institute and State University ("Virginia Tech"), Wake Forest University, and the University of Louisville. Also, as the ACC stated in its 2012-13 annual report, the University of Notre Dame "officially joined the ACC on July 1, 2013 … Notre Dame will compete as a full member in all conference sponsored sports with the exception of football, which will play five games annually against league programs."

173.    Defendant ACC participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiffs, and will continue to damage Plaintiffs.

174.    Defendants Pac-12, Big Ten, Big 12, SEC, and ACC are collectively referred to herein as the "Power Five Conference Defendants" or "Conference Defendants.

175.    Whenever in this Complaint Plaintiffs make reference to any act, deed, or transaction of a Defendant, the allegation means that the Defendant engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the Defendant's business or affairs.

## C.    Co-Conspirators

176.    Various persons, firms, corporations, organizations and other business entities, some unknown and others known, have participated as unnamed co-conspirators in the violations alleged herein, including the NCAA's member-schools and other NCAA Division I athletic conferences not named as defendants in this Complaint. Representatives of those schools and conferences serve on NCAA committees which promulgate rule changes. Representatives of those schools and conferences voted to adopt the rules prohibiting NIL compensation and compensation for athletic services, as well as the rules limiting the number of athletic scholarships available to college athletes, and thus agreed to impose the restraints on trade

described herein. All Division I schools and conferences continue to benefit from those restraints of trade by virtue of their agreement to abide by the restraints.

## IV.     THE ILLEGAL AGREEMENTS TO RESTRAIN COMPETITION

177.     Defendants' anticompetitive agreements are not secret or disputable. They are a matter of public record, codified in the NCAA Division I Manual (the NCAA's rulebook) and the rulebooks of each Conference Defendant. They are proposed, drafted, voted upon, and agreed to by the NCAA members—including the Conference Defendants—that compete for the services of college athletes in the various relevant labor markets. These anticompetitive rules are also strictly enforced, so that the competing NCAA member institutions have no choice but to comply with them or face severe cartel penalties.

178.     Plaintiffs bring this suit to challenge and seek damages caused by the NCAA and the Conference Defendants' rules that prohibit, cap, or otherwise limit the compensation that Division I student-athletes may receive from schools or conferences including for the use of their names, images, likenesses, and athletic reputations in the manners discussed in this Complaint, as well as compensation for their athletic services. Plaintiffs also challenge the NCAA and Conference Defendants' rules limiting Division I athletes' ability to enter into NIL transactions with third parties.  Further, Plaintiffs challenge the NCAA and Conference Defendants' rules limiting the number of athletic scholarships available to student-athletes.

179.     Article 4 of the NCAA Constitution ("Rules, Compliance and Accountability") provides: "Each member institution . . . shall hold itself accountable to support and comply with the rules and principles approved by the membership. Further, each school shall ensure that its staff, student-athletes, and other individuals and groups representing the institution's athletics interests comply with applicable rules (institutional, conference, divisional and Association-wide) in the conduct of the institution's intercollegiate athletics program."

180.    The NCAA rules, and each Conference Defendant's rules, that prohibit or otherwise limit the compensation that players may receive for their athletic services are illegal cartel agreements. The NCAA rules, and each Conference Defendant's rules, that limit the scholarships and roster spots available to players for their athletic services are illegal cartel agreements. These rules include, but are not limited to NCAA Bylaws 12.01.4, 12.1.2, 12.1.2.1, 12.4.1, 12.4.1.1, 12.4.2.3, 12.4.4, 12.5.2.1, 12.5.2.2, 15.02.2, 15.02.6, 15.1, 15.5.1, 15.5.2, 15.5.3, 15,5,4, 15.5.5, 15.5.6, 16.02.3, 16.1.4, 16.11.2 (individually, and as interpreted and applied in conjunction with each other).

181.    Any Division I school that deviates from NCAA rules may be subject to severe sanctions. Potential punishments for rules violations include a complete ban on participation (the "death penalty"), as well as a reduction in the number of grants-in-aid a school can offer, or even expulsion from the NCAA.

**A.    NCAA NIL-Specific Compensation Rules**

183.    The NCAA's rules in force during most of the the Plaintiffs' Collegiate Athletic Career prohibited student-athletes from endorsing any commercial product or service while they are in school, regardless of whether or not they receive any compensation for doing so. NCAA Bylaw 12.5.2.1 ("Advertisements and Promotions After Becoming a Student-Athlete") states:

> After becoming a student-athlete, an individual shall not be eligible for participation in intercollegiate athletics if the individual:
>
> (a)    Accepts any remuneration for or permits the use of his or her name or picture to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind; or
>
> (b)    Receives remuneration for endorsing a commercial product or service through the individual's use of such product or service.

183.    The NCAA also burdens student-athletes with the responsibility of policing any commercial uses of their NILs that take place without their knowledge or permission. NCAA

Bylaw 12.5.2.2 ("Use of a Student-Athlete's Name or Picture Without Knowledge or Permission") states:

> If a student-athlete's name or picture appears on commercial items (e.g., T-shirts, sweatshirts, serving trays, playing cards, posters) or is used to promote a commercial product sold by an individual or agency without the student-athlete's knowledge or permission, the student-athlete (or the institution acting on behalf of the student-athlete) is required to take steps to stop such an activity in order to retain his or her eligibility for intercollegiate athletics.

184.    NCAA rules further restrict student-athletes' outside employment and the compensation that they may receive from third-party employers. The NCAA rules allow athletes to obtain outside employment while attending college and participating in NCAA sports. And they even permit multi-sport athletes to retain their college eligibility in one sport while simultaneously competing (and receiving a salary) as a professional in a different sport.[10] However, the NCAA rules restrict virtually all NIL-related opportunities and compensation that athletes can obtain through outside employment.

185.    While a student-athlete may generally earn money from any "on- or off-campus employment" unrelated to his or her athletic ability, NCAA Bylaw 12.4.1 ("Criteria Governing Compensation to Student-Athletes") limits the remuneration that athletes can receive from outside employers to "a rate commensurate with the going rate in that locality for similar services." And NCAA Bylaw 12.4.1.1 ("Athletics Reputation") specifically prohibits athletes from receiving "any remuneration for value or utility that the student-athlete may have for the employer because of the publicity, reputation, fame or personal following that he or she has obtained because of athletics ability." While, as of July 1, 2021, the NCAA temporarily suspended enforcement of this rule, it has not been removed from the NCAA's bylaws. Moreover,

---

[10] NCAA Bylaw 12.1.3.

the interim policy continues to prohibit schools from licensing athletes' NILs and bundling those rights to feature the athletes as part of the school's licensing arrangements.

186.    NCAA Bylaw 12.4.2.3 ("Athletics Equipment Sales") provides that "a student-athlete may not be employed to sell equipment related to the student-athlete's sport if his or her name, picture or athletics reputation is used to advertise or promote the product, the job or the employer. If the student-athlete's name, picture or athletics reputation is not used for advertising or promotion, the student-athlete may be employed in a legitimate sales position, provided he or she is reimbursed at an hourly rate or set salary in the same manner as any nonathlete salesperson." While, as of July 1, 2021, the NCAA has temporarily suspended enforcement of this rule, it has not been removed from the NCAA's bylaws. And again, the interim policy continues to prohibit schools from licensing athletes' NILs and bundling those rights to feature the athletes as part of the school's licensing arrangements.

187.    The NCAA's rules also restrict the NIL-related compensation that athletes can obtain through self-employment and personal business ventures. Bylaw 12.4.4 ("Self-Employment") states that "a student-athlete may establish his or her own business, provided the student-athlete's name, photograph, appearance or athletics reputation are not used to promote the business." While, as of July 1, 2021, the NCAA has temporarily suspended enforcement of this rule, it has not been removed from the NCAA's bylaws.

188.    The NCAA, effective July 1, 2021, adopted an "interim" NIL policy to suspend enforcement of some aspects of its NIL rules. But the NIL restraints at issue have not been withdrawn or removed from the NCAA rules, and the NCAA remains free to change its NIL rules at any time in the future at its discretion and/or to revert back to full enforcement of all of the NIL rules, and it has stated that "the current legal and legislative landscape prevents a

permanent solution at this time."[11] Moreover, even under its interim policy, the NCAA has not

suspended enforcement of some of the most restrictive aspects of its NIL rules. For example, the

NCAA states that under its interim policy, NIL compensation still cannot be "contingent upon

enrollment at a particular school" or based on "athletic participation or performance."[12] That is

an onerous restriction, as a sponsor could otherwise have language in an endorsement deal that

ties payment to being actively playing the sport, achieving an athletic accomplishment (such as

playing in or winning a Bowl game) or playing the sport at a particular school. A sponsor may

refuse to enter into an endorsement deal if it is not able to put this language in a contract.

Furthermore, "Institutions providing compensation in exchange for the use of a student-athlete's

name, image or likeness" remains prohibited under the interim policy.[13]

### B.    NCAA Compensation Rules

189.    Article 12 of the NCAA Bylaws ("Amateurism and Athletics Eligibility") is the

foundation of Defendants' unlawful agreements to fix the amount of compensation that may be

paid to student athletes for their athletic services.  Bylaw 12.1.2 provides:

> A [student athlete] loses amateur status and thus shall not be eligible for
> intercollegiate competition in a particular sport if the individual: (a) [u]ses
> athletics skill (directly or indirectly) for pay in any form in that sport; [or] (b)
> [a]ccepts a promise of pay even if such pay is to be received following the
> completion of intercollegiate athletics participation . . . .

190.    Bylaw 12.1.2.1 then includes a non-exhaustive, two-page list of "Prohibited

Forms of Pay," including any "direct or indirect salary, gratuity or comparable compensation";

any "division or split of surplus (bonuses, game receipts, etc.);" any "[e]ducational expenses not

permitted by the governing legislation of this Association [i.e., the NCAA]"; and any

---

[11] *See Name | Image | Likeness Quick Guide to New NCAA Interim Policy*,
https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QuickGuideToNewPolicy.pdf (last visited July 25, 2021).
[12] *Name, Image and Likeness Policy Question and Answer*,
https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QandA.pdf (last visited July 25, 2021).
[13] *Id.*

"[p]referential treatment, benefits or services." The NCAA rules then continue with nearly two pages of "Exceptions to Amateurism Rule." Bylaw 12.1.2.4, et seq. Unless an exception applies, the NCAA Bylaws categorically prohibit conferences and schools from providing any form of pay to college athletes.

191.    Article 15 of the NCAA Bylaws ("Financial Aid") restricts the amount and type of, and method by which, schools can provide financial aid to athletes. Financial aid "is not considered to be pay or the promise of pay for athletics skill, provided it does not exceed the financial aid limitations set by [NCAA's] membership." See Bylaw 12.01.4. Bylaw 15.1 allows athletes to receive financial aid "based on athletics ability" "up to the value of a full grant-in-aid, plus any other financial aid up to the cost of attendance." "Full Grant-in-Aid" is "financial aid that consists of tuition and fees, room and board, books and other expenses related to attendance at the institution up to the cost of attendance." NCAA Bylaw 15.02.6. "Cost of attendance" (or COA) is the "amount calculated by an institutional financial aid office, using federal regulations, that includes the total cost of tuition and fees, living expenses, books and supplies, transportation, and other expenses related to attendance at the institution." NCAA Bylaw 15.02.2. If an athlete receives financial aid in excess of the COA, they "shall not be eligible to participate in intercollegiate athletics." NCAA Bylaw 15.1.

192.    Article 16 ("Awards, Benefits and Expenses for Enrolled Student-Athletes") similarly prohibits NCAA members from providing benefits to athletes based on their athletic abilities. Bylaw 16.11.2 provides, "The student-athlete shall not receive any extra benefit." "Extra benefit" is defined as "any special arrangement by an institutional employee or representative of the institution's athletics interests to provide the student-athlete or the student-athlete's family members or friends with a benefit not expressly authorized by NCAA legislation." See NCAA Bylaw 16.11.2; see also NCAA Bylaw 16.02.3.

COMPLAINT
56

### C.    NCAA Scholarship Limits

193.    The NCAA bylaws artificially restrain the athletic scholarships available for college-athlete labor services by setting maximum numbers or amounts of scholarships that can be provided in each sport. For example, NCAA Bylaw 15.5.2 states that "[a]n institution shall be limited in any academic year to the total number of counters (head count) in … Women's Gymnastics 12[,] Women's Tennis 8[, and] Women's Volleyball 12." This means that each institution can provide athletic scholarships (in any amount up to the NCAA cap) to this maximum number of athletes set for each sport. Similarly, the NCAA sets maximum numbers of scholarship recipients at 85 for FBS football (NCAA Bylaw 15.5.6.1), 13 each for men's and women's basketball (NCAA Bylaws 15.5.5.1 and 15.5.5.2), and a maximum value of 11.7 scholarships to a maximum of 27 athletes for baseball (NCAA Bylaw 15.5.4.1).

194.    The NCAA Bylaws 15.5.3.1.1 ("Maximum Equivalency Limits, Men's Sports") and 15.5.3.1.2 ("Maximum Equivalency Limits, Women's Sports") also "limit [] the value (equivalency) of financial aid awards that an institution may provide in any academic year" in the other NCAA sports.

### D.    Conference Rules

195.    As NCAA members, the Conference Defendants have agreed to the NCAA rules restricting NIL and other types of compensation as well as the number of scholarships. To that end, Conference Defendants have also adopted their own rules (which may be more restrictive but not more permissive than the NCAA's rules) that adopt NCAA rules and otherwise restrict the monies and benefits that may be provided to student-athletes, including limitations on the number of scholarships.

196.    Examples of the Conference Defendants' anticompetitive rules include:

a.    <u>ACC Constitution, Article 1.2.1 ("General Purpose")</u>: "The Conference

aims to . . . [c]oordinate and foster compliance with Conference and NCAA rules."[14]

b.  <u>ACC Manual, Bylaw 2.2 ("NCAA Regulations")</u>: "All [ACC] Members are bound by NCAA rules and regulations, unless Conference rules are more restrictive."[15]

c.  <u>Big Ten Conference Handbook, Rule 14.01.3 ("Compliance with NCAA and Conference Legislation")</u>: "The Constitution and Bylaws of the National Collegiate Athletic Association shall govern all matters of student-athlete eligibility except to the extent that such rules are modified by the Conference Rules and Agreements."[16]

d.  <u>Big 12 Bylaw 1.2.3 ("Adherence to NCAA Rules")</u>: "All Members of the Conference are committed to complying with NCAA rules and policies.... In addition, the conduct of Members shall be fully committed to compliance with the rules and regulations of the NCAA and of the Conference."[17]

e.  <u>Big 12 Bylaw 6.1 ("Eligibility")</u>: "A student-athlete must comply with appropriate minimum requirements of the NCAA and the Conference in order to be eligible for athletically related aid, practice, and/or competition in any intercollegiate sport."[18]

f.  <u>Big 12 Bylaw 6.4.3 ("Financial Aid Reports")</u>: "Each institution shall comply with all financial aid legislation of the NCAA and the Conference."[19]

g.  <u>Pac-12 Bylaw 4-2 ("Application of NCAA Legislation")</u>: "The Conference is a member of the NCAA, therefore, all member institutions are bound by NCAA rules and regulations unless the Conference rules are more demanding."[20]

h.  <u>Pac-12 Executive Regulation 3-1 ("NCAA Rules")</u>: "The rules of the National Collegiate Athletic Association shall govern all matters concerning financial aid to student-athletes except to the extent that the CEO Group modifies such rules to be applied on a conference wide basis."[21]

i.  <u>SEC Constitution, Article 5.01.1 ("Governance")</u>: "The Conference shall be governed by the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA."[22]

---

[14] ACC Manual, 2020–21, https://virginiatech.sportswar.com/wp- content/uploads/sites/15/2022/08/2020-21-ACC-Manual-2020-9-17-2.pdf (last visited July 10, 2024).

[15] *Id.*

[16] Big Ten Conference Handbook, 2017–2018, https://iuhoosiers.com/documents/2018/4/5// 2017_18_Big_Ten_Conference_Handbook.pdf?id=2732 3 (last visited July 10, 2024).

[17] Big 12 2021–22 Conference Handbook, https://s3.amazonaws.com/big12sports.com/documents/2021/8/16/ Handbook_v_3_08_16_2021_.pdf (last visited July 10, 2024).

[18] *Id.*

[19] *Id.*

[20] Pac-12 Conference 2021–22 Handbook, Aug. 1, 2021, https://pac-12compliance.org/wp-content/uploads/2021/08/ 2021-22-P12-Handbook.V1.pdf (last visited July 10, 2024).

[21] *Id.*

[22] Southeastern Conference Constitution and Bylaws, 2023–2024, https://a.espncdn.com/sec/media/2023/2023-24%20SEC%20Bylaws.pdf (last visited July 10, 2024).

j.    <u>SEC Bylaws 15.01.1 ("Institutional Financial Aid Permitted")</u>: "Any scholarship or financial aid to a student-athlete must be awarded in accordance with all NCAA and Conference regulations."[23]

## V.    RELEVANT MARKETS

197.    The relevant markets are the nationwide markets for the labor of NCAA Division I college athletes in the various sports in which they compete. In these labor markets, current and prospective athletes compete to participate on the various Division I athletic teams. NCAA Division I member institutions compete to recruit and retain the best players by offering unique bundles of goods and services including scholarships to cover the cost of attendance, tutoring, and academic support services, as well as access to state-of-the-art athletic training facilities, premier coaching, medical treatment, and opportunities to compete at the highest level of college sports, often in front of large crowds and television audiences. In exchange, student-athletes must provide their athletic services and acquiesce in the use of their NILs by the NCAA and its members for commercial and promotional purposes without compensation. They also implicitly agree to pay any costs of attending college and participating in intercollegiate athletics that are not covered by their scholarships.

198.    All of the colleges and universities in Division I, which the NCAA itself defines as the highest level of competition in college sports, compete in the relevant labor markets. This includes all colleges and universities that are members of the Power Five Conference Defendants, as well as the schools and conferences that collude with the Defendants through NCAA rules to fix the maximum compensation to athletes in exchange for the commercial use of their NILs and their athletic services while working on Division I teams. These colleges and universities also fix the maximum number of athletic scholarships available to student-athletes at

---

[23] *Id.*

each college or university through NCAA rules.

199.    The NCAA and its members have the ability to control price and exclude competition in these labor markets. All NCAA members have agreed to utilize and abide by the NCAA's bylaws, including the provisions detailed herein. The NCAA and its members have the power to exclude from these markets any member who is found to violate its rules.

200.    The NCAA imposes a wide variety of restraints on student-athletes as a condition for their being able to play for a Division I team. For example, athletes may not receive compensation beyond educational expenses approved by the NCAA; they must meet minimum requirements for educational progress; and they are strictly limited in their ability to receive compensation for any services that might be understood to reflect on their athletic ability or reputation. If student-athletes had the opportunity to receive a college education and compete at an elite level of intercollegiate competition without these restrictions, many would choose to do so. The fact that they agree to these conditions demonstrates the market power of the NCAA and its members in each of the relevant labor markets for Division I athletes.

201.    There are no reasonable substitutes for the educational and athletic opportunities offered by NCAA Division I schools in the relevant labor markets. No other division or association of collegiate athletics provides the same combination of goods and services offered in Division I. Schools in NCAA Division II, for example, provide fewer athletic scholarships than Division I schools, which results in a lower level of athletic competition, and much lower notoriety. Schools in NCAA Division III do not provide any athletic scholarships at all and a lower level of competition. The National Intercollegiate Athletic Association (NAIA), National Junior College Athletic Association (NCCAA), and United States Collegiate Athletic Association (USCAA) likewise provide less scholarship money and offer a much lower level of competition. And schools in these other divisions and associations are often smaller than Division I schools,

spend far less resources on athletics, and many do not even provide the opportunity to attend a four-year college. Nor are equivalent labor market opportunities offered by the professional leagues. Indeed, neither the National Football League (NFL) nor the National Basketball Association (NBA) permits players to enter the league immediately after high school. And, although some minor leagues and professional leagues in other sports do permit athletes to compete immediately after high school, recruits rarely forego opportunities to play Division I sports in order to play professionally. The qualitative differences between the opportunities offered in NCAA Division I, including the opportunity to receive a college education, and those offered by other sports leagues illustrate that Division I schools operate in distinct labor markets for their athletes.

202.    Because Division I schools are the only suppliers in these relevant labor markets, they have the power, when acting in concert through the NCAA and its conferences, to fix the quantity and price of labor. They have chosen to exercise this power by enacting collectively agreed-to, horizontal rules that strictly limit the compensation and terms of employment for Division I athletes. If any school seeks to depart from these fixed employment terms, that school may be subject to sanctions or expulsion by the NCAA.

203.    As discussed above, effective July 1, 2021, the NCAA suspended the enforcement of rules prohibiting NIL compensation from third parties, but only on an interim basis. That has led to an explosion of NIL compensation currently being provided to student-athletes. The fact that this occurred only after the NCAA stated that it was temporarily suspending enforcement of some of the NIL restraints is further evidence of the NCAA's market power, and of the anticompetitive impact of their use of this market power to eliminate an entire category of welfare-enhancing commercial activity.

204.    By contrast, because the NCAA has not suspended the enforcement of its rules

barring schools and conferences from providing compensation in addition to the fixed financial-aid amount allowed, including any NIL compensation to student-athletes, no NCAA member institution has begun to directly provide NIL compensation to student-athletes. This further demonstrates the monopsony power of the NCAA.

205.    The agreement to abide by the NCAA's compensation and scholarship maximum rules is anticompetitive because, among other things, it undermines schools' efforts to compete freely for the best college recruits.

206.    Absent these nationwide restraints, there would have been free and vigorous competition for the services of college athletes with schools or conferences offering more scholarships and compensation for athletic services and the use of NILs.

207.    Again, the events since July 1 have proven this to be true, as schools and conferences have permitted student-athletes to commercialize their NILs once the NCAA restraints were suspended, and the quantity of output has exploded, resulting in higher compensation to a large number of athletes who had previously been subject to the pre-July 1, 2021 cap. To date, Plaintiffs are unaware of any Division I school or conference that has chosen to prohibit NIL compensation that is currently permitted by the NCAA and applicable law. But no NIL compensation has been provided directly by NCAA institutions to athletes, as the NCAA has not suspended its rules barring such NIL compensation by its members. If these NCAA rules were not in effect, such compensation by the schools, including for group licensing rights for broadcasts and other purposes, would be provided.

208.    The harm to student-athletes from the NCAA's restraints is obvious. Absent the challenged restraints, more student-athletes would obtain scholarships, and many student-athletes would receive additional compensation from conferences or schools for the use of their NILs and providing athletic services. These young men and women—often from socio-economically

disadvantaged backgrounds—have been deprived of the economic benefit the market would

otherwise pay. The adverse impact of this harm is exacerbated by the fact that only a small

percentage of student-athletes will ever play professionally. The injuries that Plaintiffs are

incurring and will continue to incur will not be fully compensable by monetary

damages. This is particularly true due to the short length of NCAA careers, and the challenges in

estimating and proving the total amount of damages suffered by Plaintiffs as a result of

Defendants' unlawful conduct.

## VI.    FACTUAL ALLEGATIONS

### A.    An Overview of the NCAA

#### 1.    History and Purpose

209.    Former NCAA Executive Director Walter Byers, in his 1995 book,

*Unsportsmanlike Conduct: Exploiting College Athletes*, wrote: "[t]he first intercollegiate

competition in the United States was conceived and organized by students in the mid-1840s. By

the turn of the century, eastern colleges were competing in some 19 sports. This all came about

through student initiative and effort.  The students set in place the underlying structure for college

sports. Today, professional coaches, professional managers and money-minded presidents have

total control. It is time to give back to the students who play sports the freedoms they deserve. At

a minimum, they are entitled to freedoms enjoyed by their fellow students."

210.    The NCAA "was founded in 1906 to protect young people from the dangerous

and exploitative athletics practices of the time."[24] According to the NCAA, "[t]he rugged nature

of early-day football, typified by mass formations and gang tackling, resulted in numerous

injuries and deaths," prompting President Theodore Roosevelt to convene two White House

---

[24] Dan Treadway, *Why Does the NCAA Exist*? HuffPost.com, Dec. 6, 2017, https://www.huffpost.com/entry/johnny-manziel-ncaa-eligibility_b_3020985 (last visited July 25, 2021).

conferences with college athletics leaders to encourage safety reforms. As a result of several subsequent meetings of colleges and universities to initiate changes in football playing rules to protect the safety of student-athletes, on March 31, 1906, 62 institutions became charter members of the Intercollegiate Athletic Association of the United States (IAAUS). The IAAUS took its present name, the NCAA, in 1910.

211.    For several years, the NCAA was a discussion group and rules-making body, but in 1921 the first NCAA national championship was conducted:  the National Collegiate Track and Field Championships. Gradually, more rules committees were formed and more championships were created, including a basketball championship in 1939.

212.    According to the NCAA, "[a]s college athletics grew, the scope of the nation's athletics programs diverged, forcing the NCAA to create a structure that recognized varying levels of emphasis. In 1973, the Association's membership was divided into three legislative and competitive divisions—I, II and III. Five years later, Division I members voted to create subdivisions I-A and I-AA (renamed the Football Bowl Subdivision and the Football Championship Subdivision in 2007) in football." The NCAA "began administering women's athletics programs in 1980 when Divisions II and III established 10 championships for 1981-82. A year later, the historic 75th Convention adopted an extensive governance plan to include women's athletics programs, services and representation. The delegates expanded the women's championships program with the addition of 19 events, many of them Division I and National Collegiate (all division) championships."

213.    Article 1 of the NCAA Constitution states that the NCAA's basic purpose is "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports."

214.    The NCAA proclaims it is "dedicated to the well-being and lifelong success of college athletes," and "united around one goal: creating opportunities for college athletes."[25]

## 2.    Governance Structure

215.    The NCAA describes itself as an "unincorporated not-for-profit educational organization . . . through which the colleges and universities of the nation speak and act on athletic matters at the national level."[26] The NCAA proclaims it is "a voluntary association of more than 1,200 institutions, conferences, and organizations devoted to the sound administration of intercollegiate athletics in all its phases," and that "[t]hrough the NCAA, its members consider any athletics issue that crosses regional or conference lines and is national in character." According to its IRS tax returns, the NCAA's "active member institutions and voting conferences are the ultimate voice in all Association decisions."[27]

216.    The NCAA "oversees 89 championships in 23 sports," and "more than 400,000 college athletes competing in three divisions at over 1,000 colleges and universities." The NCAA website further states:

> Each member school is able to choose a level of competition that best fits its mission. Competition is offered in Division I (the largest programs that provide the most athletically related financial aid for student-athletes), Division II (limited financial aid) and Division III (no athletically related financial aid).
>
> There are 1,066 active member schools in the NCAA membership—340 in Division I, 290 in Division II and 436 in Division III. The NCAA also contains 95 member conferences in all three divisions.  Overall membership membership—counting schools, conferences and related associations—is 1,273.
>
> Division I is subdivided based on football affiliation. A total of 120 schools are members of the Football Bowl Subdivision (FBS). That subdivision is characterized by postseason play outside the NCAA structure and also by

---

[25] 2018 IRS Form 990.
[26] NCAA Consolidated Financial Statements, FY 2018 & 2019.
[27] 2018 IRS Form 990.

higher financial aid allocations. The second Division I subdivision is the Football Championship Subdivision, which contains 122 schools that participate in the NCAA's Division I Football Championship. The remaining 98 Division I schools do not sponsor football.

217.    According to the NCAA, "Division I offers three classes of membership: active, conference and affiliated." NCAA Constitution Article 3.02.3, titled "Membership Categories," provides:

> **3.02.3.1 Active Member.**    An active member is a four-year college or university that is accredited by the appropriate regional accrediting agency and duly elected to active membership under the provisions of this article (see Constitution 3.2.3). Active members have the right to compete in NCAA championships, to vote on legislation and other issues before the Association, and to enjoy other privileges of membership designated in the constitution and bylaws of the Association.

> **3.02.3.2 Member Conference.**    A member conference is a group of colleges and/or universities that conducts competition among its members and determines a conference champion in one or more sports (in which the NCAA conducts championships or for which it is responsible for providing playing rules for intercollegiate competition), duly elected to conference membership under the provisions of this article (see Constitution 3.3.3). A member conference is entitled to all of the privileges of active members except the right to compete in NCAA championships (see Constitution 3.3.2). Only those conferences that meet specific criteria as competitive and legislative bodies (see Constitution 3.02.1 and 3.02.2) and minimum standards related to size and division status are permitted to vote on legislation or other issues before the Association.

218.    The NCAA's website explains that, "[e]ach division creates its own rules governing personnel, amateurism, recruiting, eligibility, benefits, financial aid, and playing and practice seasons—consistent with the overall governing principles of the Association. Every program must affiliate its core program with one of the three divisions."

219.    The NCAA "operates through a governance structure, which empowers each division to guide and enhance their ongoing division-specific activities."[28] In Division I, the

---

[28] NCAA Consolidated Financial Statements, August 31, 2019 and 2018.

legislative system is based on conference representation and an eighteen-member Board of

Directors that approves legislation. The governance structure also includes an Executive

Committee composed of sixteen chief executive officers that oversees association-wide issues

and is charged with ensuring that each division operates consistently with the basic purposes,

fundamental policies, and general principles of the NCAA.

### 3.    Bylaws and Enforcement

220.    The NCAA and its members govern themselves through the NCAA manual,

which is promulgated yearly and updated quarterly. The manual contains, among other things, the

NCAA's Constitution and operating Bylaws, which includes nearly five hundred pages of

regulations governing all aspects of college sports.

221.    The Constitution and Bylaws were adopted—and may be amended—by votes of

the NCAA membership. Article 5.2.2 ("Operating Bylaws") states that "[e]ach division may

adopt legislation to be included in the operating bylaws of the Association, which provide rules

and regulations not inconsistent with the provisions of the constitution and which shall include,

but not be limited to, the following particulars: (a) The administration of intercollegiate athletics

by members of the Association; (b) The establishment and control of NCAA championships

(games, matches, meets and tournaments) and other athletics events sponsored or sanctioned by

the Association; (c) The procedures for administering and enforcing the provisions of the

constitution and bylaws; and (d) The adoption of rules of play and competition in the various

sports, and the delegation of authority in connection with such subjects to individuals, officers or

committees."

222.    The manual also contains extensive provisions requiring member schools to

follow NCAA rules and providing for discipline of members that fail to do so. For example,

Article 1.3.2 ("Obligations of Member Institutions") states that "[l]egislation governing the

conduct of intercollegiate athletics programs of member institutions shall apply to basic athletics issues such as admissions, financial aid, eligibility and recruiting. Member institutions shall be obligated to apply and enforce this legislation. . . ." Article 2.8.1 ("Responsibility of Institution") reiterates that "[e]ach institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs," and that "[m]embers of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance."

223.    Article 3.1 ("Eligibility for Membership") reinforces that "institutions or organizations must accept and observe the principles set forth in the constitution and bylaws of the Association." And Article 3.2.1.2 ("Compliance with Association Rules") mandates that each institution "shall administer its athletics programs in accordance with the constitution, bylaws and other legislation of the Association."

224.    Similarly, Article 3.2.4 ("Conditions and Obligations of Membership") states that "[a]n active member institution agrees to administer its athletics program in accordance with the constitution, bylaws and other legislation of the Association." And, pursuant to Article 3.2.4.4 ("Certification of Eligibility/Declaration of Ineligibility"), every NCAA school "is responsible for certifying the eligibility of student-athletes under the terms of the constitution, bylaws or other legislation of the Association" and institutions are "obligated immediately to apply all applicable rules and withhold ineligible student-athletes from all intercollegiate competition." In other words, the NCAA mandates a collective boycott by all members of any athlete found to have deviated from the price-fixing activity alleged in this Complaint.

225.    To reinforce its rules, the NCAA goes even further. For example, Article 3.2.4.11 ("Discipline of Member") states that, "active members shall refrain from athletics competition

with designated institutions under the provisions of the Association's enforcement procedures." To put it another way, the NCAA mandates a collective boycott by all members of any school found to have deviated from the price-fixing activity alleged in this Complaint.

226.    Article 2.8.3 ("Penalty for Noncompliance") states that "[a]n institution found to have violated the Association's rules shall be subject to such disciplinary and corrective actions as may be determined by the Association." Article 3.2.5.1 ("Termination or Suspension") states that "[t]he membership of any active member … failing to meet the conditions and obligations of membership may be suspended, terminated or otherwise disciplined." Article 3.01.4 ("Termination or Suspension of Membership") states that "[a]ll rights and privileges of a member shall cease immediately upon termination or suspension of its membership." And, Article 3.2.5.1.1 ("Cessation of Rights and Privileges") states that "[a]ll rights and privileges of the member shall cease upon any termination or suspension of active membership."

227.    Conferences also enforce the NCAA's rules. For example, the Pac-12's 2018-19 Handbook states that "[t]he Conference is formed for the following purposes: a. To provide its members with a jointly governed body for sponsoring, supervising and regulating intercollegiate athletics as a member of the National Collegiate Athletics Association ('NCAA') in accordance with the principles, policies, constitution and bylaws of the NCAA…." The Handbook continues that "[t]he members of the Conference value: … Compliance with Conference and NCAA rules" and that "[t]he Conference may place a member on probation or suspension, or terminate its membership, by vote of at least three-fourths of all of the members of the CEO Group eligible to vote on the matter, for one or more of the following reasons: … Violating rules and regulations of the NCAA, or becoming ineligible for active membership in Division I of the NCAA, by a written determination of the NCAA; … Such disciplinary action may also include the assessment of financial penalties." It continues that "[t]he Conference is a member of the NCAA, therefore,

all member institutions are bound by NCAA rules and regulations unless the Conference rules are more demanding," and "[t]he rules of the National Collegiate Athletic Association shall govern all matters concerning financial aid to student-athletes except to the extent that such rules are modified by the CEO Group." All of the other Conference Defendants have similar rules agreeing to abide by and enforce NCAA bylaws.

228.     In addition to controlling its members, the NCAA also regulates college athletes. Bylaw 14.01.3 ("Compliance With Other NCAA and Conference Legislation") mandates that, "to be eligible to represent an institution in intercollegiate athletics competition, a student-athlete shall be in compliance with all applicable provisions of the constitution and bylaws of the Association…" Bylaw 12.7.2 ("Student-Athlete Statement") states that each year a college athlete "shall sign a statement in a form prescribed by the Legislative Council … related to … eligibility … financial aid, amateur status … [f]ailure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition."

## B.     The Commercial Nature of Division I Sports

229.     The rapid and largely unconstrained escalation of commercialization in college sports makes it increasingly difficult to justify the ever-expanding divide between student-athletes, who have been compensated only with restrictive, in-kind benefits or expense reimbursement, and the business of the sports they play. This divide has eroded the value of the education that athletes receive and gives rise to high-profile violations of NCAA rules that highlight the pervasive influence of money in college sports and the lack of commitment to academics.

230.     In a January 2020 interview with ESPN, former NCAA Vice President of Championships, Mark Lewis explained the highly commercialized nature of big-time college sports: "The priority is to monetize the sport, that's taken precedence over everything else. If

that's the model—and there's nothing wrong with that—then you can't expect the players to live by the same set of rules [as they did in the past]. To me, it's just a question of fairness." Lewis continued, "If you go back 30 or 40 years to all the ways pro sports tried to be financially successful and compared that to college sports, you didn't check all those boxes. There were legitimate differences … Then, you could say the focus was an academic-oriented situation. But in this drive for revenue now, the boxes line up the same. Colleges are doing everything that pro sports leagues are doing to make money. So how come you're treating the participants radically different? You can't justify it."[29]

231.    The money generated by the college sports enterprise is staggering. In 2019, the NCAA reported total revenues of $1,118,495,545.[30] And it is important to note that the revenues reported by the NCAA are only a fraction of the total revenues brought in by Division I college sports each year. And, whether through sponsorship arrangements, ticket sales, television contracts, apparel deals, merchandise sales, or increasing student fees, the revenue streams for conferences and individual athletics programs are varied and robust.

232.    College sports have also proved to be highly profitable for corporate interests that find every way imaginable to market and exploit student-athletes. While corporations have fueled the massive growth of the college sports industry, their profit margins have simultaneously expanded off the backs of "amateur" college athletes.

233.    For example, television networks have capitalized on the immense profitability of the college sports machine through substantial broadcasting deals with the NCAA and its members. In 2016, CBS Sports and Turner Broadcasting signed an eight-year, $8.8 billion

---

[29] Dan Murphy, *Former NCAA executive Mark Lewis supports college players earning money*, ESPN.com, Jan. 21, 2020, https://www.espn.com/college-sports/story/_/id/28530364/former-ncaa-executive-mark-lewis-supports-college-players-earning-money (last visited July 25, 2021).
[30] NCAA Consolidated Financial Statements, August 31, 2019 and 2018.

extension with the NCAA for broadcasting rights to the March Madness basketball tournament. In the same year, the Big Ten conference signed a six-year deal with Fox, ESPN, and CBS worth $2.64 billion.[31] That contract mirrors similar deals that the other Power Five conferences and schools have made with broadcasters to launch their own channels. In 2011, for example, the University of Texas signed a deal with ESPN worth $300 million over 20 years that created the Longhorn Network.[32]

234.    Every television deal, whether with the NCAA, its conferences, or individual programs, nets broadcasters substantial advertising revenues. With championship game ads going for $1.5 million each, corporate spending on the March Madness tournament now rivals that of the Super Bowl. It is estimated that CBS and Turner took in $1 billion from advertisements during the 2018 tournament.[33] In 2019, the University of Virginia's overtime victory over Texas Tech drew 19.6 million viewers and that game alone was reported to have generated $114 million in ad spending.[34] Despite the fact that student-athletes contribute a substantial portion of the value that supports the massive revenues generated in these deals (through both their athletic performances and the use of their NILs), because of the challenged restraints agreed to by Defendants, student-athletes do not receive any share in those revenues apart from the limited scholarships and benefits that NCAA rules permit. Absent these restraints, student-athletes would receive the market value commensurate with what they contribute.

---

[31] Lev Facher, *Report: Big Ten getting $2.64 billion in new TV deal*, Indystar.com, June 20, 2016, https://www.indystar.com/story/sports/college/2016/06/20/report-espn-pay-more-than-1-billion-big-ten-footballgames/86133418/ (last visited July 25, 2021).
[32] Spencer Hall, *The Longhorn Network and ESPN Sign Texas-Sized Deal (Yeehaw!)*, SBNation.com, Jan. 19, 2011, https://www.sbnation.com/ncaa-football/2011/1/19/1944110/texas-longhorn-network-espn-sign-deal (last visited July 25, 2021).
[33] Andrew Lisa, *The Money Behind the March Madness NCAA Basketball Tournament*, Finance.yahoo.com, Mar. 9, 2020, https://finance.yahoo.com/news/money-behind-march-madness-ncaa-194402803.html (last visited July 25, 2021).
[34] *Id.*

235.    With so many cameras pointed at college sporting events, corporations have also realized an opportunity to profit by associating their products and services with student-athletes. Because the NCAA has prevented them from dealing directly with individual athletes, brands have found other ways to leverage the college sports platform to their advantage, including by entering into lucrative sponsorship deals with the NCAA, conferences, schools, and coaches.

236.    The NCAA maintains an official list of "corporate champions and partners" that currently includes 18 major corporations ranging from Coca-Cola, AT&T, and Capital One to Google, Geico, and Uber. These companies gain exclusive marketing and promotional rights to all 89 NCAA championship events, including the Division I Men's Basketball Championship and Football Championships. Those rights pay dividends as each commercial or logo embedded in the NCAA's programming has the potential to reach millions. As a result, and as U.S. Senator Chris Murphy noted in his 2019 report, Madness, Inc., "Everything that can be branded has been. That iconic moment where athletes climb a ladder as they cut down the nets to celebrate a berth in the Final Four or the championship? Even the ladder is sponsored."[35]

237.    The nation's largest sports apparel companies also compete for what they recognize is prime advertising real estate—college athletes whose games are broadcast for millions to see.  Because the NCAA has prohibited them from dealing directly with the athletes, instead of the athletes being compensating for the use of their NILs (as would occur absent the restraints), apparel companies enter into lucrative agreements with schools and coaches instead. In 2019, Nike, Adidas, and Under Armour had secured exclusive rights to outfit 97 percent of all Division I football and basketball programs, and it was reported that, in that year alone, these

---

[35] Chris Murphy, *Madness, Inc. How Everyone is getting rich off college sports – except the players*, Murphy.Senate.gov, Mar. 28, 2019, https://www.murphy.senate.gov/download/madness-inc (last visited July 25, 2021).

three companies spent over $300 million on college sponsorship contracts. Universities receive substantial sums from these sponsorships, and apparel advertising on network telecasts of college basketball games also helps, together with advertising from other sources, to support the large media rights payments to the NCAA and its members.

238.    Division I programs are now defined by the apparel company that outfits their teams. For example, the University of Michigan is a Nike school, having signed a $173.8 million contract with the company in 2016. In 2017, the Ohio State University signed a 15-year, $252 million deal with Nike that included a $20 million cash signing bonus. And UCLA signed a record-setting deal with Under Armour worth $280 million.[36]

239.    Schools can further increase their sponsorship revenues by staying loyal to a particular brand. For example, when Clemson University signed a 10-year contract extension with Nike in 2018 that granted its athletic department more than $58 million in "apparel allowances, direct cash payouts, and royalties," the school doubled its annual payout.[37] Meanwhile, Indiana University's renewed contract with Adidas nearly doubled its payments from $3.7 million per year under its prior agreement to $6.7 million.[38]

240.    Over time, major apparel retailers, predominantly Nike and Adidas, have come to dominate the funding of American Amateur Union ("AAU") basketball and other youth teams and tournaments in an effort to affiliate their brands and products with the next generation of sports stars. The value companies obtain from investing in and affiliating with youth teams is

---

[36] ESPN.com, *Breaking down college shoe and apparel deals*, Sept. 27, 2017, http://www.espn.com/mens-collegebasketball/story/_/id/20837463/a-look-colleges-apparel-shoe-deals (last visited July 25, 2021).
[37] Sports Business Journal, *Clemson's 10-year Nike Extension Doubles Value of Previous Deal*, sportsbusinessdaily.com, Aug. 6, 2018, https://www.sportsbusinessdaily.com/Daily/Issues/2018/08/06/Marketing-and-Sponsorship/Clemson-Nike.aspx (last visited July 25, 2021).
[38] Zach Osterman, *IU to get 81% hike in apparel revenue in Adidas deal*, IndyStar.com, Aug. 17, 2015, https://www.indystar.com/story/sports/college/indiana/2015/08/17/iu-adidas-extend-apparel-agreement/31887747/ (last visited July 25, 2021).

derived from the opportunity it provides to create relationships with top prospects and those around them from a young age. These early relationships allow the companies to influence which colleges prospects will attend and, ultimately, which brands they will endorse if and when they go pro. The system creates a strong incentive for basketball coaches at all levels to remain loyal to a particular brand—and have their players do the same—while also continuing to recruit fresh talent on behalf of the company they affiliate with. As a result, AAU basketball has become a nationwide marketplace for the most talented young basketball players in the country and is now a recruiting battleground for college coaches and corporations alike.

241.    While many factors might influence the college selected by a young athlete, there is evidence demonstrating that early affiliation with a particular brand often holds significant weight in an athlete's future decisions. Between 2003 and 2017, roughly 80 percent of five-star prospects from Nike-affiliated AAU teams went on to play for a Nike-sponsored college. And of the five-star players who ultimately reached the NBA, roughly 87 percent of those who were affiliated with Nike through youth teams and colleges, continued to endorse the company as professionals.[39]

242.    The impact of apparel company influences are not limited to men's basketball. In April 2020, shortly after becoming the number one pick in the 2020 WNBA draft, reigning NCAA national player of the year and former Oregon Duck, Sabrina Ionescu—former teammate of Plaintiff Sedona Price—signed a multi-year endorsement deal with Nike. Nike co-founder Phil Knight is a major donor for the University of Oregon athletics program and Ionescu recently confirmed that Nike's close ties to the university factored heavily into her decision to sign with

---

[39] Chris White, *By the Numbers: Once Nike gets a five-star college recruit, he's unlikely to ever leave*, USAtoday.com, Feb. 26, 2018, https://sports.usatoday.com/2018/02/26/by-the-numbers-once-nike-gets-a-fivestar-college-recruit-hes-unlikely-to-ever-leave/ (last visited July 25, 2021).

the company amid aggressive offers and competition from other brands. "Obviously going to an Oregon school and coming from Nike and knowing Phil Knight and just knowing everyone on the Nike side [factored into the decision]" said Ionescu, "Being a Nike athlete for the last 10 years … ultimately I think Nike is the best decision—just kind of staying loyal to my roots and continuing to be a Nike athlete at the professional level."[40]

243.    In 2014, then University of Louisville head basketball coach Rick Pitino criticized the system, claiming that because Louisville was sponsored by Adidas, he couldn't recruit a player from a Nike-sponsored AAU team: "Believe me, it's a very competitive thing by these shoe companies to get players. They're going out and recruiting like us, in the summertime. 'Let's get this kid into the (Nike) EYBL. Let's get this kid in the Adidas Nations.'" It's hard for coaches to resist the system, Pitino says, because "our pockets are lined with their money."[41] Ironically, 98 percent of the income from Louisville's recent Adidas sponsorship deal went directly to Pitino. In 2015-16, Pitino was reportedly paid $1.5 million through the agreement while just $25,000 went to the program.

244.    In 2017, the FBI announced a sweeping corruption investigation that implicated Pitino along with other college coaches, as well as financial advisors, and Adidas executives in a conspiracy to pay five-star high school recruits to attend Louisville and other Adidas-sponsored universities. Three federal criminal complaints released in September 2017 detail some aspects of the corruption and exploitation that occurs in the current system when coaches, agents, and shoe companies work together to control a prospect's basketball career and business dealings for their

---

[40] Adam Wells, *Liberty's Sabrina Ionescu Agrees to Multi-Year Endorsement Contract with Nike*, bleacherreport.com, Apr. 17, 2020, https://bleacherreport.com/articles/2887160-sabrina-ionescu-agrees-to-multi-year-endorsement-contract-with-nike (last visited July 25, 2021).
[41] Associated Press, *Pitino: Shoe companies too influential*, ESPN.com, Oct. 9, 2014, https://www.espn.com/mens-college-basketball/story/_/id/11672004/rick-pitino-wants-eliminate-influence-athletic-shoe-companies-recruiting (last visited July 25, 2021).

own enrichment.

245.    According to Sonny Vaccaro, a retired Nike executive and the person many consider to be the godfather of basketball endorsement money: "Everybody is involved in this scandal.  There's nobody left out. The most important person in the transaction is that high school kid … and he's the poorest of all of them. And they're all bidding on his ability to play basketball—to win championships, go to the Final Four, to sell shoes, to sell suits, to put money in investments … the universities are now co-conspirators in everything that happens… It's a willing co-conspiracy. The shoe company wants to sell shoes. The university wants to win games so they get more money from the shoe company."[42] Vaccaro acknowledges that "there's been scandals in college athletics forever. And there's been a word in college athletics forever: Amateurism. And amateurism and scandal go together."

246.    While athletes have not been allowed to profit from schools' and conferences' social media activities, social media sponsorships have become a staple in negotiations of corporate partnership deals for many major college athletic programs. In addition to television deals and apparel contracts, social media plays an important role in each school's quest for more revenue, providing brand exposure, fan interaction, and increased awareness of events at a relatively low cost to athletic departments. A strong social media presence is appealing to potential sponsors, and teams can drastically increase the value of their sponsorships by creating high-quality, engaging content featuring brand logos and often the NILs of student-athletes.

247.    For example, it was reported in 2015 that the University of Southern California ("USC") athletics department was sending about a dozen sponsored messages each week across

---

[42] Gentry Estes, *College basketball's trap: How agents and shoe companies team up to exploit athletes*, courier-journal.com, Feb. 25, 2018, https://www.courier- journal.com/story/news/2018/02/25/college-basketball-recruiting-scandal-system-traps-players/370215002/ (last visited July 25, 2021).

each of its official social media accounts, including on Twitter, Facebook, Instagram, and Snapchat. Fox Sports, the school's rights holder, confirmed at the time that revenue from those sponsored posts was approaching the mid-six-figures annually and the report further noted that "Fox and USC have seen no evidence that the presence of sponsor branding turns off Trojans' fans… it's the content in the graphic that drives views, whether a sponsor is present or not."[43]

248.    Other Division I schools negotiate similar social media sponsorship arrangements and incorporate brand logos into their own athletic posts in exchange for payment from the brands.

249.    In the 2017-18 academic year, sponsorship spending on college athletic departments, conferences, bowl games, and related properties totaled $1.24 billion.[44] In 2018, the Pac-12 conference alone generated $153.13 million—15 percent of its total revenues ($1,011.97 million)—from corporate sponsorship, advertising and licensing.[45] Pac-12 schools derived similar portions of their revenues from sponsorships as well. For example, in 2018, corporate sponsorships accounted for 16 percent ($18.07 million) of ASU's total athletic department operating revenues ($113.64 million).[46]

250.    Flush with cash and unable to compete for athletes on the basis of financial remuneration, colleges invest their revenues internally. The constant drive to win, either between big-time Power Five schools or smaller programs hoping to make the jump onto the national

---

[43] Michael Smith, *Colleges find revenue stream in social media*, sportsbusinessdaily.com, Oct. 12, 2015, https://www.sportsbusinessdaily.com/Journal/Issues/2015/10/12/Colleges/College-social-media.aspx (last visited July 25, 2021).
[44] *Sponsorship spending on College Athletics to Total $1.24 billion in 2017/2018 Season*, sponsorhip.com, Mar. 19, 2018, https://www.sponsorship.com/Report/2018/03/19/Sponsorship-Spending-On-College-Athletics-To-Total.aspx (last visited July 25, 2021).
[45] College Athletics Financial Information (CAFI) Database, http://cafidatabase.knightcommission. org/fbs/pac-12#!quicktabs-tab-where_the_money-1 (last visited July 25, 2021).
[46] College Athletics Financial Information (CAFI) Database, http://cafidatabase.knightcommission.org/fbs/pac-12/arizona-state-university#!quicktabs-tab-where_the_money-1 (last visited July 25, 2021).

stage, fuels an "arms race" that has inflated staff salaries and rationalized lavish athletic facilities, among other spending intended to make the school as competitive as possible in recruiting.

251.    Collegiate athletic programs invest in facilities that outshine even their most impressive professional counterparts. In 2018, for example, Clemson finished construction of a $55-million football complex complete with a miniature golf course, plunge pool, sand volleyball courts, laser tag, bowling lanes, movie theater, barber shop, and 23,000 square-foot weight room.[47] In 2019, the University of South Carolina completed its own $50 million, 110,000 square-foot football operations building which features, among other things, a music recording studio, video arcade, and 12-foot by 27-foot video display made of thirty-six 55-inch flat screen televisions.[48]

252.    The college sports industry has also become increasingly lucrative for university athletic administrators and coaches. The median salary for an athletic director at a Division I institution is now over $500,000 per year. Meanwhile, more than 150 football and men's basketball coaches at Division I schools earn over $1 million per year, with the top 25 football coaches earning an average of $5.2 million annually and the top 25 basketball coaches earning an average of $3.2million annually.[49] Today, the highest paid public employees in 41 of the 50 states are college football or basketball coaches.

253.    Since 1984, the average base salary for head football coaches at public universities

---

[47] Cork Gaines, *Clemson's $55 million football complex shows how swanky college football facilities have become for the top programs*, businessinsider.com, Jan. 8, 2019, https://www.businessinsider.com/photos-clemsons-football-facility-2017-10#now-check-out-the-drinking-diet-tom-brady-put-gronk-on-28 (last visited July 25, 2021).

[48] Josh Kendall, *South Carolina already reaping benefits of 'phenomenal' new football ops center*, thestate.com, Feb. 4, 2019, https://www.thestate.com/sports/college/university-of-south-carolina/usc-football/josh-kendall-blog/article225502770.html (last visited June 14, 2020).

[49] Multiple Contributors, *The perks of being a college football coach: Cars, planes, and ... good behavior bonuses?*, ESPN.com, Aug. 16, 2017, https://www.espn.com/college-football/story/_/id/20176937/college-football-coaches-perks-sweeten-deals-nick-saban-dabo-swinney-jim-harbaugh-urban-meyer-jimbo-fisher-mike-leach (last visited July 25, 2021).

COMPLAINT

has grown 750 percent (adjusted for inflation). As an example, Nick Saban, former head football coach at the University of Alabama, made $11 million in 2017—more than any NFL coach.[50] Mike Krzyzewski, former head basketball coach at Duke, a private university, made $8.98 million in the same year. These figures represent just one aspect of the compensation that college coaches receive.  On top of extravagant salaries, coaching contracts often include additional perks like complimentary flight time on private jets, personal cars, country club memberships, negotiated percentages of ticket sales, and six-figure performance bonuses.

254.    Coaches also share in the revenues that their schools bring in from commercial sponsorship contracts and generate income from their own personal NIL deals, including consultation contracts with apparel companies, television and radio programs, employment by or ownership of sports camps and clinics, book deals, and commercial speaking engagements.

255.    For example, between 2014 and 2017, University of Kentucky's ("UK") then-head basketball coach John Calipari reported approximately $1.1 million in outside income on top of his $7.75 million salary from UK. The sources of this income included Calipari's personal contract with Nike, book and video royalties, and various speaking fees.[51]

256.    In 2014, Michigan State University signed an apparel deal with Nike that included a $100,000 annual cash payment to then-head football coach Mel Tucker. Men's basketball coach Tom Izzo also benefitted from the school's apparel deal, as well as from a separate personal contract with Nike that netted him a $50,000 signing bonus, $400,000 in annual compensation, $95,000 per year in equipment and apparel, and the opportunity to receive additional bonuses if his team wins in the post-season tournament. Izzo also received $35,000 in outside income from

---

[50] Monte Burke, *Nick Saban Will Make $11 Million Next Football Season And He Is Worth Every Penny*, forbes.com, May 2, 2017, https://www.forbes.com/sites/monteburke/2017/05/02/nick-saban- will-make-11-million-next-football-season-and-he-is-worth-every-penny/#3b912a476403 (last visited July 25, 2021).

[51] Linda Blackford, *UK pays Coach Cal $7.75 million a year. Here's how he makes even more*, Kentucky.com, Oct. 12, 2017, https://www.kentucky.com/news/local/education/article178430576.html (last visited July 25, 2021).

his camps and clinics.[52]

257.    University of North Carolina's ("UNC") former basketball coach Roy Williams

released the details of his personal contract with Nike, which paid out $250,000 in 2018.

Williams's compensation from Nike was set to increase gradually over the next ten years,

ultimately reaching $340,000 by 2028.[53] In December 2018, four other UNC coaches also had

personal service contracts with Nike. Along with Williams, Mack Brown (football), Anson

Dorrance (women's soccer), Mike Fox (baseball), and Sylvia Hatchell (women's basketball) each

had similar deals. UNC also has its own ten-year contract with the retailer that runs through 2028.

In 2019, the school received $5.1 million in product and $3.25 million in cash from Nike.[54]

258.    While NCAA rules allow college athletes to trademark their names or slogans,

they have prohibited athletes from collecting any royalties from the use of those trademarks.

Meanwhile, coaches are free to profit from the licensing of their own trademarks. For example,

Clemson football coach Dabo Swinney has trademarked his own name and, in 2016, he applied

to trademark the phrases "BYOG" and "Bring Your Own Guts" after a post-game interview in

which he said the phrases went viral. Time Magazine reported that as part of Swinney's $3.3

million compensation package, Clemson paid him $500,000 in 2015 for the rights to market his

name, image, and likeness.  And, thanks to the trademarks, other parties that sell Swinney

trademarked products must pay 10 percent of the wholesale price to the coach for using his name,

and an additional 10 percent for using BYOG or Bring Your Own Guts. The Collegiate Licensing

Company, which helps manage Swinney's relationships with outside vendors, has reportedly

---

[52] Rod Beard, *Michigan State's Nike Deal worth $34M for 10 years*, detroitnews.com, July 18, 2015,
https://www.detroitnews.com/story/sports/college/michigan-state-university/2015/07/18/michigan-states-nike-deal-
worth-years/30325697/ (last visited July 25, 2021).
[53] Dane Huffman, *UNC extends deals with Roy Williams, Nike, others*, bizjournals.com, Dec. 19, 2018,
https://www.bizjournals.com/triangle/news/2018/12/19/unc-extends-deals-with-roy-williams-nike-others.html (last
visited July 25, 2021).
[54] *Id*.

given permission to at least 13 companies, including Nike, to sell merchandise stamped with the BYOG slogan, Swinney's name, or both.[55]

259.    While student-athletes were barred from receiving compensation for promotional appearances, schools can profit by selling "access" to their athletes to the highest bidder. For example, ESPN reported that, in 2013, Texas A&M auctioned a seat next to Heisman Trophy winner Johnny Manziel at an athletic department banquet to a booster for $20,000.[56] In the absence of rules limiting athletes from making similar deals, such compensation to the athletes would have been the norm. Already, since the temporary suspension of most NIL rules on July 1, 2021, Texas A&M football players Isaiah Spiller and Demani Richardson are set to earn $10,000 each for exclusive interviews posted to Aggies-centric website TexAgs.com.[57]

260.    And, while student-athletes were prohibited from receiving compensation in exchange for their autographs, others have been free to profit from the sale of those same autographs without fear of penalty. In 2013, at the same time Manziel was being investigated by the NCAA for allegedly accepting money in exchange for signing autographs for memorabilia brokers, ESPN reported that independent merchandiser Aggieland Outfitters had "recently auctioned off six helmets signed by Manziel and Texas A&M's other Heisman Trophy winner, John David Crow, for $81,000."[58] At the time, NCAA Vice President Kevin Lennon acknowledged that "student-athletes are often asked for autographs from fans, but unfortunately,

---

[55] Sean Gregory, *Meet Dabo Swinney®, The Clemson Coach Who Trademarked More Than His Name*, TIME.com, Jan. 8, 2016, https://time.com/4171504/dabo-swinney-clemson-coach-who-trademarked-bring-your-own-guts/ (last visited July 25, 2021).
[56] Darren Rovell, Justine Gubar, *Sources: NCAA investigating Manziel*, ESPN.com, Aug. 4, 2013, https://www.espn.com/espn/otl/story/_/id/9537999/otl-ncaa-investigating-johnny-manziel-profiting-autographs (last visited July 25, 2021).
[57] Jace Evans, *Texas A&M players Isaiah Spiller, Demani Richardson make $10,000 each for interviews with fan site in NIL deal*, USAToday.com, July 18, 2021, https://www.usatoday.com/story/sports/ncaaf/sec/2021/07/17/texas-am-football-players-making-10-k-interviews-nil-deal/8005537002/ (last visited July 10, 2024).
[58] *Id*.

COMPLAINT

some individuals' sole motivation in seeking an autograph is for resale."[59]

261.    From what they wear, to where you can watch them and what advertisements come across your screen, in the modern world of big-time college sports, student-athletes serve the financial interests of their colleges and the corporations that have paid well to turn them into walking billboards.

262.    If not for the NCAA's restrictions on athlete NIL compensation, there would have also been (as there now is) a market for NCAA sports video games from which the athletes would share in the revenues. EA Sports produced college sports video games, which were wildly popular with fans, until former Arizona State University quarterback Sam Keller sued EA and the NCAA, arguing that they were illegally profiting from the images of college football and basketball players in such games.[60] *The Keller* case established that video games like the previously-marketed *NCAA Football* and *NCAA Basketball* titles cannot be produced without obtaining permission from the athletes to use their NILs. But, although EA indicated that it was willing to pay players to use their likenesses in the games, the NCAA refused to change its rules to allow such payments.[61] And, when the case ultimately settled for a total of $60 million paid to the 24,819 student-athletes whose NILs were featured in the games from 2003 to 2014, the NCAA ended its licensing agreement with EA and the games were discontinued after *NCAA Football 14*.

263.    In light of the recent developments related to college athlete NIL rights, in

---

[59] George Schroeder, *'No evidence' Manziel took money for autographs, A&M says*, USAToday.com, Aug. 28, 2013, https://www.usatoday.com/story/sports/ncaaf/sec/2013/08/28/johnny-manziel-suspended-for-first-half-of-texas-am-opener-vs-rice/2723767/ (last visited July 10, 2024).
[60] *Keller v. Elec. Arts Inc. (In re NCAA Student-Athlete Name & Likeness Licensing Litig.)*, 724 F.3d 1268 (9th Cir. 2013).
[61] See Kevin Trahan, *Court filing: EA Sports wanted to pay college football players, but couldn't*, SBnation.com, June 4, 2021, https://www.sbnation.com/college-football/2014/6/4/5779102/ea-sports-ncaa-lawsuit-pay-players (last visited July 25, 2021).

February 2021, EA announced its intention to revive its college sports games. And, on July 1, 2021, EA released a statement indicating that it is "watching the recent developments regarding student-athlete name, image and likeness very closely. It's still very early stages at this point, and we plan to explore the possibility of including players in EA SPORTS College Football."[62]  A number of organizations have announced their intention to enter the group licensing business for Division I athletes to help them take advantage of these opportunities now that the NCAA has suspended many of its NIL rules.[63]

### C.     The NCAA's History of Antitrust Violations

264.    Rather than permit student-athletes to engage in competition for NIL payments as the commercial nature of college sports has exploded, Defendants have combined and conspired to foreclose athletes from the market entirely. This has been accomplished by Defendants jointly adopting and imposing rules that have the purpose and effect of preventing players from offering the use of their NILs in competitive markets.

265.    The NCAA has a history of violating federal antitrust law. As a result, over the years, numerous parties have brought and successfully prosecuted antitrust lawsuits against the NCAA. In each of these cases, the NCAA and its members argued that loosening their anticompetitive restraints would be the death knell of amateurism and would irreparably damage consumer demand for college sports. Yet, time and time again, the NCAA's specious claims have proven false and demand has only continued to steadily grow up through the present.

266.    In 1984, the U.S. Supreme Court ruled in *NCAA v. Board of Regents* that the NCAA had violated the Sherman Act by limiting the number of live televised football games

---

[62] See Matthew Liebl, NCAA: What the new NIL rule means for EA Sports College Football game, Apptrigger.com, July 4, 2021, https://apptrigger.com/2021/07/04/ea-sports-college-football-ncaa-nil/ (last visited July 25, 2021).
[63] *See* Emily Caron, *Oneteam, Opendorse Deal to Bring Group Licensing to College Athletes*, Sportico.com, June 29, 2021, https://www.sportico.com/leagues/college-sports/2021/oneteam-partners-opendorse-group-licensing-college-athletes-nil-1234632980/ (last visited July 25, 2021).

under the media plan it adopted for the 1982-85 football seasons. In conjunction with the plan, the NCAA had announced that it would punish any member institution that abided by a competing agreement with another network to televise more games. At the Supreme Court, the NCAA decried schools freely competing to sell their broadcast rights, claiming that such activity would pose an existential threat to amateurism and consumer demand. But the Court granted injunctive relief and held that the NCAA's anticompetitive scheme unlawfully restrained the market for live broadcasts of college football games.[64] Since then, schools have engaged in such competition and generated billions of dollars in revenues as a result. And, despite the NCAA's dire predictions about the destruction of college sports, consumer demand now flourishes more than ever.

267.    In *Law v. NCAA*, the Court of Appeals for the Tenth Circuit upheld a summary judgment ruling that the NCAA's then-existing cap on part-time coaches' salaries at $16,000 per year was an unlawful restraint of trade. The NCAA opposed allowing schools to freely compete, claiming that it would be contrary to the collegiate model. The Court of Appeals held that the presence of a horizontal agreement to fix compensation was presumptively anticompetitive, and that the NCAA had failed to present even a triable issue concerning whether the salary restraint was procompetitive.[65] Today, such competition is unrestrained, assistant coaches often earn *millions*,[66] and consumer demand still flourishes.

268.    In *White v. NCAA*, the NCAA argued against allowing schools to freely compete by offering cost-of-attendance ("COA") scholarships, calling such scholarships "pay for play."[67]

---

[64] 468 U.S. 85, 119 (1984) (rejecting NCAA argument that restricting sale of broadcast rights was necessary "to preserve amateurism").

[65] 134 F.3d 1010, 1021 (10th Cir. 1998) (rejecting NCAA's proposed procompetitive justifications for restricting assistant coach salaries).

[66] For example, between 2009 and 2015, assistant men's basketball coaches' salaries increased by nearly 40 percent.

[67] *See* NCAA Memo. P&A in Support. Summ. J. 28, *White v. NCAA*, No. 06-cv-99 (C.D. Cal. Oct. 22, 2007, ECF No. 220).

Today such competition is unrestrained, and both full COA scholarships and payments above

COA are ubiquitous (as discussed further below, and recently confirmed by the Ninth Circuit and

Supreme Court), while consumer demand for college sports is healthier than ever.

269.    In 2009, a group of Division I men's basketball and football student-athletes

brought an antitrust class action—*O'Bannon v. NCAA*[68]—challenging the NCAA's rules that

prevent athletes from receiving a share of the revenue from member institutions that the NCAA

and its members derive from the use of athletes' NILs in live game broadcasts, related footage,

and video games. The district court held that the challenged rules were more restrictive than

necessary to achieve any legitimate procompetitive justification and thus violated the antitrust

laws. The district court enjoined the NCAA from prohibiting its schools from directly paying

athletes (1) full COA scholarships and (2) $5,000 per year in deferred compensation for the

game-related use of their NILs, through trust funds distributable after the athletes leave school.

The Ninth Circuit affirmed the liability finding and COA portion of the remedy, but held that on

the particular record before the district court, plaintiffs had not shown that allowing payments

directly from schools in deferred compensation for game-related NIL usage would be virtually as

effective as the existing restraints in preserving "amateurism"—and thus consumer demand for

college sports.[69] Since the *O'Bannon* decision, based on new evidence and recent factual

developments, this Court for the Northern District of California found in a decision upheld by the

Ninth Circuit and Supreme Court that the NCAA's compensation rules "'do not follow any

coherent definition of amateurism.'"[70] Moreover, since *O'Bannon*, student-athletes regularly

---

[68] 802 F.3d 1049 (9th Cir. 2015).

[69] *See Id.* at 1072-79.

[70] *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig. ("NCAA GIA")*, 958 F.3d 1239, 1249 (9th Cir. 2020) (quoting and *affirming In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1074 (N.D. Cal. 2019)).

receive compensation from their schools that exceeds COA—including both education and non-education-related compensation—and consumer demand for college sports has continued to grow exponentially.

270.    After years of litigation following complaints filed in 2014, on May 18, 2020, the Ninth Circuit Court of Appeals upheld a decision and injunction entered by this United States District Court for the Northern District of California in favor of a nationwide class of college-athletes challenging NCAA-imposed caps on athletic scholarships.[71] In *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litigation*, the Ninth Circuit affirmed the district court's holding that NCAA's compensation restraints—agreed to by the Defendants in this Complaint—imposed substantial anticompetitive effects in relevant markets that were not justified by procompetitive justifications, and that there were less restrictive alternatives to the rules that would be virtually as effective in serving any procompetitive purpose for them. The Ninth Circuit affirmed the district court's order enjoining the NCAA from enforcing rules that restrict education-related benefits that its member institutions may offer student-athletes.

271.    In reaching its decision in the *NCAA GIA* litigation, the Ninth Circuit held that "[a]ntitrust decisions are particularly fact-bound," the "Rule of Reason contemplate[s] case-by-case analysis" that is "inherently fact-dependent" and "evaluates dynamic market conditions and consumer preferences, and, citing *O'Bannon*, that "courts must continue to subject NCAA rules, including those governing compensation, to antitrust scrutiny."[72]

---

[71] *NCAA GIA*, 958 F.3d 1239.
[72] *NCAA GIA*, 958 F.3d at 1253; *see also Id.* (citing *Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 579 (1925) ("[E]ach case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and . . . opinions in those cases must be read in the light of their facts"); Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1205c3 (4th ed. 2018) ("Continuing contracts in restraint of trade," are "typically subject to continuing reexamination," and "even a judicial holding that a particular agreement is lawful does not immunize it from later suit or preclude its reexamine at circumstances change.").

**D.    The Supreme Court's *Alston* Decision, this Court's Motion to Dismiss and Class Certification Orders in *In re Collegiate Athletics NIL Litigation*, 4:20-cv-03919-CW, and State Laws Result in the NCAA and Conference Defendants' Interim Suspension of Many of Their NIL Restraints.**

272.    In *NCAA v. Alston*, 141 S. Ct. 2141 (2021), decided on June 21, 2021, the Supreme Court reviewed the Ninth Circuit's decision and unanimously affirmed it in full 9-0. Contrary to Defendants' argument, the Supreme Court held that the NCAA's so-called amateurism rules are subject to the same rule-of-reason analysis applicable to other businesses, especially because the "NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition."[73] The Court further held that nothing in its decision in *Board of Regents* approved of the NCAA's limits on athlete compensation or provided the NCAA with any reduced scrutiny under, or protection from, rule of reason review.[74] Finally, the Supreme Court agreed with the Ninth Circuit's affirmance of this Court's application of the rule-of-reason, finding that the NCAA's restraints on education-related benefits violated Section 1 of the Sherman Act.[75] In a concurring opinion, Justice Kavanaugh wrote that the NCAA's remaining compensation rules (*i.e.*, those *not* at issue in *Alston*) "may lack" a legally valid procompetitive justification, that its "current compensation regime raises serious questions under the antitrust laws," and reiterated that the "NCAA is not above the law."[76]

273.    A few days following the *Alston* decision, on June 24, 2021, this Court ruled on Defendants' motion to dismiss Plaintiffs' original complaints challenging Defendants' NIL rules in *In re Collegiate Athletics NIL Litigation*, 4:20-cv-03919-CW. The Court largely denied

---

[73] *Alston*, 141 S. Ct. at 2156 (emphasis in original).
[74] *Id*. at 2157-58.
[75] *Id*. at 2155-2160, 2166.
[76] *Id*. at 2166-69 (Kavanaugh, J., concurring).

Defendants' motion to dismiss.[77]

274.    Around the same time that the *Alston* and *House* decisions were issued, the NCAA and its members were facing the prospect of an effective date of July 1, 2021, for several state laws and executive orders that would permit student-athletes to monetize their NILs. Indeed, at least sixteen of these laws became effective on July 1, 2021 or allowed schools to opt in immediately as of that date (Alabama, Colorado, Connecticut, Florida, Georgia, Illinois, Kentucky, Louisiana, Mississippi, Nebraska, New Mexico, Ohio, Oklahoma, Oregon, Pennsylvania, and Texas).

275.    In the face of these developments in the legal landscape, Defendants decided to adopt their new, "interim" NIL policy, which was announced on June 30 and became effective on July 1, 2021. That policy temporarily suspended enforcement of many of the NCAA's NIL restraints.

276.    The period after adoption of the NCAA's interim policy is already providing a natural experiment where student-athletes are, with certain continuing limitations, able to market their NILs to third parties. Indeed, NCAA President Emmert stated in a recent video that seeing "how all this unfolds" will be informative about what rules there should be and what is in the best interests of the athletes.[78] What we have seen thus far is that NIL opportunities are widespread and have been taken advantage of by student-athletes across a wide variety of sports—without any harm to consumer demand. Representatives of Defendants have admitted that the suspension of most NCAA NIL rules, with the authority now vested in the individual schools and conferences, has gone well since July 1.  On July 7, Purdue Athletics Director Mike Bobinski

---

[77] Order Granting in Part and Denying in Part Motions to Dismiss, ECF No. 152.
[78] *See* YouTube, *Inside the NCAA, NCAA Social Series EP 65*, Twitter.com, July 15, 2021, https://twitter.com/insidethencaa/status/1415831043098112001?s=21 (last visited July 25, 2021).

commented that, "for all the wringing of hands and other gloom and doom prognostications, I

don't see (any of that) yet."[79] And Big 12 Commissioner Bob Bowlsby stated on July 14, 2021,

during one of the Big 12 Media Days, that "I think relative to name, image and likeness there was

a commonly held misperception that the sky was going to fall on July 1 and we were going to be

in an Armageddon scenario," but "[o]bviously that hasn't happened. There have been some

things that have occurred that have raised eyebrows, but generally speaking, schools are

managing it."[80]

277.    In *In re Collegiate Athletics NIL Litigation*, 4:20-cv-03919-CW, on September 22,

2023, the Court granted plaintiffs' motion for certification of an injunctive [81] On November 3,

2023, the Court granted plaintiffs' motion for certification of three damages.[82]

278.    On July 26, 2024, Plaintiffs' counsel in the *House* case filed a Motion for

Settlement. Plaintiffs' Class Counsel has given Plaintiffs named herein until January 31, 2025 to

"opt-out" of the class, which right they have exercised and choose to proceed herein outside of

the Class.

**E.    The Challenged Restraints are not Necessary to Serve Any Purported Procompetitive Purpose.**

**1.    Any Procompetitive Justification Based on Consumer Demand for College Sports is Legally Irrelevant Because it Concerns an Entirely Different Market.**

279.    As explained *supra*, Defendants' restraints have anticompetitive effects in the

---

[79] *See* Ray Couture, *Purdue AD addresses NIL concerns*, MDJonline.com, July 6, 2021, https://www.mdjonline.com/neighbor_newspapers/extra/news/purdue-ad-addresses-nil-concerns/article_a0bb2362-d01c-5b49-a736-03037e35d13a.html (last visited July 25, 2021).
[80] *See* Frank Bonner II, *Big 12 Commissioner Bob Bowlsby says 'anyone not getting vaccinated is taking unnecessary and unwarranted risks'*, TulsaWorld.com, July 14, 2021, https://tulsaworld.com/sports/college/osu/big-12-commissioner-bob-bowlsby-says-anyone-not-getting-vaccinated-is-taking-unnecessary-and-unwarranted/article_7b845f22-e4cf-11eb-8949-5fae51ac6d45.html (last visited July 10, 2024).
[81] ECF No. 323.
[82] ECF No. 387.

relevant Division I labor markets. The purported procompetitive justifications, on the other hand, concern entirely separate and distinct output markets for Division I sports and are therefore legally irrelevant for antitrust analysis in this case.

280.    The purported procompetitive benefit relied upon most heavily by Defendants in recent antitrust litigation challenging NCAA compensation restraints is the claim that such restraints are necessary to preserve consumer demand for college sports. But, even if the challenged restraints did have some positive effect on consumer demand—they do not—those benefits would relate to the consumer output markets for college sports, which is distinct from the relevant labor markets here that are directly restrained by Defendants' rules.

281.    The Ninth Circuit in the *NCAA GIA* litigation explained that "[i]t is not settled" whether courts may "consider a restraint's procompetitive benefits in a market outside the market deemed relevant for the purpose of evaluating a restraint's anticompetitive effects."[83] Because the issue was not raised by parties in that case, it was not addressed by the Court either.[84] But, concurring in the decision, Chief Judge Smith wrote that "the underlying purpose of the Sherman Act—promoting competition—counsels in favor of conducting a more limited Rule of Reason analysis," confined to the market that is being restrained. "If the purpose of the Rule of Reason is to determine whether a restraint is net procompetitive or net anticompetitive, accepting procompetitive effects in a collateral market disrupts that balancing. It weakens antitrust protections by permitting defendants to rely on a broader array of justifications that promote competition, if at all, in collateral markets where the restraint under analysis does not occur."[85]

---

[83] *NCAA GIA*, 958 F.3d at 1257.
[84] *Id.*
[85] *Id.* at 1269 (Smith, C.J., concurring).

COMPLAINT
91

2.    **Even if Effects on Consumer Demand in Output Markets Were Relevant, the Restraints at Issue are not Necessary to Preserve Consumer Demand for College Sports.**

282.    Whatever doubt there may have been about the validity of Defendants' amateurism justification in 2019, when the *Grant-in-Aid Cap* trial was conducted, ensuing market realities and new factual developments show that "amateurism" is no longer a legitimate procompetitive justification for any of the Defendants' compensation restraints. Specifically, despite the ubiquitous payment of "*Alston* benefits," the continuation and expansion of full-COA scholarships and payments, and substantial and unlimited NIL payments from third parties, there has been no adverse effect on consumer demand for Division I college sports. To the contrary, the NCAA concedes that these payments and benefits to college athletes have not had any adverse impact on consumer demand.

283.    In fact, since the NCAA has allowed these benefits and compensation, television ratings and revenues (broadcast and otherwise) for Division I college sports have increased exponentially. Accordingly, a number of NCAA and Conference officials have since admitted that amateurism is no longer a justification for their restraints.

284.    Moreover, recent public opinion surveys demonstrate that fans support student-athletes being able to profit from the use of their NILs, and thus that consumer demand would not be negatively affected if Defendants' anticompetitive NIL restraints were eliminated. Indeed, the growing public sentiment in support of student-athlete NIL rights indicates that the lifting of these restraints would actually improve fan interest in college sports.

285.    In June 2021, College Pulse surveyed 829 college students at 51 universities in June 2021. The results of that survey indicated that 89% of students surveyed believe that student-athletes should be able to profit off their likenesses, 88% think the athletes should be able to profit by endorsing products on social media, and 93% think the athletes should be able to

profit by appearing in advertisements.[86]

286.    In December 2019, the Associated Press polled 1,053 American adults: 66 percent of respondents supported allowing athletes to earn money from the use of their NILs.[87]

287.    The results of a November 2019 Turnkey Sports Poll of more than 2,000 senior-level sports industry executives similarly indicated that consumer demand for intercollegiate athletics will not suffer if college athletes are permitted to monetize their NILs. Only 14 percent of the respondents in that study opined that allowing student-athletes to benefit from their NILs would have a negative effect on fan interest, while 45 percent indicated that such a change would have "no impact" on fan interest, and 35 percent believed it would actually positively impact fan interest.[88] These recent survey results indicate that if student-athletes were allowed to monetize and profit from their own NILs it would likely increase fan interest in, and consumer demand for, college sports.

288.    In May 2022, *The Washington Post* and the University of Maryland conducted a poll in which 88% of 1,503 respondents said that allowing athletes to receive NIL compensation either "hasn't made a difference" or had a "positive impact" on their enjoyment of college sports.[89]

289.    More broadly, survey evidence presented by the plaintiffs in the *NCAA GIA* litigation "tested [consumer] behavior and found that consumers would continue to view or

---

[86] Jenn Hatfield, *Even Students Who Aren't Athletes Think the NCAA is a Problem*, fivethirtyeight.com, July 12, 2021, https://fivethirtyeight.com/features/college-students-dont-like-how-the-ncaa-treats-student-athletes/ (last visited July 25, 2021).
[87] Michael T. Nietzel, *Americans Now Overwhelmingly Support College Athletes Earning Endorsement and Sponsorship Money*, forbes.com, Feb. 11, 2020, https://www.forbes.com/sites/michaelnietzel/2020/02/11/americans-now-overwhelmingly-support-college-athletes-earning-endorsement-and-sponsorship-money/ (last visited July 10, 2024).
[88] Michael Smith, Liz Mullen, *College Sports: Sharper Resolution*, sportsbusinessdaily.com, Dec. 2, 2019, https://www.sportsbusinessdaily.com/Journal/Issues/2019/12/02/In-Depth/NIL.aspx (last visited July 25, 2021).
[89] Emily Giambalvo, Scott Clement, and Emily Guskin, *NIL hasn't made a difference for most in enjoyment of college sports, poll finds*, The Washington Post (June 30, 2022), https://www.washingtonpost.com/sports/2022/06/30/nil-college-sports-fans-poll/.

COMPLAINT
93

attend college athletics (at the same rate) even if eight types of compensation that the NCAA currently prohibits or limits were individually implemented."[90] In fact, the survey results indicated that consumers would tend to watch or attend *more* college sports events if athletes were treated more fairly by being provided with additional compensation that the NCAA rules currently prohibit.

290.    Indeed, the NCAA itself acknowledged in its April 17, 2020 Final Report and Recommendations that "allowing such compensation for some promotional or commercial activities can likely be accommodated in a manner consistent with the NCAA's model of amateur intercollegiate competition."[91]

291.    The Ninth Circuit in the *NCAA GIA* litigation affirmed that the record in the case supported the district court's findings that NCAA rules "permit a wide range of above-[cost-of-attendance] payments—both related and unrelated to education. Without losing their eligibility, student-athletes may receive, for instance: "(i) awards valued at several hundred dollars for athletic performance ('athletic participation awards')[,] which may take the form of Visa gift cards; (ii) disbursements—sometimes thousands of dollars—from the NCAA's Student Assistance Fund ("SAF") and Academic Enhancement Fund ('AEF') for a variety of purposes, such as academic achievement or graduation awards, school supplies, tutoring, study-abroad expenses, post-eligibility financial aid, health and safety expenses, clothing, travel, 'personal or family expenses,' loss-of-value insurance policies, car repair, personal legal services, parking tickets, and magazine subscriptions; (iii) cash stipends of several thousands of dollars calculated to cover costs of attendance beyond the fixed costs of tuition, room and board, and books, but

---

[90] *See NCAA GIA*, 958 F.3d at 1250 (discussing evidence presented to district court).
[91] NCAA Federal and State Legislation Working Group Final Report and Recommendations, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf (last visited July 10, 2024).

used wholly at the student-athlete's discretion; (iv) mandatory medical care (available for at least

two years after the athlete graduates) for an athletics-related injury; (v) unlimited meals and

snacks; (vi) reimbursements for expenses incurred by student-athletes' significant others and

children to attend certain athletic competitions; and (vii) a $30 per diem for 'unitemized

incidental expenses during travel and  practice' for championship events."[92] The Ninth Circuit's

decision explained that "[t]he record indicates that the NCAA does little to regulate or monitor

the use of these funds" from the "Student Assistance Fund" or "Academic Enhancement Fund."[93]

292.    In its recent history, the NCAA has made many exceptions allowing for additional

payments to student-athletes—both education and non-education related—beyond the cost of

attendance. For example, before 2015, athletic participation awards did not take the form of cash-

equivalent Visa gift cards. And, when the NCAA changed its rules to allow full COA

scholarships in August 2015, the number of student-athletes receiving above-COA payments,

such as cash stipends, Pell Grants, and AEF and SAF distributions, increased significantly. This

expansion of above-COA payments has not coincided with any decline in consumer demand for

intercollegiate athletics. To the contrary, demand for college sports has only risen, as

demonstrated by the consistent and ever-growing revenues brought in by Division I basketball

and FBS football. Thus, the current factual record shows that non-educational payments to

student-athletes in excess of COA are no longer a "quantum leap" from NCAA practice, as the

court held it would be at the time of *O'Bannon*.[94]

293.    Two-sport athletes have also received million-dollar payments as professionals in

one sport while retaining NCAA eligibility in another. For example, in 2018, Kyler Murray

---

[92] *NCAA GIA*, 958 F.3d at 1244-45.
[93] *Id*. at 1245.
[94] *Id*. at 1255 (quoting and citing *O'Bannon*, 802 F.3d at 1078).

signed a $9 million contract to play baseball for the Oakland A's while he was still playing

football at the University of Oklahoma. If such compensation does not implicate "pay-for-play"

or otherwise undermine the distinction between college and professional, it is hard to imagine

how compensation for NIL rights would do so. And again, all these forms of compensation have

been permitted, and consumer demand for college sports has only increased.

294.    Moreover, allowing compensation would not affect consumer demand for college

sports to the extent that such demand is "driven by consumers' perception that student-athletes

are students."[95] Plaintiffs do not challenge any of the NCAA's existing rules and regulations that

require college athletes to be students in good standing at their respective schools. And if student-

athletes are allowed to receive scholarships beyond the current limits and/or compensation for

their NILs and athletic services, schools will provide educational resources and programs

designed to help their athletes learn about personal brand management and athletes will gain

access to new academic opportunities to develop marketing and financial skills. This is already

happening with the NCAA's current suspension of some of the NIL rules. School athletic

departments across the country are offering new educational programming to their athletes and as

of July 1, 2021 53 of the 65 Power Five universities had announced an NIL-related initiative

partnering with companies like Opendorse, INFLCR, or Altius Sports.[96] Schools are also offering

new NIL-focused classes and hiring additional staff to give their athletes an edge. That is in

keeping with the NCAA's purported objective to help athletes prepare for life after college, which

for the vast majority of them does not include a professional sports career. NCAA President

agreed in a recent interview that providing NIL opportunities encourages student-athletes to

---

[95] *See In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1105.
[96] Lila Bromberg, *In the NIL Arms Race, Some Schools Are Going the Extra Mile to Help Their Athletes*, SI.com, July 1, 2021, https://www.si.com/college/2021/07/01/name-image-likeness-programs-schools-ncaa (last visited July 25, 2021).

experience and try out different professional options.[97]

295.    The district court in the *NCAA GIA* litigation relied on testimony by the NCAA's and conferences' own witnesses that consumer demand for Division I basketball and FBS football is actually driven by consumers' perception that student-athletes are, in fact, students. For example, University of Wisconsin-Madison Chancellor Rebecca Blank testified that fans of college sports "love seeing their fellow students out there playing" and that viewership of college sports is based on student-athletes being "students at the university." Eugene Smith, athletic director at the Ohio State University, testified to a similar point and explained the "collegiate fan is more aligned to the educational experience that college sports provide." AAC Commissioner and former CBS/ESPN executive, Michael Aresco, noted that the programming of televised college sports focuses on "the college experience," which includes the campus, academics, and community service.[98] The district court concluded (and the Ninth Circuit affirmed on appeal) that this testimony did not support, but rather undermined, the NCAA's justification for its compensation rules because, in the absence of those rules, college athletes would still be students.[99] Such testimony similarly suggests that the restraints challenged in this Complaint are not necessary to preserve consumer demand for college sports. Absent the challenged rules, college athletes would remain students and "fellow students, alumni, and neighbors of the schools would continue to identify with them."[100]

296.    The fact that the compensation rules are not needed to preserve consumer demand is conclusively established by the natural experiment of the NCAA's interim NIL policy. Most

---

[97] YouTube, *Inside the NCAA, NCAA Social Series EP 65*, Twitter.com, July 15, 2021, https://twitter.com/insidethencaa/status/1415831043098112001?s=21 (last visited July 25, 2021).
[98] *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1082.
[99] *Id.*
[100] *Id.*

NIL rules have been suspended and scores of Division I athletes are now receiving NIL compensation across Division I sports. Yet, there is no evidence that these dramatic and conspicuous NIL payments have in any way adversely impacted consumer interest or demand for Division I sports. To the contrary, it is precisely because so many fans are supportive of Division I athletes that the many sponsors and business are so interested in partnering with the athletes and paying for their NIL rights.

297.    Moreover, to the extent that the purported procompetitive purpose of promoting consumer demand is served by the rules at all—it is not—there are reasonable and patently less restrictive alternatives available. For example, as discussed above, an injunction could forbid enforcement of national NCAA NIL rules, but permit such rules at the conference and school level.  In an interview about NIL, former NCAA President Mark Emmert agreed that sports serve different functions at different schools, and that the NCAA needs to govern in a way that is more reflective of that, with consideration given to a decentralized and deregulated version of college sports, shifting power back to conferences and campuses. And the NCAA's interim policy, in fact, has adopted just such a school and conference empowerment structure as the less restrictive alternative currently in effect, without any evidence of harm to consumer demand.

298.    Fears about potential abuses of a competitive market should not be conflated with fears of competition itself, nor do they justify restrictions on a free market.

### 3.    Education and Compensation are not Mutually Exclusive.

299.    The NCAA, in other litigation, has also argued that its compensation rules somehow promote the integration of student-athletes with their academic communities and that payments for NILs or compensation based on athletic performance would "create a wedge" between student-athletes and the student body at large. The NCAA has further claimed that the "chase for endorsements" could interfere with student-athletes' focus on education.

300.    To begin with, this paternalistic rationale does not constitute a legitimate procompetitive justification for a sweeping market restraint on adult student-athletes being able to commercially benefit from their own names, images, and likenesses.

301.    Moreover, in *O'Bannon*, the Court held that this purported goal is better achieved by other NCAA rules, such as those requiring athletes to attend class or forbidding more than a certain number of practice hours per week.[101] And, while the Court acknowledged the NCAA may have some interest in preventing a social "wedge" between athletes and the rest of the student body, it held that "it does not justify a total, 'sweeping prohibition' on paying student-athletes for the use of their NILs."[102]

302.    For one, income disparities already exist on college campuses as a result of family background and wealth derived from other sources. And, despite the existing disparities, there is no evidence that students with more financial resources are negatively impacted in terms of their integration with peers or the quality of education they receive.

303.    The ability to earn compensation will enhance, not detract from, the integration and academic experiences of college athletes. Education and pay are not mutually exclusive and are, in fact, pursued simultaneously by millions of college students across America. And as noted herein, schools now admit that marketing NIL brings its own educational benefits as it teaches students business, marketing and promotional skills that are themselves educational in nature.

304.    In the *NCAA GIA* litigation, the district court rejected the NCAA's so-called "academic integration" and "wedge" arguments,[103] and its finding was not challenged by the NCAA on appeal. Moreover, as explained above, the Ninth Circuit found a wealth of evidence

---

[101] 802 F.3d at 1061.
[102] *Id*. at 1060.
[103] *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1083-86.

showing that NCAA rules already permit athletes to receive numerous above-COA payments "related and unrelated to education."

305.    The NCAA's compensation restrictions do not promote integration and in fact create a significant divide between the rights enjoyed by purely academic students and those allowed to athletes. The NCAA itself has acknowledged that "the current rules preclude student-athletes from engaging in a wide range of promotional activities that are open to college students generally, a situation that is inconsistent with the NCAA's goal of treating student-athletes in the same manner as the student-body in general."[104] Non-athlete students are free to exploit the full potential of their NIL rights while student-athletes have been forced to forego any NIL compensation whatsoever under the NCAA's complicated system of regulations. Allowing student-athletes to monetize their NILs will increase the validity of the NCAA's claim that the athletes are "students first" by treating athletes more like their peers.

306.    Plaintiffs do not challenge the NCAA's existing rules and regulations that require them to be students in good standing at their respective schools or that require athletes to meet certain academic standards to remain eligible for competition. Moreover, if athletes were allowed to earn compensation for their athletic services or NIL while in school, schools would provide additional educational resources and programs designed to help athletes learn about finances, marketing and personal brand management and athletes would gain access to new opportunities to develop life skills. As explained above, this is already happening with schools investing substantial resources to provide new educational opportunities to give their athletes the best opportunity to maximize their NIL value.

---

[104] *NCAA Federal and State Legislation Working Group Final Report and Recommendations*, nacaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG _Report.pdf (last visited July 10, 2024).

### 4.    NCAA Compensation Restrictions do not Prevent Exploitation-They are Exploitative.

307.    The NCAA has also previously argued that the elimination of its compensation restrictions would lead to "over-commercialization, which transposes the collegiate model into a system that more closely resembles the professional sports approach." In particular, the NCAA has asserted that its no-endorsement rules "prevent students from becoming billboards for commercialism."

308.    To begin with, this supposed rationale does not constitute a legitimate procompetitive justification for a sweeping market restraint on college athlete compensation.

309.    Moreover, in a system where billions of dollars are generated primarily off the backs (literally, when sponsors pay to outfit athletes with branded equipment and apparel) and athletic successes of student-athletes, the restrictions on compensation do not prevent exploitation—they are exploitative. As explained above, whatever downside comes from commercialization is already impacting college athletes; the current rules merely ensure they have a limited share in the benefits from such commercialization. The unfairness in this arrangement grows exponentially with each new multi-million (or multi-billion) dollar television and sponsorship deal, coaching contract, and facility construction, while the selective and blanket restrictions on student-athletes are maintained. As it stands, the current system does far more to advance the financial interests of the NCAA, broadcasters, corporations, and athletic departments than it does for the athletes who provide the product from which everyone else profits.

310.    John Shoop, former offensive coordinator for the University of North Carolina football team, described his first-hand perspective of the inequities of this system in a 2018 documentary: "I know people say these players get everything.  No they don't get everything. What they get is a facility that might have a barbershop in it, tons of flat screen TVs, they might

get a bunch of Nike spikes. At this time in their life, when they really did have incredible value, I was the one absorbing all that value, not them. That didn't feel good to me. I was the one getting paid a lot, not them. For some of these young men, these are the four years where their earning potential is higher than it's ever been. This is it. When they graduate, they're done… They're propelling a billion-dollar industry right here and they're getting a sweat suit for it."[105]

311.    The harm to student-athletes is exacerbated because only a small number of them will go on to play professionally. This fact highlights that for most Division I athletes, their college years are when they may have their greatest earning potential.

312.    The current restrictions have also created an incentive for student-athletes, boosters, agents, third parties, and others to violate the rules and enter into under-the-table deals. The absence of an above-the-board market has thus created an environment where exploitation is more, not less, likely. On the other hand, permitting payments out in the open would allow the NCAA and its members to more effectively educate the athletes on how to avoid exploitation.

### 5.    Female Athletes Have Been Especially Adversely Impacted by NIL Restrictions and Will Profit in the New NIL Era.

313.    The NIL rules adversely impacted female athletes more than their male counterparts because (1) they have fewer professional opportunities and they must use their time in school to monetize, and (2) because the NCAA promotes female sports less than it does male sports and thus many female athletes are not as well known.

314.    There was unanswered demand for the use of NIL of female athletes before the interim NIL rules. Take Hayley Hudson, a Stanford volleyball star who had to turn down an offer from a sunglass company, a clothing company, and a TV company who wanted to make a reality show based on "tall families." She "medically retired" from volleyball before the interim NIL

---

[105] HBO, Student Athlete (2018), www.hbo.com/documentaries/student-athlete (last visited July 25, 2021).

rules were in effect.

315. A study conducted by the website AthleticDirectorU and the marketing firm Navigate Research found that 13 of the 25 college athletes with the greatest annual endorsement potential between $46,000 and $630,000 were female athletes.

316. The impact of the restraints on female athletes is further exacerbated by the NCAA's unequal treatment of female athletes. The largest revenue source for the NCAA is men's basketball, and the NCAA Tournament. The NCAA makes money from selling tickets and TV revenue. It then takes that revenue and pays a large percentage to conferences based on how many games are won by teams in the conference.

317. Women's basketball has become immensely popular. Take, for example, the 2019 Final Four in Tampa. It set attendance records. More than 3 million TV viewers watched Baylor's 82-81 victory over Notre Dame in the final. Roughly 274,507 fans attended the 2019 Women's Tournament. Yet, the women's teams and conferences received no payouts. So, a men's team receives a payout for just one win, while a female championship team receives nothing. This ultimately means the women's teams are under-resourced compared to the men and this under-resourcing depresses the value of women's NILs.

### 6. The Challenged Restraints Cannot be Justified by the Purported Need to Cross-Subsidize Non-Revenue Sports.

318. The NCAA has also sought to justify its compensation restraints based on the purported need to prevent compensation to high-revenue-sport athletes from draining cross-subsidies to the non-revenue sports. This justification is legally and factually invalid.

319. First, the justification is, once again, not procompetitive. It amounts to arguing that the efficient allocation of a competitive market is somehow undesirable and that there is a need to suppress compensation to higher-revenue-generating athletes so that they can subsidize

non-revenue-generating sports. That is an argument that competition itself and allocative efficiency are undesirable, which is not a procompetitive or legally viable justification under the Sherman Act.

320.    Second, allowing compensation to high-revenue-sport athletes would not have a negative impact on any subsidies these sports provide to low- or non-revenue sports. The amount of these subsidies is tiny compared to the vast revenues generated by FBS football and Division I basketball, and thus any compensation for athletes in these high-revenue sports will not impact schools' ability to maintain their current subsidization of lower-revenue sports. In fact, history shows, that every time a new form of compensation has been permitted for Division I athletes— full COA, *Alston* education-related benefits, third-party NIL payments—there has been no adverse impact on the subsidization of low- or non-revenue sports.

321.    Third, if needed, the excessive compensation paid to coaches, athletic directors, NCAA executives, and Conference commissioners (among others) show that there is more than enough money to make up for any hypothetical revenue reallocation that could impact low- or non-revenue sport subsidies. In Division III—where there are no high-revenue sports to subsidize others—the schools themselves support all sports (which are, by definition, non-revenue), just like they do all other activities at their institutions.

322.    In short, the claim that direct NIL or BNIL compensation, or college-athlete pay-for-play compensation would harm low- or non-revenue sports is both legally untenable and factually unsupported as a purported justification for the Defendants' anticompetitive compensation restraints.

**F.     There is Significant Support for Allowing Athletes to Receive NIL Compensation and Plaintiffs Have Been Damaged by Defendants' Anticompetitive Restraints.**

323.    There is widespread support among college sports administrators, athletes,

legislators, and the public at large for the concept of allowing Division I athletes to be compensated for their NILs. It is also clear that Defendants' rules prohibiting such compensation have damaged and will continue to damage athletes absent a court-imposed remedy.

1.     **The NCAA and Its Members Have Made Numerous Statements Supporting NIL Compensation, in a Stark Departure From Previous Positions Taken Before Federal Courts.**

324.     Even while continuing to enforce the NCAA's NIL restraints, representatives of the NCAA and its member schools and conferences made a multitude of public comments in recent years acknowledging the unfairness in the system and supporting the concept of allowing athletes to financially benefit from their NILs. That led to an official NCAA report issued on April 29, 2020 acknowledging that NCAA athletes should have the right to benefit from their NILs. The NCAA then stated that it was prepared to make official changes to its NIL rules in January 2021 that would permit some athlete monetization of NIL rights, before it delayed those plans after the Supreme Court granted certiorari in the *Alston* case. But, as explained above, after the NCAA lost in the Supreme Court in a unanimous decision making it clear that it was fully subject to scrutiny under the rule of reason, and after the NCAA had its motion to dismiss denied in this case, the NCAA enacted its new "interim" NIL policy which permits Division I athletes to monetize their NIL rights in many (although not all) respects.

325.     In 2015, NCAA Vice President for Regulatory Affairs Oliver Luck was quoted as saying, "I do believe that the name, image, likeness for an individual is a fundamental right—that any individual controls his or her name, image and likeness—and I don't believe that a student-athlete who accepts a grant-in-aid simply waives that right to his or her name, image, likeness."[106]

---

[106] Steve Berkowitz, *Oliver Luck brings own perspective to NCAA on O'Bannon name and likeness issue*, USAToday.com, Jan. 16, 2015, https://www.usatoday.com/story/sports/college/2015/01/16/ncaa-convention-oliver-

326.    In March 2018, Mark Emmert acknowledged that the Olympic model, in which athletes are permitted to obtain third-party endorsement deals and other NIL-related compensation, was under consideration by the NCAA at that time, and he suggested that such a model could be a viable option for intercollegiate athletics: "There's a lot of discussion about the Olympic model and I think it's well deserving of serious consideration inside the context of college sports."[107]

327.    A 2019 CBS Sports survey of more than 100 Division I coaches revealed that 77 percent of the coaches polled support an Olympic-style model for college sports that allows student-athletes to profit off of their NILs.[108]

328.    During an interview on April 24, 2020, University of Michigan Athletic Director Warde Manuel voiced his support for the concept of allowing student-athletes to accept NIL compensation: "It's the right thing to do… I think this is good for our [student-athletes]… It allows them to be considered just like any other student who would have the opportunity to profit." Manuel rejected the claim, long relied upon by the NCAA to justify its restraints, that the outright ban on NIL compensation is necessary to prevent the destruction of college sports: "Sometimes the doom and gloom gets a bit much. We adapt, we move."[109]

329.    In a 2014 interview with CBS Sports, Notre Dame's then-Athletics Director Jack Swarbrick spoke out about the inequitable effect of the existing NIL restraints: "if our standard

---

luck-obannon-name-and-likeness-court-case/21873331/ (last visited July 25, 2021).

[107] Richard Johnson, *Here's why Mark Emmert's comment on the NCAA embracing the Olympic mode of compensation is meaningless*, SBNation.com, Mar. 3, 2018, https://www.sbnation.com/college-football/2018/3/3/17075570/mark-emmert-says-hes-open-to-olympic-model (last visited July 10, 2024).

[108] Gary Parish, *Candid Coaches: Would you support an Olympic-style model for student-athletes?*, cbssports.com, Sept. 3, 2019, https://www.cbssports.com/college-basketball/news/candid- coaches-would-you-support-an-olympic-style-model-for-student-athletes/ (last visited July 25, 2021).

[109] Aaron McMann, *Michigan AD Warde Manuel for an NIL bill: 'It's the right thing to do'*, mlive.com, Apr. 27, 2020, https://www.mlive.com/wolverines/2020/04/michigan-ad-warde-manuel-for-an-nil-bill-its-the-right-thing-to-do.html (last visited July 25, 2021).

had been what's the rule for other students, capturing name, image and likeness outside team activity, the musician at school doesn't have that limitation. I'm not sure why the student-athlete should, either… I think it would contribute to reducing so many of the problems we have which really spring from this situation we created when we say they're not going to be the same as other students."[110] Swarbrick reiterated this point as recently as April 2020, explaining that, "since regular students have the opportunity to exploit their name, image and likeness, we've always felt students who are athletes should have a version of that."[111]

330.    In October 2019, the Big South conference's then-commissioner Kyle Kallander echoed this sentiment:

> "We must provide an opportunity for student athletes to benefit from NIL. I believe it just makes common sense to allow athletes to be involved in entrepreneurship, business, modeling, online initiatives, and other activities where NIL may be a factor. Other students are taking advantage of this. Ours should as well. I'm even willing to consider some athletics-related monetization—through autograph signing, jersey sales, video games, etc. These activities can be directly tied to their individual NIL. It makes sense."[112]

331.    Numerous school officials have also expressed support for a change in the NIL restraints. Nebraska's then-head football coach, Scott Frost, stated that, "regardless of what change comes in NIL legislation, we want every Nebraska athlete to be prepared with the blueprint for success beyond the field." Athletics Director Garrett Klassy further indicated that Nebraska has "no concern" about changes to NIL rules. "We have the most passionate fan base

---

[110] Ryan Ritter, *Jack Swarbrick Speaks Out on Paying Student Athletes*, herloyalsons.com, Dec. 11, 2014, https://www.herloyalsons.com/blog/2014/12/11/jack-swarbrick-speaks-paying-student-athletes/ (last visited July 25, 2021).

[111] Dennis Dodd, *What's ahead in the name, image and likeness rights debate as recommendations set to be submitted*, cbssports.com, Apr. 22, 2020. https://www.cbssports.com/college-football/news/whats-ahead-in-the-name-image-and-likeness-rights-debate-as-recommendations-set-to-be-submitted/ (last visited July 10, 2024).

[112] Brian Mull, *Big South Commissioner Discusses Name, Image, Likeness*, bigsouthsports.com, Oct. 30, 2019, https://bigsouthsports.com/news/2019/10/30/general-big-south-commissioner-discusses-name-image-likeness.aspx (last visited July 25, 2021).

and sponsors in the country and we fully expect them to continue to support Nebraska if NIL legislation changes."[113]

332.    University of Michigan's then-head football coach Jim Harbaugh similarly confirmed that he and others in the UM athletic department "believe the name, image and likeness is a very good thing. A player should have the same opportunity that a football coach has to profit off their name, image and likeness… Again, not the best to have a rule that says you can't. So we're all for it. We're all for name, image and likeness."[114] According to its official budget, UM received $18.4 million in "corporate sponsorship" and $9.4 million in "licensing royalties" in 2019.[115]

333.    Former Ohio State basketball coach Chris Holtmann expressed a similar sentiment: "I think given the amount of money that's generated from college sports, in particular our sport the NCAA tournament, and obviously we know what a profound impact college football has on the overall economy of a university and a campus, I think it makes sense to allow guys, to allow athletes, men and women, to profit off of this. Again, I think it's going to, just like the regular marketplace, it's going to be significant for some and maybe somewhat insignificant for others. But that's also a lesson as to what life is going to look like in the marketplace beyond college."[116]

---

[113] J. Brady McCollough, *Nebraska prepares for student-athlete branding by partnering with Opendorse*, latimes,com, Mar. 10, 2020, https://www.latimes.com/sports/story/2020-03-10/nebraska-opendorse-nil-athlete-branding (last visited July 25, 2021).

[114] Clayton Sayfie, *Jim Harbaugh is 'All For' NIL proposal,* Michigan.rivals.com, May 9, 2020, https://michigan.rivals.com/news/jim-harbaugh-is-all-for-nil-proposal (last visited July 25, 2021).

[115] Zach Shaw, *Unpacking Jim Harbaugh's comments on NIL pay and NCAA amateurism*, 247sports.com, Oct. 8, 2019, https://247sports.com/college/michigan/LongFormArticle/Unpacking- Michigan-football-coach-Jim-Harbaughs-comments-on-NIL-pay-NCAA-amateurism-and-the-Fair-Pay-Act-136697466/#136697466_7 (last visited July 25, 2021).

[116] Colin Hass-Hill, *Chris Holtmann Working Proactively Behind Scenes to use Name, Image, Likeness Reform in Recruiting for Ohio State*, elevenwarriors.com, May 6, 2020, https://www.elevenwarriors.com/ohio-state-basketball/2020/05/113914/chris-holtmann-proactively- working-behind-scenes-to-use-name-image-likeness-reform-in-recruiting-for-ohio-state (last visited July 10, 2024).

334.    Auburn men's basketball coach Bruce Pearl stated in May 2021 that "the idea that they are going to be able to be compensated for their own name, image and likeness, it absolutely makes sense. Auburn is going to kind of do everything we can to support those student-athletes and, from a compliance standpoint, manage it. There are limits to what we can do with it, but we'll pay very close attention to what's being done around the country and do everything we can to assist the kids."[117]

335.    Fresno State Athletic Director Terry Tumey also spoke out in support of student-athletes' NIL rights in March of 2021, explaining that "having folks understand how to better their brand is no different than a person going to business school and learning how to market a product."[118]

336.    Indeed, A-10 Conference Commissioner Bernadette McGlade explained in November 2020 that "truly exceptionally elite student-athletes will have an incentive to pursue the collegiate experience with a more permissive legislative structure, and may benefit from a real-world 'internship' type experience in managing their own NIL and the associated opportunities."[119]

337.    Kristin Williams, Senior Associate Commissioner for Institutional Services/Woman Administrator for the Mid-American Conference, confirmed that "the concern that this may create a recruiting benefit to institutions that have commercial entities willing and

---

[117] Jordan D. Hill, *Auburn coaches, athletic director preparing for Alabama's name, image and likeness law*, oan.com, May 13, 2021, https://oanow.com/sports/college/auburn/auburn-coaches- athletic-director-preparing-for-alabama-s-name-image-and-likeness-law/article_186fb45c-b3ee-11eb-900e-d34b267d4e99.html (last visited July 10, 2024).

[118] David Hale, *Social media stardom: How changes to NIL will benefit athlete-influencers across the NCAA*, ESPN.com, Mar. 8, 2021, https://www.espn.com/womens-college-basketball/story/_/id/30945653/social-media-stardom-how-changes-nil-benefit-athlete-influencers-ncaa (last visited July 10, 2024).

[119] Andy Wittry, *Memos obtained from 19 DI conferences shed light on name, image and likeness views*, andywittry.substack.com, Nov. 3, 2020, https://andywittry.substack.com/p/memos-obtained-from-19-di-conferences (last visited July 10, 2024).

interested in supporting the student-athlete endorsements is not unique. For instance, there was worry that the allowance of cost of attendance would be a recruiting advantage/disadvantage and certain institutions would abuse this opportunity. This was not the case as the value managed itself, as any other recruiting opportunity has, and the commercial promotions to student-athlete's name, image and likeness would also work itself out through the market. The market will settle itself."[120]

338.    Former Big South Conference Commissioner Kyle Kallander also explained that "other than the legal risks, perhaps the other biggest concern of the membership with NIL is the 'fairness' issue. What if 'his' quarterback can make more on autographs than 'mine'? Frankly, intercollegiate athletics isn't 'fair' now, at least when using that type of test. Institutions have different levels of support, resources, and following. We shouldn't let the fact that student-athletes at some institutions may command a higher monetization than others get in the way of a common sense solution."[121]

339.    In October 2019, the NCAA announced that its governing board "voted unanimously to permit students participating in athletics the opportunity to benefit from the use of their name, image, and likeness in a manner consistent with the collegiate model."[122]

340.    The board's report concluded that "enhanced opportunities related to name, image or likeness would be an appropriate extension of efforts to modernize NCAA rules in a way that is consistent with our values and principles. We believe additional flexibility in this space can and must continue to support the collegiate model in clear contrast to the professional sports

---

[120] *Id.*

[121] *Id.*

[122] *Board of Governors starts process to enhance name, image and likeness opportunities*, ncaa.org, Oct. 29, 2019, http://www.ncaa.org/about/resources/media-center/news/board-governors-starts-process-enhance-name-image-and-likeness-opportunities (last visited July 25, 2021).

model."[123]

341.    The report continued:

"the working group generally believes student-athletes should be permitted to use their name, image or likeness to promote their own work product or business, particularly when the work product or business is not related to athletics. Even when the work product or business is related to athletics, the working group believes sufficient controls can be developed to mitigate potential abuse, including current rules related to recruitment offers and inducements and extra benefits, and permit student-athletes to pursue opportunities in a manner consistent with the collegiate model… It is important to note that NCAA bylaws already allow for student-athletes to have outside employment and business activity. This framework of review and regulation is specific to when student-athletes wish to lend their name, image or likeness to promote a student's own enterprise or an employer's business activity, such that name, image and likeness become intertwined."

342.    On April 29, 2020, the NCAA announced its official endorsement of a broad spectrum of recommendations from the working group that would allow college athletes to be compensated by third parties for commercial use of their NILs in "third-party endorsements or social media influencer activity… social media content creation and distribution, promotion of student-athlete businesses (music, art, athletic lessons, etc.), and personal promotional activities (autograph signings, etc.)."[124]

343.    Despite the fact that such compensation would not be tethered to educational expenses or costs incidental to college athletics participation, and could be substantial, the working group confirmed that it "has received feedback from all three divisions that illustrates allowing such compensation for promotional or commercial activities can likely be

---

[123] *Report of the NCAA Board of Governors October 29, 2019 Meeting*, ncaa.org, https://ncaaorg.s3.amazonaws.com/committees/ncaa/exec_boardgov/Oct2019BOG_Report.pdf (last visited July 10, 2024).
[124] *NCAA Board of Governors Federal and State Legislation Working Group Final Report and Recommendations*, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG _Report.pdf, (last visited July 10, 2024).

accommodated in a manner consistent with the NCAA's model of intercollegiate competition."[125] Indeed, the report explains that allowing student-athletes to receive such compensation could actually help them "directly offset their educational costs without undermining the Association's model of intercollegiate athletics."[126]

344.    Notably, the statements by the NCAA are a complete reversal from positions it took before the federal courts, including in the *O'Bannon* case. There, the NCAA insisted before the Ninth Circuit Court of Appeals that NIL payments—no matter how small—would be "anathema to amateurism," would constitute "pay-for-play," and would "blur the clear line between amateur college sports and their professional counterparts."[127] The NCAA argued that permitting any NIL payments would destroy amateurism and be ruinous to consumer demand because such payments are not related to educational expenses:

> "Contrary to the [district] court's view, *amateurism is not simply a matter of the amount of any payment*. Allowing student-athletes to receive compensation for specific commercial revenue generated via use of their NILs is no less anathema to amateurism than paying football players $100 per sack."[128]

345.    In April 2020, the NCAA acknowledged that its "current rules related to NIL commercialization are in need of modernization,"[129] and directed its three divisions to draft NIL legislative proposals that are in line with the recommendations by 2021.

346.    The NCAA suggested that its policy shift demonstrated a "willingness to respond to the evolving needs of student-athletes, and its long track record of providing remarkable

---

[125] *Id.*

[126] *Id.*

[127] *O'Bannon v. NCAA*, Nos. 14-16601 & 14-17068 (9th Cir.), Brief for NCAA at 57 (Nov. 14, 2014, ECF No. 13-1) ("NCAA *O'Bannon* Br."); NCAA Mem. P. & A. in Supp. Summ. J. 28.

[128] NCAA *O'Bannon* Br. at 57.

[129] NCAA Board of Governors Federal and State Legislation Working Group Final Report and Recommendations, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG _Report.pdf (last visited July 10, 2024).

opportunities for student-athletes to gain access to higher education," but the NCAA's announcement made clear that it "was primarily motivated to form the working group and charge it with reviewing the NCAA's rules regarding student-athlete NIL by proposals of state and federal legislation on this topic." The report also explicitly criticizes and downplays the positive benefits for student-athletes resulting from antitrust litigation against the NCAA, including what it terms ongoing litigation to "second guess the Division I membership," and it has proposed that the NCAA "seek an exemption from federal and state antitrust laws."[130] Indeed, while the NCAA claimed to be working towards some "modernization" of the NIL rules, it was actively and aggressively seeking an exemption from federal and state antitrust law that would allow it to continue its anticompetitive practices without legal repercussion.

347.    The Associated Press also reported that the Power Five athletic conferences spent at least $350,000 in the first three months of 2020 "as part of a coordinated effort to influence Congress on legislation affecting the ability of college athletes to earn endorsement money." Those expenditures came on the heels of a combined $750,000 spent on lobbying by the NCAA, ACC, and Big 12 in 2019.[131]

348.    And the Power Five conferences on May 23, 2020 sent a letter to congressional leaders, where in the context of discussing potential federal NIL-related legislation, they requested statutory immunity from certain antitrust laws and state laws protecting NIL rights.[132] In sum, while the NCAA and its members were forced to admit that there is no legitimate basis to exclude athletes from being able to commercialize their own names, images, and likenesses—

---

[130] *Id.*
[131] *AP Exclusive: Power Five spend big on lobbying Congress*, collegebasketball.nbcsports.com, May 19, 2020, https://apnews.com/ap-exclusive-power-five-spend-big-on-lobbying-congress-401b1cac7b8a96b2f98772ca709b79d7 (last visited July 10, 2024).
[132] *See* Brett McMurphy, Twitter.com, May 29, 2020, https://twitter.com/Brett_McMurphy/status/1266411058044035075/photo/1 (last visited July 25, 2021).

their personal property—the NCAA and its members also indicated that they would only want to permit such NIL compensation if this could be done with continued restrictions to protect the NCAA's own commercial interests and antitrust immunity to boot.

349.    In fall 2020, the NCAA's Division I Council drafted legislation to allow athletes to commercially benefit from their NILs, with a final vote set to take place in January 2021. But, as discussed above, the NCAA halted moving forward with NIL rule changes after certiorari was granted on December 16, 2020 in the *Alston* litigation. The NCAA was hoping the Supreme Court would provide a legal opinion and framework that would provide it with protection to continue some of the NIL restraints, without facing the prospect of continued antitrust liability for maintaining those restrictions. Indeed, the U.S. Department of Justice sent the NCAA a letter warning it that continued NIL restraints would be subject to antitrust review. In response, the NCAA Board of Governors announced that it was going to delay making any NIL rule changes while it waited for the Alston decision.

350.    During the period before the Supreme Court's *Alston* decision, representatives of the NCAA and its member schools and conferences continued to make statements supporting the concept of allowing athletes to financially benefit from their NILs. For example, in a hearing before the Senate Committee on Health, Education, Labor & Pensions on September 23, 2020, University of Wisconsin Chancellor Rebecca Blank, who testified for Defendants during the *Alston* trial that Wisconsin "would have a very serious conversation about whether we wanted to continue under our current type of student athlete programs" if NCAA athletes were paid, stated: "New opportunities for NIL can exist within the confines of our student-athlete model . . . preserving the educational opportunities for hundreds of thousands, while modernizing

endorsement opportunities for all."[133]

351.    Similarly, Auburn University's then-Athletic Director Allen Greene stated in May 2021 that at Auburn, "[w]e embrace NIL and welcome the opportunities and challenges. We fully support our student-athletes and their opportunity to utilize Auburn's national brand to put themselves in the best position to capitalize on the benefits of NIL. Our mission remains to educate, support and develop our student-athletes at every moment to create Auburn men and women."[134]

352.    Even former NCAA President Mark Emmert provided testimony before the Senate Commerce Committee on June 9, 2021 that the NCAA supported providing NIL opportunities for student-athletes (contrary to the NCAA's longstanding rules to the contrary). At the same time, however, he requested federal legislation to provide a "safe harbor" against lawsuits from "lawyers using the weapon of antitrust laws" to challenge the NCAA's NIL rules.[135] The NCAA thus made clear that it still hoped to continue some of its NIL restraints without antitrust scrutiny.

### 2.    Statements from the Knight Commission on Intercollegiate Athletics.

353.    Roughly eight years ago, the Knight Commission on Intercollegiate Athletics

---

[133] Utah State University Athletic Director John Hartwell likewise confirmed: "We believe there is a way to provide additional income opportunities to student-athletes through NIL, while preserving the collegiate model and the student-athletes' amateur status." Karen Dennis, the Director of Track & Field at Ohio State University, distinguished NIL compensation from "pay to play" and testified: "Providing our student-athletes the opportunity to monetize their talents through NIL will allow them to grow and use their intellectual and creative talents beyond their athletic abilities. . . .Given the opportunity to brand themselves while in college with technical, intellectual, tangible and legal resources at their disposal, a greater number of student athletes will leave school better prepared for life and global citizenship." Full committee hearing and the written testimonies of Rebecca Blank, Karen Dennis, and John Hartwell are available at: https://www.help.senate.gov/hearings/compensating-college-athletes-examining-the-potential-impact-on-athletes-and-institutions (last visited July 25, 2021).

[134] *See Auburn Athletics Launches SPIRIT, a Comprehensive Name, Image and Likeness Program*, auburntigers.com, May 20, 2021, https://auburntigers.com/news/2021/5/20/general- auburn-athletics-launches-spirit-a-comprehensive-name-image-and-likeness-program.aspx (last visited July 25, 2021).

[135] *See Hearing Before the United States Senate Committee on Commerce, Science and Transportation, Written Testimony of Dr. Mark Emmert, President, National Collegiate Athletic Association*, commerce.senate.gov, June 9, 2021, https://www.commerce.senate.gov/services/files/B28D0810-54D7-4C53-8058-B04A8ED4684B (last visited July 10, 2024).

commissioned research on the topic of student-athlete NIL rights. In May 2016, Tulane law professor and Associate Provost for NCAA Compliance Gabe Feldman presented a white paper to the Commission in which he concluded that, at very least, that "the non-game related NIL restrictions are unnecessary to the NCAA's core goals and may actually be counterproductive," and he recommended an NCAA rule change "to allow student-athletes to secure endorsement deals or otherwise receive compensation for use of their NILs, including value derived from their athletic ability, as long as such use is not related to their participation in the underlying athletic event or derivative of the underlying event (including broadcast, re-broadcast, etc.)."[136]

354.    While limited, the Knight Commission report concluded, among other things, that the NCAA's prohibition on non-game-related NIL compensation is "not necessary to preserve the distinct character and product of amateur collegiate sports," that "education and NIL payments are not mutually exclusive," and that "the restrictions on non-game related NIL deals do not prevent exploitation—they are exploitative."[137]

355.    On April 3, 2020, the Knight Commission issued a follow-up statement outlining its current position on the issue of student-athlete NIL rights:

> "The Knight Commission on Intercollegiate Athletics believes an updated model of college sports is necessary to ensure the fair treatment of college athletes and to better prioritize their education, health, safety, and success. This model must maintain the two foundational elements that distinguish college sports from professional sports: college athletes must be full-time academically eligible students and institutions must be prohibited from paying them for their athletics participation."[138]

---

[136] Gabe Feldman, *The NCAA and "Non-Game-Related" Student-Athlete Name, Image and Likeness Restrictions*, Knightscommission.org, May 2016, https://www.knightcommission.org/wp-content/uploads/2008/10/feldman_nil_white_paper_may_2016.pdf (last visited July 25, 2021).
[137] *Id.*
[138] *Knight Commission on Intercollegiate Athletics Principles for New Rules on the Use of College Athletes' Name, Image and Likeness*, Knightscommission.org, Apr. 3, 2020, https://www.knightcommission.org/wp-content/uploads/2020/04/kcia-principles-new-rules-use-college-athletes-nil-040320-01.pdf (last visited July 25, 2021).

COMPLAINT
116

### 3.    The NCAA Has Made Exceptions for Several Years That Have Allowed Some Athletes to Profit From the Value of Their NILs.

356.    Even before the NCAA's "interim" NIL policy change, more than 200 legislative relief waivers have been submitted to the NCAA since 2015 requesting to allow certain athletes to use and/or profit from the use of their NILs in various commercial activities. According to Atlantic 10 conference commissioner Bernadette McGlade, the NCAA has been approving waivers at a high rate to allow athletes to earn money if they want to develop a product or write a book, for example.[139] Approximately 95 percent of these waivers have been approved.[148] [140]Since 2018, institutions have also had the flexibility to apply pre-set guidelines from a list of NCAA-approved waivers. According to the NCAA, "it is not possible to accurately account for these local waivers, but they likely significantly exceed those allowed by the NCAA."[141]

357.    According to the NCAA, the waiver process has allowed athletes to use their NIL to promote products or businesses in the following types of circumstances:

    a.    An athlete was allowed to use her name and picture on a website and social media accounts to promote a clothing business that she created;

    b.    An athlete was allowed to use his NIL to promote a company that he created to provide personalized nutrition advice for clients; and

    c.    An athlete was allowed to use her name and photo on a website to promote a photography business that she had created (and that was named after her).[142]

358.    As another example, Notre Dame women's basketball player Arike Ogunbowale

---

[139] Associated Press, *NCAA poised to move toward allowing athletes to make money*, CNBC.com, Oct. 28, 2019, https://www.cnbc.com/2019/10/28/ncaa-poised-to-move-toward-allowing-athletes-to-make-money.html (last visited July 25, 2021).
[140] *Name Image and Likeness: What Student-Athletes Should Know*, ncaa.org, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/2020_NILresource_SA.pdf (last visited July 25, 2021).
[141] *NCAA Board of Governors Federal and State Legislation Working Group Final Report and Recommendations*, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG _Report.pdf (last visited July 10, 2024).
[142] *Id.*

was granted a waiver in 2018 that allowed her to compete on the ABC television show *Dancing with the Stars* and to accept prize money from the show (contestants earn $125,000 for appearing and $325,000 if they win) while remaining NCAA eligible. According to the NCAA, it made this exception because it considered Ogunbowale's participation on the show to be "unrelated to her basketball abilities." But it is obvious that Ogunbowale was invited specifically because of her skills on the college basketball court—she was the star player of the 2018 March Madness tournament and made a game-winning shot at the buzzer to win the national championship for Notre Dame. That performance is what landed her on the Ellen Degeneres Show and the cover of Sports Illustrated, and there is no doubt it is what earned her a spot on *DWTS*.

359.     These examples of student-athletes being able to profit from their own NILs, including in very publicized ways such as performing on *Dancing with the Stars*, have occurred while the revenue of college sports has continued to explode. Certainly then, it cannot be reasonably argued that allowing other athletes to obtain similar benefits would cause a decline in consumer demand.

### 4.     NCAA Division I Athletes Have Sought the Ability to Compete Without Anticompetitive Restraint in the Labor Markets, and Would Receive Such Compensation Absent Defendants' Unlawful Restraints.

360.     While some Division I student-athletes were lucky enough to obtain waivers from the NCAA prior to July 1, 2021, most were denied the opportunity to engage in any NIL-related activities and receive any NIL compensation without losing NCAA eligibility. Similar restraints have prevented them from receiving any compensation for their athletic services. Despite the NCAA's purported aim "to create an environment that allows student-athletes to reach their full potential in academics, athletics and life"—and in contrast to their non-athlete counterparts— student-athletes know that even while participating in intercollegiate sports competition at a high level and attending college as a student at the same time, they have been unable to pursue NIL

opportunities or other compensation opportunities from the conferences or the schools that could significantly benefit them financially, academically, and in their future careers.

361.    On October 9, 2019, *The New York Times* reported[143]:

> "An exuberant top-scoring floor routine by UCLA's Katelyn Ohashi went viral this year, making her one of the most famous college gymnasts ever. But NCAA rules prevented Ohashi from making any money from the performance."

In a video op-ed featured in the article, Ohashi argues that college students should be given the ability to earn income from their athletic achievement:

> "My senior year my routine went viral with over 100 million views. Along with this came a lot of attention and opportunities, but I couldn't capitalize on them. I was handcuffed by the NCAA rules that prevented me from deriving any benefit from my own name and likeness, despite the fact that after my final meet, I had no pro league to join. How different would things be for me had I been able to use my image and name in my last year of school in order to promote the things that I want to further my future? I want to make sure that the next person doesn't have to wonder."

> Ohashi continued: "It's not about paying salaries to college athletes, it's about empowering student-athletes to rightfully earn off their individual name and likeness without sacrificing the opportunity to get an education. It's about making sure if a student-athlete's jersey is still selling in the bookstore ten years after graduation that they get a cut. It's about recognizing that women only receive 4% of all coverage in sports media, and giving us the freedom to leverage sponsored deals to break through. It's about treating student-athletes with the same respect as the other student who can freely profit off their talent as writers, artists, DJs, programmers, or scientists while in college."

> Further she says, "critics say that allowing student-athletes to earn endorsement income will come at the expense of Title IX or non-revenue-generating sports. But from experience, allowing an athlete, especially a woman or Olympic sport athlete who for the most part are staying and graduating from NCAA institutions to take advantage of unexpected moments like I had, empowers us to help finally earn what we deserve."

362.    Lilly King, a world record-holder, two-time Olympic gold medalist, and the

---

[143] Katelyn Ohashi, *Everyone Made Money Off My N.C.A.A. Career, Except Me*, NYTimes.com, Oct. 9, 2019, https://www.nytimes.com/2019/10/09/opinion/katelyn-ohashi-fair-play-act.html (last visited July 25, 2021).

winningest breaststroke swimmer in NCAA history has also been an outspoken advocate of allowing student-athletes to benefit from their NILs. King attended Indiana University ("IU"). She was forced to turn down at least $60,000 in bonuses when she set two world records at the 2017 World Championships, although the NCAA did arbitrarily allow her to keep the other more than $100,000 that she was awarded by the USOC for her performance in the Olympics.

363.    In October 2019, King explained that IU, the Big Ten, and the NCAA were able to feature her in advertisements and announcements without compensation. They could promote her, she said, but she wasn't allowed to promote herself. King was quoted as saying: "I won an Olympic gold medal at 19. So I still had to wait three more years to do anything to promote myself [before finishing school]. As an athlete. As a Hoosier. These are things I'm proud of being."[144]

364.    When Katie Ledecky swam for Stanford after the 2016 Olympic Games, she could not accept an estimated $5 million-per-year endorsement deal. Her teammate, 14-time NCAA champion Simone Manuel, also forewent significant sponsorship opportunities.

365.    Less than a week after the NCAA's March 12, 2020 decision to cancel its postseason tournament basketball in the wake of the ongoing coronavirus pandemic, senior Oregon basketball player Sabrina Ionescu, and teammate of Plaintiff Sedona Prince, initiated endorsement talks with multiple brands. By the end of April, before she had even graduated from college, the 22-year-old Ionescu had secured offers worth multiple times her expected WNBA salary, some of which even outpaced the value of recent WNBA Finals MVP-level player deals. Ionescu ultimately signed a multi-year endorsement contract with Nike.

---

[144] David Woods, *Robbie Hummel, Lilly King favor college athletes profiting off their names and images*, Indystar.com, Oct. 2, 2019, https://www.indystar.com/story/sports/college/purdue/2019/10/02/lilly-king-robbie-hummel-favor-college-athletes-profiting-off-names-images/3825833002/ (last visited July 25, 2021).

366.    If the NCAA had not prohibited her from doing so, Ionescu would have been able to benefit from the value she provided to Nike and the money she was already generating for the company and her university long before her college playing days were over. In November 2019, the UO bookstore released a "White Nike Replica # 20 basketball jersey" representing the number 20 jersey that Ionescu wore for the Ducks. The $75 jerseys sold out in less than an hour and have been reselling for twice as much ever since.[145] In mid-December, Nike released another number 20 replica jersey in green which sells for $75 at the university bookstore and on the retailer's website to this day.[146] Because of the challenged restraints, Ionescu has received zero percent of the profits from these sales.

367.    Analyses of the NIL value of student-athletes competing in several Division I sports also demonstrate the economic harm to Plaintiffs caused by Defendants' restraints. On May 25, 2020, news website Axios.com reported estimates by Opendorse—a social publishing platform that helps professional athletes build their brands—of the social media earnings that student-athletes could obtain if they were not prevented from doing so by the NCAA. "Based on actual data from the last decade of providing the technology behind millions of dollars of transactions between brands and professional athletes," Opendorse estimated positive earnings for all of the student-athletes in its sample analysis, which included football players, men's and women's basketball players, and female gymnasts. The analysis looked specifically at Twitter and Instagram, evaluating the per-post value for various student-athletes. Based on its formula, Opendorse estimated, for example, the annual lost value for social media posts by Sam Ehlinger, quarterback of the University of Texas football team, at $962,000. As a second example, Morgan

[145] Nick DePaula, *Nike Signs No. 1 Pick Sabrina Ionescu to multi-year endorsement deal*, ESPN.com, Apr. 17, 2020, https://www.espn.com/wnba/story/_/id/29051284/nike-signs-no-1-pick-sabrina-ionescu-multi-year-endorsement-deal (last visited July 25, 2021).
[146] *Nike College Replica (Oregon) jersey*, available at https://www.nike.com/t/replica-oregon-basketball-jersey-d6B3WZ/P32919-OD1 (last visited July 25, 2021).

Hurd, a gymnast at the University of Florida, had an estimated potential earning value of $44,000 from social media.[147]

368.    The website fivethirtyeight.com, which focuses on opinion poll analysis, politics, and economics, also reported estimates by Opendorse of the potential social media earnings for a different group of student-athletes. Opendorse's appraisals were "based on a decade's worth of transactional data between businesses and professional athletes, specific to each respective sport. Taking into account an athlete's current audience size, engagement rate and seven other proprietary data points, [Opendorse CEO Blake] Lawrence and his team at Opendorse distilled their estimates of an athlete's post value on Instagram and Twitter—and a potential range of earnings."[148] Opendorse examined the earning potential of student-athletes in nine different college sports—women's basketball, men's basketball, football, women's softball, men's wrestling, women's volleyball, women's soccer, and men's soccer—and projected positive social media earnings for each student-athlete examined. Two of the top four potential earners recognized in the study are female athletes, which is significant because women have fewer opportunities to continue their playing careers after graduating from college.[149] These analyses illustrate how the challenged restraints have had a negative economic impact on a wide range of Division I athletes.

369.    As explained above, there is now a natural experiment occurring where one can see how the NIL market has developed post-July 1, 2021, following the NCAA's suspension of many of its NIL rules. Within only a few weeks, thousands of student-athletes, female and male,

---

[147] Jeff Tracy, *How much college athletes could earn as social media influencers*, Axios.com, May 25, 2020, https://www.axios.com/college-athletes-earnings-social-media-influencers-35ce09f0-3bc2-46fa-ae5a-eba8ff61079b.html (last visited July 25, 2021).
[148] Josh Planos, *How Much Money Could Student-Athletes Make As Social Media Influencers?*, fivethirtyeight.com, May 15, 2020, https://fivethirtyeight.com/features/how-much-money-could-student-athletes-make-as-social-media-influencers/ (last visited July 25, 2021).
[149]    *Id.*

across a variety of sports, at myriad Division I schools were making money from their NILs. Former NCAA President Emmert recognized that he and the NCAA were learning new things by the day in the post-July 1, 2021 world, including what is in the best interests of athletes. He recognized that NIL compensation would be going to athletes across many sports and the different NCAA divisions, often disconnected to pure athletic talent, and gave examples of sports camps, commentating and social media as areas with enormous financial potential.[150] These facts demonstrate the significant damage that the challenged NIL restraints have caused to student-athletes. Indeed, there has been no indication of any negative impact of this activity on consumer demand. To the contrary, the explosion of interest from consumer-facing companies in using athletes as product spokespeople is a strong indication that firms believe such payment will induce more consumer spending, rather than turn consumers off.

370.    Moreover, as explained previously, the NCAA, conferences, and schools make an enormous amount of money from, among other things, television broadcasting agreements that involve the use of student-athletes' names, images, and likenesses. Defendants have been unjustly enriched from these deals at the expense of student-athletes. In the absence of the challenged restraints, market-based competition would have led student-athletes to receive, among other things, a share of revenues for the group licensing of their BNILs. These athletes would be able to offer group licenses to their schools and conferences, which could in turn package them to broadcast and other companies with school and conference rights. Due to the ongoing unlawful NIL restraints of Defendants, Plaintiffs have been deprived of the opportunity to receive group licensing compensation for their BNIL rights that they otherwise would have received from NCAA members or conferences.

---

[150] *See Inside the NCAA, NCAA Social Series EP 65*, Twitter.com, July 15, 2021, https://twitter.com/insidethencaa/status/1415831043098112001?s=21 (last visited July 25, 2021).

5.    **Corporate Sponsors Value Student-Athlete NILs and Would Compete for the Rights to Use Plaintiffs' NILs absent Defendants' anticompetitive restraints.**

371.    Business leaders have long recognized that, absent the challenged restraints, there would be significant opportunities for college athletes to make commercial use of their NILs. What has occurred since July 1 shows that to be true beyond a shadow of a doubt. Senior executives at the nation's leading influencer marketing companies are enthusiastic about the prospect of being able to work with student-athletes, and even before the NCAA announced its interim policy change, many had already put strategies into place to begin as soon as possible if the rules change to allow it.

372.    According to Mae Karwowski, founder and CEO of Obvious.ly, about third party brands: "They're chomping at the bit. We're also ramping up our talent and recruitment efforts to make sure that athletes have the best possible representation and contracts as they're entering this space. People love sports, and social media is a huge overdue opportunity for college athletes."[151]

373.    Stephanie Stabulis, Vice President of HireInfluence, confirmed that, "in 2018-2019 alone, our company has developed strategies for at least four to five brands targeting student-athletes, and we have been restricted due to the NCAA regulations. The demand is already there, so we see potential for brands to move quickly to work with student-athletes." Regardless of their star status, Stabulis says there is money for student-athlete influencers at every level while they are still in college: "Because it's a niche market, we can expect influencers to be able to make about $250 to $1,000 per post, at these lower beginning ranges. That will escalate as the athlete can reach more people through their social media outlets… For

---

[151] Kristi Dosh, *Marketers Bullish On Monetization Opportunities for NCAA Athletes with NILRights*, forbes.com, Dec. 3, 2019, https://www.forbes.com/sites/kristidosh/2019/11/25/marketers- bullish-on-monetization-opportunities-for-student-athletes-with-nil-rights/#f25fd487aa49 (last visited July 25, 2021).

endorsement deals that rely on paying for an athlete's name, likeness and deeper partnership or ambassadorship, we anticipate this is higher."[152] A July 21, 2021 article reporting on the Bryce Young endorsement deals indicated that Tua Tagovailoa could have monetized his NIL at "three to five million easy."[153]

374.    Matthew Micheli, co-founder and managing partner at Viral Nation, explained that "some of these athletes could arguably be more popular than their pro counterparts. For example, Tua Tagovailoa in college football would probably out-earn 90% of starting NFL quarterbacks if given the opportunity. I could almost guarantee that." Micheli says Instagram and YouTube are the two most valuable social media platforms for monetization right now and that a student-athlete with a following of over 25,000 could earn $2,000 to $4,000 per month between digital advertisements and local sponsorships. According to Micheli, "for athletes who produce video content, their earnings can easily be in the six-figure range annually to start."[154]

375.    Micheli also commented on the extremely limited timeframe student-athletes have to take advantage of their NIL value: "Once the college athlete's career is over and they don't go pro, their marketability essentially goes away … Endorsements will most likely become non-existent.  They become old news unless they go pro or go into another career that would require them to keep up a social presence. There could be some anomalies or outliers to this, but for the most part, all is lost for them, unfortunately."[155]

376.    Former Fresno State basketball players Hanna and Haley Cavinder had as of March 8, 2021, 2.7 million followers on TikTok. According to the CEO of Opendorse, they have

---

[152] *Id.*

[153] Randall Williams, *Sophomore Alabama Quarterback Nears $1 Million in NIL Pay, Saban Says*, Sportico.com, July 20, 2021, https://www.sportico.com/personalities/athletes/2021/saban-bryce-youngs-nil-pay-1234634836/ (last visited July 23, 2021).

[154] *Id.*

[155] *Id.*

as much value as star quarterback Trevor Lawrence. A March 8, 2021 ESPN article reporting on the twins indicated they were being contacted by companies "every single day."

377.    Certain school officials now admit that allowing athletes to market their NIL enhances their educational experience. For example, Fresno State Athletic Director Terry Tumey stated, "Having folks understand how to better their brand is no different than a person going to business school and learning how to market a product."[156]

### 6.    When the NAIA Withdrew NIL Restrictions, Athletes Prospered Financially and Academically.

378.    In November 2020, the NAIA amended its NIL restrictions as follows:

**SUBJECT:    AMATEUR CODE – NAME, IMAGE, AND LIKENESS COMPENSATION**

**VII SECTION B:    ACTS PERMITTED BY NAIA AMATEUR CODE**

The following acts will NOT cause an athlete to lose amateur standing.

---

6.    Participating in radio or television programs for the purpose of promoting an amateur athletic event.

7.    Receiving reasonable compensation for supervision of physical education, playground or recreational activities.

8.    Receiving compensation for use of name, image or likeness to promote any commercial product or enterprise, or public or media appearance. It is the responsibility of the student-athlete to notify their institution's athletics director in writing of any compensation the student receives from the use of their name, image or likeness in relation to their school or status as a student-athlete.

379.    NAIA athletes immediately began to market their NILs and they have been

---

[156] David M. Hale, *Social media stardom: How changes to NIL will benefit athlete-influencers across the NCAA*, ESPN.com, Mar. 8, 2021, https://www.espn.com/womens-college- basketball/story/_/id/30945653/social-media-stardom-how-changes-nil-benefit-athlete-influencers-ncaa (last visited July 10, 2024).

incredibly successful in the new world of opportunities available to them. Then freshman Aquinas Volleyball player, Chloe Mitchell, became the first NAIA athlete to monetize her NIL in December 2020 when she turned a home project DIY video into a successful online brand. Since then, Mitchell has received numerous sponsorship deals that have allowed her to pay off her student loans, buy a computer and a car, and start saving for her first house. She also started a company called PlayBooked, which connects college athletes with fans and brands interested in doing NIL deals with them. As of March 2021, PlayBooked was already working with more than 200 NAIA athletes.[157] Mitchell says that her experience with NIL has been nothing but positive. Not only is she making money, but she says it has also made her a better student and is teaching her valuable marketing and business skills, and that the new opportunities have made her feel more connected with her teammates and peers on campus.

380.    Hundreds of other NAIA athletes are also taking advantage of their new NIL opportunities. For example, basketball player Victor Faria is creating content on YouTube and using the money he has earned to pay for his tuition at Northern New Mexico College. Track and Field athlete Connor Clemens has already earned money from two promotional videos he created, and says that having the opportunity to monetize his NIL has been extremely helpful to be able to pay his bills and develop professional networking skills. And Clarke University lacrosse player, Tucker Labelle has also had a very positive experience in the new world of NIL

## VIII.   ANTITRUST ALLEGATIONS

381.    Defendants' contract, combination, and conspiracy described herein consisted of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to artificially fix,

---

[157] *Id.*

depress, maintain, and/or stabilize prices received by Plaintiffs for their NIL rights and athletic

services, and to restrict scholarships available to Plaintiffs in the United States, its territories and

possessions.

382.    In formulating and effectuating the contract, combination, or conspiracy,

Defendants and their co-conspirators did those things that they unlawfully combined and

conspired to do, including, among other things:

        a.      agreeing to artificially fix, depress, maintain, and/or stabilize prices
                  paid to Plaintiffs for the use of their names, images and/or
                  likenesses;

        b.      agreeing to artificially fix, depress, maintain, and/or stabilize prices
                  paid to Plaintiffs for their athletic services; and

        c.      agreeing to artificially fix, depress, maintain, and/or stabilize the
                  number of scholarships available to Plaintiffs

        d.      implementing and monitoring the conspiracy among cartel
                  members.

383.    The activities described above have been engaged in by Defendants and their

co-conspirators for the purpose of effectuating the unlawful agreement to fix, depress, maintain

and/or stabilize prices paid to and scholarships available to Plaintiffs

384.    Defendants' actions constitute an unreasonable restraint of trade.

## IX.    CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1
### Unreasonable Restraint of Trade

385.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this

Complaint as if fully set forth herein.

386.    Defendants and their co-conspirators, by and through Defendants' and co-

conspirators' officers, directors, employees, agents, or other representatives, have entered into a

continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade in the relevant markets to artificially depress, fix, maintain, and/or stabilize the prices paid to Plaintiffs for the use of, and to limit supply for the licensing and sale of their images, likenesses and/or names and for their athletic services in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

387.    Defendants' unlawful conduct deprived Plaintiffs of compensation for the use of their names, images, and likenesses and their athletic services. This unreasonable restraint on competition has artificially limited supply and depressed compensation paid to Plaintiffs for the use of their images, likenesses and/or names and for their athletic services.

388.    Plaintiffs received less than they otherwise would have received for the use of their images, likenesses and/or names and their athletic services and in a competitive marketplace, were thus damaged, and seek to recover for those damages.

389.    Defendants and their co-conspirators' abridgment of compensation rights for current and former student-athletes is not connected to any legitimate non-commercial goal. Defendants' actions are solely to enhance revenue for themselves and their for-profit business partners by, for example, being able to take all of the revenue related to the commercial use of student-athletes' names, images, and likenesses for themselves. Defendants' actions have no relationship to any alleged goal of "amateurism," or any legitimate procompetitive purpose. The NCAA's actions directly regulate commercial markets and therefore are illegal.

390.    As a direct and proximate result of Defendants' scheme, Plaintiffs and the have been injured and financially damaged. Plaintiffs' injuries consist of receiving lower prices for use of their NILs and for their athletic services than they would have received absent Defendants' conduct. Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

COMPLAINT

391.    Defendants and their co-conspirators have collectively conspired to illegally limit and depress the compensation to student-athletes for the use of their NILs and athletic services. This anticompetitive and illegal scheme has unreasonably restrained trade.

392.    The anticompetitive effects of Defendants' scheme substantially outweigh any alleged procompetitive effects that may be offered by Defendants, including that their collusive conduct is shielded by the NCAA's concept of "amateurism." Moreover, reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

393.    The amount of damages suffered by Plaintiffs has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover from Defendants treble the amount of actual damages, as well as an award of reasonable attorneys' fees and costs of suit.

394.    Plaintiffs are entitled to a permanent injunction that terminates the ongoing violations alleged in this Complaint.

### SECOND CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1**
**Unreasonable Restraint of Trade – Group Boycott / Refusal to Deal**

395.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

396.    Defendants and their co-conspirators, by and through Defendants' and co-conspirators' officers, directors, employees, agents, or other representatives, entered into a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade to effectuate a horizontal group boycott of Plaintiffs. Defendants' group boycott/refusal to deal encompasses Defendants' concerted acts to prevent Plaintiffs from being compensated for the use of their images, likenesses and/or names and athletic services in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

397.    Defendants' group boycott/refusal to deal includes Defendants' concerted action to require all current student-athletes to abide by regulations. This concerted action is in effect a refusal to deal with Plaintiffs on compensation rights issues, and forecloses them from full access to the marketplace. Defendants use the eligibility rules as a threat of a boycott to force all student-athletes to abide by the rules.

398.    Plaintiffs received less than they otherwise would have received in a competitive marketplace, were thus damaged, and seek to recover for those damages.

399.    As a direct and proximate result of Defendants' group boycott, Plaintiffs have been injured and financially damaged. Plaintiffs' injuries consist of denial of compensation for use of their images, likenesses and/or names and athletic services. Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

400.    The anticompetitive effects of Defendants' group boycott substantially outweigh any alleged procompetitive effects that may be offered by Defendants, including that their collusive conduct is shielded by the NCAA's concept of "amateurism" or any procompetitive purpose.  Moreover, reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

401.    The amount of damages suffered by Plaintiffs has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover from Defendants treble the amount of actual damages, as well as an award of reasonable attorneys' fees and costs of suit.

402.    Plaintiffs are entitled to a permanent injunction that terminates the ongoing violations alleged in this Complaint.

## THIRD CLAIM FOR RELIEF

### Unjust Enrichment

403.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

404.    Defendants have been unjustly enriched as a result of the unlawful conduct detailed herein at the expense of Plaintiffs.  Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred upon them via their wrongful conduct, and it would be unjust for them to be allowed to do so.

405.    Plaintiffs seek disgorgement of all Defendants' profits resulting from the wrongful conduct described herein and establishment of a constructive trust from which Plaintiffs may seek restitution.

## X.    REQUEST FOR RELIEF

406.    WHEREFORE, Plaintiffs, request judgment as follows:

A.    For actual damages according to the proof at trial;

B.    For treble damages pursuant to 15 U.S.C. § 15;

C.    For a declaratory judgment declaring as void the NCAA's Bylaws that operate to impose restrictions on the compensation Division I student-athletes can receive from the schools, conferences, or third parties for their NILs or athletic services and the NCAA's Bylaws that operate to impose restrictions on the athletic scholarships available for college-athlete labor services by setting maximum numbers or amounts of scholarships that can be provided in each sport;

D.    For an injunction restraining the NCAA and Conference Defendants from enforcing their unlawful and anticompetitive agreements to restrict the (a) compensation available to Division I student-athletes from the schools, conferences or third parties for their

services or NILs; and (b) athletic scholarships available to Division I student-athletes;

      E.      For Plaintiffs' attorneys' fees, costs, and expenses; and

      F.      For other such relief that the Court may deem just and equitable.

## XI.    JURY DEMAND

407.    Plaintiffs, on behalf of themselves, hereby request a jury trial on any and all claims so triable.

DATED this 31st day of January, 2025      Respectfully submitted,

        <u>/s/ Thomas F. DellaFera, Jr.</u>
        Thomas F. DellaFera, Jr. (CA Bar No. 325005)
        Miller DellaFera PLC
        3420 Pump Road | PMB 404
        Henrico, VA  23233
        Telephone: (800) 401-6670
        tdellafera@millerdellafera.com

        John Arthur Eaves, Jr. (MS Bar No. 8843)
        (*pro hac vice application forthcominge*)
        Christopher Brady Eaves (MS Bar No. 106474)
        (*pro hac vice application forthcoming*)
        Sterling Overton Eaves (MS Bar No. 106642)
        (*pro hac vice application forthcoming*)
        Eaves Law Firm, LLC
        101 North State Street
        Jackson, MS  39201
        Telephone: (601) 355-7961
        Facsimile: (601) 355-0530
        johnjr@eaveslawmail.com
        brady@eaveslawmail.com
        sterling@eaveslawmail.com

        *Counsel for Plaintiffs*